IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CIVIL ACTION NO. 15-cv-00179-WYD-STV

IT PORTFOLIO, INC., a Colorado Corporation      *
                                              *

       Plaintiff                              *
                                              *

v.                                                    *
                                              *

NER DATA CORPORATION, a Delaware Corporation    *
NER DATA PRODUCTS, INC., a New Jersey Corporation    *
and STEPHEN F. OATWAY, an Individual,           *
                                              *

       Defendants.                         *

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT ON COUNTS VII, VII, and IX OF THE SECOND AMENDED AND SUPPLEMENTAL COMPLAINT

Defendants Stephen F. Oatway ("Oatway"), NER Data Products, Inc. ("NER DP"), and NER Data Corp. ("NER DC"), through counsel, move pursuant to Fed.R.Civ.P. 56 and D.C.COLO.LCiv.R 56.1, for partial summary judgment, specifically on three counts asserted against Oatway, NER DP, and NER DC in the plaintiff's Second Amended and Supplemental Complaint (Docket No. 128). The counts that are the subject matter of this motion are:

- Count VII – Fraudulent Transfer – v. NER Data Products, Inc. ("NER DP") NER Data Corp. ("NER DC"), Stephen Oatway, Atlantic Technology Integrators, LLC ("ATI"), and Facsimile Communications Industries, Inc. ("Atlantic");[1]

- Count VIII – Civil Conspiracy – v. the same defendants as Count VII; and

---

[1] In this cause of action, plaintiff alleges that NER DC's sale of its managed print assets to ATI for $150,000 plus an earn out provision was below fair market value and was made to defeat or hinder plaintiff's ability to recover amounts owed to it.  [Complaint, Pars. 109-110].

- Count IX – Breach of Fiduciary Duty v. Oatway[2]

## RELEVANT PROCEDURAL HISTORY

Plaintiff brought this action on January 26, 2015 against NER DC (Docket No 1).  The claims asserted by plaintiff arise from a business contract between plaintiff and NER DP.  On March 22, 2016 plaintiff moved to file an Amended Complaint to assert the same causes of action against NER DP (Docket No. 48), which motion was allowed (Docket No. 57).

In the Amended Complaint, plaintiff also asserted new claims and added new parties including the Counts (VII, VIII, and IX) that are the subject matter of this motion.  In sum and substance, the plaintiff's claims arise from NER DC's October 31, 2015 sale of certain assets of its managed print services business to an entity formed by Atlantic, ATI.  On July 29, 2016, the Court (Wang, J.) allowed plaintiff's motion to file an Amended Complaint (Docket No. 57) and it was filed on August 2, 2016 (Docket No. 57).  On September 19, 2016, Atlantic and ATI filed a motion to dismiss based on lack of personal jurisdiction (Docket No. 82).  Discovery on the new claims and concerning the new parties then took place, including paper discovery and depositions.  Atlantic and ATI filed a renewed motion to dismiss based on lack of personal jurisdiction on December 12, 2017 (Docket No. 134).  All of the causes of action against defendants ATI and Atlantic were dismissed by this court (Daniel, J) on May 17, 2018 for lack of personal jurisdiction (Docket No. 152).

On October 18, 2018, the plaintiff filed yet another lawsuit against Atlantic and ATI in the United States District Court, Southern District of New York (Case 1:18-cv-09586 GBD).

---

[2] In this cause of action, plaintiff alleges that it was a breach of fiduciary duty for Oatway to receive a salary when NER DC was insolvent.  [Complaint, Pars. 106-107, 232].   Plaintiff also alleges that the sale of the managed print assets to ATI for less than fair consideration was a breach of fiduciary duty by Oatway.  [Complaint, Pars. 235].  In response to interrogatories and deposition testimony, plaintiff alleges that Oatway personally benefitted from the sale of the assets because Atlantic took over server equipment leases for which Oatway had been a personal guarantor.  [Exhibit A - Lessner Depo. Vol. 1 - p. 105, line 22 – p. 106, line 8].

Notably, the plaintiff has not brought the fraudulent transfer and conspiracy claims (that were brought in this case) against Atlantic or ATI in plaintiff's New York lawsuit.  Atlantic and ATI have filed a Rule 12(b)(6) motion to dismiss which has been briefed, argued, and is pending.

## MOVANT'S STATEMENT OF MATERIAL FACTS

1.      Plaintiff is a Colorado corporation doing business in Colorado.  [Second Amended and Supplemental Complaint ("Complaint"), Par. 1].

2.      NER DP is a New Jersey corporation that was based in New Jersey.  [Complaint, Par. 3].

3.      NER DC is a Delaware corporation that was based in New Jersey.  [Complaint, Par. 2].

4.      Oatway is an individual who resides in New Jersey.  [Complaint, Par. 4].

5.      At all relevant times, Oatway was the president and a Director of NER DP and NER DC.  [Complaint, Par. 105; Complaint, Par. 230].

6.      Plaintiff alleges that on January 1, 2009 NER DP and plaintiff entered into a business contract referred to as Software Development and Assignment Agreement ("Software Agreement").  [Complaint, Par. 15].

7.      The Software Agreement was actually signed on February 25, 2010.  [March 31, 2017 Deposition of Mark Lessner, Rule 30(b)(6) designee of plaintiff ("Exhibit A - Lessner Depo. Vol. 1"), p. 14, lines 5-12].

8.      The contract related to software and services in connection with NER's managed print services business.  [Complaint, Par. 16].

9.       Plaintiff alleges that NER DP failed to pay its obligations under the Software Agreement and brought this lawsuit.  [Complaint, Pars. 20, 21].

10.     Plaintiff alleges that NER DC and NER DP are both liable under the Software Agreement and for the purposes of this motion, this is not disputed.  [Complaint, Par. 26].

11.     NER DC was formed in April 2010 as part of a transaction to sell a minority equity interest in the NER business to United Stationers.  [April 4, 2017 Deposition of Stephen Oatway ("Exhibit B - Oatway Depo.") p. 110, lines 16-20].

12.     From after its formation in 2010, NER DC operated the managed print services business and owned the managed print services assets.  [Exhibit B - Oatway Depo. p. 60, lines 2-7].

13.     From April 2010, NER DC was losing money, approximately $100,000 per month as it was trying to build the managed print services business.  [Exhibit B - Oatway Depo. p. 115, line 7 – p. 116, line 1].

14.     In 2010 or 2011 Hewlett Packard approached NER DC about purchasing NER DC's managed print services business.  [Exhibit B - Oatway Depo. p. 135, line 22 - p. 136, line 2].

15.     Although NER DC and Hewlett Packard had entered into a letter of intent, Hewlett Packard ultimately walked away from the deal in the first quarter of 2011.  [Exhibit B - Oatway Depo. p  137, lines 2 -17].

Facts concerning the decision to sell the managed print business

16.     In January 2015, NER DC first showed a profit after it had reduced operating expenses by selling its data center business and improved contract profitability.  [Exhibit B - Oatway Depo. p. 142, line 17- p. 143, line 4].

17.     In January 2015, NER DC had engaged an investment banking firm, Everingham & Kerr to find potential buyers of its managed print business.  [Exhibit B - Oatway Depo. p 143, lines 5-9; p. 186, lines 9-15].

18.     In engaging Everingham & Kerr, NER DC's goal was to maximize the value of what was left of the NER DC business, to shut it down once and for all and to wind down operations.  [Exhibit B - Oatway Depo. p 247, line 22 – p. 248 line 3].

19.     Everingham & Kerr prepared a confidential business review of NER DC to send out to prospective purchasers who had expressed an interest in buying the managed print business.  [Exhibit B - Oatway Depo. p. 53, line 21- p.  54, line 3; Exhibit C - Oatway Depo. Exhibit 47].

20.     There were several management calls following the preparation of the confidential business review and at least one site visit by a potential buyer.  [Exhibit B - Oatway Depo. p. 167, line 9 - p. 168, line 3].

21.     One potential buyer was a reseller out of New York/New Jersey who used to be called Westwood Computer and another was in the thermal bar code business and was looking to see whether this would be a good fit for their business.  [Exhibit B - Oatway Depo. p. 168, lines 4-17].

22.     Both prospective inquiries passed and did not make any offer to purchase the business.  [Exhibit B - Oatway Depo. p. 169, line 1].

23.     In 2015, Office Max was NER DC's largest customer.  [Exhibit B - Oatway Depo. p. 228, lines 18-20].

24.     Office Max accounted for approximately 60 percent of NER DC's revenues. [Exhibit B- Oatway Depo., p. 247, lines 12-14].

25.     However, the business was declining.  Revenues from OfficeMax went from $3,630,000 in 2013 to $1,627,194 in 2015.  [Exhibit B - Oatway Depo. p. 230, lines 14-16].

26.     Office Max notified NER DC that it was cancelling its managed print contract and the revenues from OfficeMax were going to zero.  [Exhibit B - Oatway Depo. p. 230, lines 17-20].

27.     NER DC had engaged Everingham & Kerr prior to receiving the notice that Office Max was cancelling its contract and the notice from Office Max came around the same time as Everingham & Kerr's preparation of the confidential business review for prospective buyers.  [Exhibit B - Oatway Depo. p 248, lines 7-13].

28.     By August 2015, when the last contracts for Office Max stopped, NER DC believed that the business was no longer viable.  [Exhibit B - Oatway Depo. p. 249, lines 13-16].

Facts concerning the sale of the managed print assets to Atlantic

29.     Atlantic, which was also a customer of NER DC, had received a copy of the Everingham & Kerr confidential business review in May 2015.  [April 3, 2017 Deposition of Jason Weiss ("Exhibit D - Weiss Depo."), p. 28, line 14 - p. 30, line 5; April 5, 2017 Deposition of William McLaughlin, ("Exhibit E - McLaughlin Depo.") p. 72, lines 9 – 19].

30.     Prior to May 2015, Atlantic had no interest in acquiring NER DC's managed print assets.   [Exhibit D - Weiss Depo.  p. 178, lines 21-25].

31.     In August 2015, Oatway received a call from Atlantic asking him to meet to discuss the relationship and the business.  [Exhibit B - Oatway Depo. p. 174, lines 1-4] .

32.     At that time, Atlantic was the largest remaining customer of NER DC.   [Exhibit B - Oatway Depo. p. 231, lines 18-23].

33.     There was a major concern on Atlantic's part about the profitability of their business that they were running with NER.  [Exhibit B - Oatway Depo. p. 174, lines 19-24; Exhibit E - McLaughlin Depo.  p. 75, line 18 – p. 76, line 5].

34.     Atlantic made it clear at the meeting that the current price levels and current arrangement that Atlantic was paying to NER would not continue.  [Exhibit B - Oatway Depo. p. 227, lines 12-18].

35.     Atlantic's Bill McLaughlin told Oatway that he did not believe the business was sustainable and that Atlantic needed to potentially move its business to another managed print platform.  [Exhibit E - McLaughlin Depo.  p. 77, lines 17 – 23].

36.     Atlantic made it clear that if some other arrangement hadn't been made or couldn't be made, that Atlantic would be transitioning off of the NER DC software to something else.  [Exhibit B - Oatway Depo. p. 227, lines 19-24].

37.     In mid to late August of 2015, discussions about Atlantic purchasing NER DC's assets began.  [Exhibit D - Weiss Depo.  p. 32, line 21- p. 33, line 5].

38.     There was discussion about Atlantic making an asset purchase of the managed print software so that the Atlantic customers on that platform could be handled by Atlantic if something happened to the NER DC business.  [Exhibit E - McLaughlin Depo.  p. 78, lines 5 – 13].

39.     Oatway knew if NER lost the Atlantic business it would be the end and the company would need to shut the doors.  [Exhibit B - Oatway Depo. p. 175, line 7- p. 177, line 19, p. 233, lines 17-23].

40.     NER had reached a point where the business could not support the existing profile of people and services and goods; with the loss of OfficeMax, it could not make it work. [Exhibit B - Oatway Depo. p. 249, lines 1-8].

41.     The conversation shifted to Atlantic buying NER DC's managed print assets. [Exhibit B - Oatway Depo. p. 180, lines 19-22].

42.     Oatway recognized it as a potential opportunity to create value for NER DC's unsecured creditors at that point in time.  [Exhibit B - Oatway Depo. p. 180, line 25-p. 191, line 3].

43.     Sometime in September 2015, Atlantic and NER agreed on a purchase price for the sale of the managed print assets.  [Exhibit B - Oatway Depo. p. 183 line 8 - p. 184, line 9].

44.     In negotiating with Atlantic for the sale of the managed print assets, Oatway's goal was to scratch and claw and fight as hard as he could to get as much value out of the transaction as he could get for NER's unsecured creditors.  [Exhibit B - Oatway Depo. p. 253, lines 9-20].

45.     In October 2015, NER DC had between two hundred and three hundred unsecured creditors, a lot of small ones.  [Exhibit B - Oatway Depo. p. 250, lines 7-15].

46.     From early 2015 when NER DC engaged Everingham & Kerr to list the managed print business for sale until October 2015 when ATI purchased the assets, NER DC had suffered more than a 50 percent reduction in its customer base.  [Exhibit B - Oatway Depo. p. 247, lines 5-11].

47.     There were no other entities in the marketplace interested in purchasing NER's customer list, Print 4 software, or any combination of them.  [Exhibit B - Oatway Depo. p. 253, line 25- p. 254, line 4].

48.     The agreement to sell the managed print assets to from NER DC to Atlantic closed on  October 31, 2015.  [Complaint, Par. 69 and Exhibit B, Asset Purchase Agreement].

49.     The purchase price was $150,000 plus 70% of net profit generated in the first year through sales to NER DC's former customers.  [Complaint, Par. 110].

50.     NER received fair value from ATI for the managed print assets in October of 2015.  [Exhibit B - Oatway Depo. p. 261, lines 19-24].

51.     Other than ATI, plaintiff cannot identify any other other potential purchaser of NER DC's managed print assets.  [Exhibit F - Lessner Depo. Vol. 2 p. 306, lines 6-18].

52.      Plaintiff has no evidence that anyone was willing to pay more for the managed print assets than that which ATI paid.  [Exhibit A - Lessner Depo. Vol. 1 p. 74, line 19 – p. 75, line 1].

53.     Plaintiff cannot identify anything that Oatway should have done differently in connection with the sale of the managed print assets.  [Exhibit F - Lessner Depo. Vol. 2 p. 338 line 11- p. 339, line 18].

54.     Plaintiff does not have any independent knowledge as to the fair market value of the managed print assets sold by NER DC to ATI.  [Deposition of Jack Drose, Rule 30(b)(6) designee of plaintiff ("Exhibit G - Drose Depo."), p. 6, lines 12-22].

## ARGUMENT

### I.  Summary Judgment Standard

The purpose of a summary judgment motion is to assess whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  If a reasonable juror could not return a verdict for the non-moving party, summary judgment is proper and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate only if

there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322; *Henderson v. Inter-Chem Coal Co., Inc*., 41 F.3d 567, 569 (10th Cir. 1994).

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc*., 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv*., 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248.

Once the moving party has affirmatively shown specific facts, through affidavit or otherwise, that no genuine issues of material fact remain, the burden shifts to the opposing party to demonstrate by relevant and specific facts that there is a genuine issue for trial. *Continental Air Lines, Inc. v. Keenan*, 731 P.2d 708, 712-713 (Colo. 1987). If the non-movant fails to demonstrate the existence of facts from which a reasonable jury could find in its favor, summary judgment is proper. *Davis v. Regis College, Inc.*, 830 P.2d 1098, 1101 (Colo. App. 1992).

**II. To Decide This Summary Judgment Motion, the Court Must First Determine What Substantive Law it Should Apply.**

A federal court exercising diversity jurisdiction applies the choice of law principles of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941); *Security Service Federal Credit Union v. First American Mortgage Funding, LLC,* 861 F.Supp. 2d 1256, 1267 (D. Colo. 2012). Colorado adopted the Restatement (Second) Conflict of Laws approach to conflict of laws issues for both contract and tort claims. *Security Service Federal Credit Union*,

10

861 F.Supp. 2d at 1267 (citing *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 601 P.2d 1369, 1372 (Colo. 1979); *Dworak v. Olson Const. Co.,* 551 P.2d 198, 199 (Colo. 1976).

The claims at issue in this motion are all tort claims.[3]  Count VII is a direct claim against Oatway and the NER defendants alleging that NER DC's sale of the managed print assets for less than fair value to Atlantic was a fraudulent transfer and that Oatway is liable for his role in that sale.  Count VIII is a conspiracy claim that is based on the same substance as Count VII. Finally, Count IX is a direct claim against Oatway alleging that by receiving a salary from NER DC and in selling the managed print assets to ATI, Oatway breached a fiduciary duty owed to the plaintiff, a creditor of NER DC.  In response to interrogatories and deposition testimony, plaintiff also alleges that Oatway personally benefitted from the sale of the assets because Atlantic took over server equipment leases for which Oatway had been a personal guarantor.  For reasons that will be apparent from the argument Section VII below, the court need not delve into these allegations to decide this motion.

Colorado courts follow the principles in the Restatement (Second) Conflict of Laws, known as the "most significant relationship" test to determine which state's substantive laws govern in a multistate tort action, which ensures predictability and uniformity. *First National Bank v. Rostek*, 182 Colo. 437, 448, 514 P.2d 314, 320 (1973); *Scheer v. Scheer*, 881 P.2d 479, 480 (Colo.App.1994); *Hoiles v. Alioto*, 345 F.Supp.2d 1178, 1183 (D.Colo.2004).  Contacts to be taken into account in determining the "most significant relationship or the occurrence and the parties" include the place where the injury occurred, the domicile, residence, nationality, place of incorporation of business of the parties, and the place where the relationship between the parties

---

[3] The original lawsuit was based on contract claims and plaintiff brought it in Colorado based on a forum selection clause in the Software Agreement.  The choice of law provision in the Software Agreement only applies to contract claims between plaintiff and NER.  For the court's convenience, relevant pages of the Software Agreement are attached as "Exhibit H."

is centered. *AE, Inc. v. Goodyear Tire & Rubber, Co.,* 168 P.3d 507, 510 (Colo. 2007) quoting Restatement (Second) of Conflicts § 145.

### III. Applying Conflict of Laws Precedent from Colorado, this Court Should Apply the Law of the State of Delaware to this Case.

Delaware substantive law should apply to the claims at issue because it is where NER DC is incorporated and no other state has a more significant relationship to the causes of action.  In a case closely on point, *In re ms55, Inc.*, the United States Bankruptcy Court sitting in Colorado addressed the choice of law question in the context of a claim of breach of fiduciary duty against corporate officers and directors.  420 B.R. 806 (2009).  The court applied the choice of law rules used in Colorado.  420 B.R. at 820, citing *Loveridge v. Dreagoux*, 678 F.2d 870, 877 (10th Cir.1982)(federal court follows conflicts of laws rules of the forum state where federal jurisdiction is based on federal question).  Applying Colorado conflict of laws precedent, the court held that the substantive law of Delaware the state of incorporation, should be applied because no other state had a more significant relationship than Delaware.  *In re ms55, Inc.*, 420 B.R. at 821.

The court's reasoning is particularly applicable to the present case.  The court stated, "the factors listed in section 6 of the Restatement, particularly the protection of justified expectations and the need for certainty and predictability of result, weigh heavily in favor of applying the law of the state of incorporation to the question of the scope of corporate fiduciaries' duties. Otherwise, a director or officer of a corporation could be faced with conflicting obligations when attempting to discharge the duties that arise from this relationship to the corporation and its constituents." *In re ms55, Inc.*, 420 B.R. at 821, 822.  The court stated, "(i)t would simply not make sense to expect MSHOW's directors to evaluate their conduct and business decisions in light of the law in multiple states and countries before taking action." *Id.*, citing *Edgar v. MITE*

*Corp.*, 457 U.S. 624, 645 (1982).  This makes perfect sense.  A corporate director should not have to consider the laws of every state where the corporation's creditors reside before making a business judgment.  In this case, it is undisputed that NER DC had between two hundred and three hundred unsecured creditors when it sold the managed print assets to ATI.  As an officer and director of NER DC, Oatway should be able to make business judgments based on the law of incorporation of the company and here, that is Delaware law.

Taking the conflict of laws analysis a step further, there is Colorado precedent for a case like this where a corporate creditor is challenging the actions of corporate officers or directors.  The bankruptcy court in *In re ms55, Inc*., stated that the Colorado Supreme Court has utilized the "internal affairs doctrine," as set forth in the Restatement (Second) of Conflict of Laws Section 309 ("Restatement"), to determine the substantive law which governs the "rights and obligations between corporate creditors on the one hand, and officers, directors and shareholders of the corporation on the other."  420 B.R. at 821, citing  *Ficor v. McHugh*, 639 P.2d 385, 391 (Colo.1982).

In *In re ms55, Inc*., the Colorado bankruptcy court was guided by Section 309 of the Restatement, which provided that "the local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders, except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction, in which event the local law of the other state will be applied."  420 B.R. at 821, 822.

The court in *In re ms55, Inc*., also reasoned that Section 6 of the Restatement also directs a court to follow statutory directives of the forum state on choice of substantive law.  420 B.R. at

822.  The *In re ms55* court found that Colorado statutory law governing foreign corporations "[do] not authorize this state to regulate the organization or internal affairs of a foreign corporation." C.R.S. 7–115–105(3) (2001).  The could held, "(t)his change in the law signals the Colorado legislature's view that it favored the application of the law of the state of incorporation to matters concerning corporate governance."  420 B.R. at  822.

Here, this court should reach the same conclusion.  There is no state with a more significant relationship.  The relationships to other states are splintered at best.  Although the plaintiff is in Colorado, none of the operative facts concerning the breach of fiduciary duty claims occurred in Colorado.  Oatway is a resident of New Jersey and NER DC had its office in New Jersey.  The buyer of the managed print assets, ATI, has its office in New York.  There is no one state that has any more significant relationship than Delaware, the state of incorporation.  Based on all of the foregoing, this court should decide that Delaware substantive law applies.

### IV. Summary Judgment Should Enter Against Plaintiff on the Fraudulent Transfer Claim (Count VII) Because Plaintiff Has No Evidence that the Price ATI Paid for the Managed Print Assets Was Not Reasonably Equivalent Value.

For purposes of the defendants' summary judgment motion, the court can assume that NER DC was insolvent when it sold the managed print assets to ATI.  Even with that established, the plaintiff still has the burden of proof to establish that NER DC did not receive reasonably equivalent fair value for the managed print assets.  *In re Plassein Int'l Corp.*, 428 B.R. 64, 67 (D. Del. 2010).  To establish a constructively fraudulent transfer under Delaware law, the plaintiff must show by a preponderance of the evidence that (1) the debtor made the transfer without receiving reasonably equivalent value, and (2) the debtor was either: a) insolvent or became insolvent as a result of the transfer; b) engaged or about to engage in a business or transaction for which its remaining assets were unreasonably small in relation to the business or

transaction; or c)intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due. 6 Del. C. §§ 1304(a)(2) & 1305(a); see also *In re Hechinger Inc. Co. of Del.*, 327 B.R. 537, 552 (D.Del.2005); *China Resource Prods. (U.S.A.) v. Fayda Int'l, Inc.*, 856 F.Supp. 856, 863 (D.Del.1994); *In re MDIP, Inc.*, 332 B.R. 129, 132 (Bankr.D.Del.2005).

The term "reasonably equivalent value" is not statutorily defined; however, courts consider the totality of the circumstances in assessing reasonably equivalent value. *In re R.M.L., Inc.*, 92 F.3d 139, 153 (3d Cir.1996); *In re MDIP, Inc.*, 332 B.R. at 133. In particular, three factors are emphasized: (1) whether the transaction was at arm's length, (2) whether the transferee acted in good faith, and (3) the degree of difference between the fair market value of the asset transferred and the price paid. *Id.* While this is often a factual issue, a court can and will award summary judgment where the plaintiff fails to carry its burden of proof that the assets sold were worth more than the value the seller received. *In re Hechinger,* 327 B.R. at 553 (2005).

There is no dispute of fact as to NER DC's circumstances and the circumstances of the transaction. The corporation did not make a profit for the first five years of its existence as it attempted to build up its managed print business. As of early 2015, the business' success was dependent largely on retaining Office Max, a customer that made up more than half of its revenues. Even with the Office Max relationship in place, Everingham & Kerr (the company hired to explore a sale for NER DC) did not locate any buyers to purchase the managed print business. After losing the Office Max contract, the business was even less viable. Atlantic was the remaining largest customer. Atlantic found out that NER DC's managed print business was for sale and took steps to protect its customers using the NER DC managed print platform.

When Atlantic told NER DC that it could not continue to pay for managed print services at NER DC's pricing, the end was near.  The managed print business was effectively dead.  Having already sold off its data center business and left with only the managed print business, NER DC was in dire straits.

It was in that context that NER DC was able to squeeze some value out of the managed print assets and sell what it could to ATI.  Atlantic was the only interested buyer.  The best evidence of the fair value of the assets is what a willing buyer paid for them, and that was ATI.  See *Barton v. Borit*, 316 F.2d 550, 552 (1963).  In fact, Atlantic may have overpaid for the assets given that it had a unique interest in protecting its customers who were on the NER DC platform.  Ten months after engaging Everingham & Kerr to sell the managed print business, there was no other company expressing any interest.  The absence of any synergistic buyers, despite Everingham & Kerr's efforts is also telling.  See *DFC Global Corporation v. Muirfield Value Partners LP,* 172 A.3d 346 n. 154 (2017).  Plaintiff has no evidence that NER DC's assets were worth anything different from what ATI agreed to pay.  Because by plaintiff's own admissions, it has no evidence of fair value to the contrary, there is no issue to be tried and summary judgment should enter for Oatway and the NER defendants on Count VII.  See *In re Hechinger,* 327 B.R. at 553.

### V. Summary Judgment Should Enter for NER DP on Count VII Because it Had No Involvement at All in the Alleged Fraudulent Transfer.

In the alternative and on a separate basis, summary judgment should enter as to the claims against NER DP in Count VII.  There are no facts plead or established in discovery that NER DP had anything to do at all with the sale of the NER DC managed print assets.  Plaintiff has simply lumped NER DP into this claim but the absence of any evidence to support the claim warrants summary judgment for NER DP.

**VI. Summary Judgment Should Enter Against Plaintiff on the Conspiracy Claim (Count VIII) Because It is Entirely Based on the Fraudulent Transfer Claim.**

The court's decision on Count VII will dictate the outcome for Count VIII. Without a viable fraudulent transfer claim, there can be no claim for conspiracy to commit a fraudulent transfer and summary judgment must enter on this count.

**VII.      The Court Should Award Summary Judgment for Oatway on Count IX Because Delaware Law Does Not Allow a Creditor to Bring  Direct Claim Against a Corporate Officer or Director for Breach of Fiduciary Duty.**

The plaintiff's breach of fiduciary duty claim has been asserted as a direct claim by plaintiff, not as a derivative claim. Plaintiff's breach of fiduciary duty claim essentially alleges that at the relevant times, NER DC was insolvent and therefore Oatway, as an officer and director owed a fiduciary duty to plaintiff, a creditor of NER DC. For purposes of this motion, this court can assume that NER DC was insolvent at the relevant times. Solvent or not, under Delaware law, creditors cannot assert breach of fiduciary duty as a direct claim against corporate directors or officers. *North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla,* 930 A.2d 92, 99, 103 (Del. 2007).

Officers and directors of a Delaware corporation owe a duty to the corporation and its shareholders. *Gheewalla,* 930 A.2d at 101. Thus, when a corporation is solvent, shareholders are the parties that have standing to bring derivative claims on behalf of the corporation. *Id.* When a Delaware corporation is insolvent, "the focus for Delaware directors does not change: directors must continue to discharge their fiduciary duties to the corporation and its shareholders by exercising their business judgment in the best interests of the corporation for the benefit of its shareholder owners." *Id.*

It is well-established that the directors of an insolvent firm do not owe any particular duties to creditors. *Quadrant Structured Products Company, Ltd. v. Vertin*, 115 A.3d 535, 546

17

(2015) citing *Gheewalla,* 930 A.2d at 101. Directors continue to owe fiduciary duties to the corporation for the benefit of all of its residual claimants, a category that will include creditors once the corporation is insolvent. *Quadrant Structured Products,* 115 A.3d at 546. When the corporation becomes insolvent, creditors may only bring <u>derivative</u> claims on behalf of the corporation. *Gheewalla,* 930 A.2d at 101. A derivative claim would have required its own prerequisites, none of which were followed by plaintiff in this case. See Fed.R.Civ.P. 23.1. A direct claim by a creditor against a director for breach of fiduciary duty unquestionably must be dismissed. See *Gheewalla,* 930 A.2d at 101; see also *In re ms55, Inc.*, 420 B.R. at 822. Accordingly, summary judgment must enter against plaintiff on Count IX.

## CONCLUSION

Based on the arguments and authorities set forth above, the moving parties, Oatway, NER DP, and NER DC request that this court award partial summary judgment in their favor on Counts VII, VIII, and IX in the plaintiff's Second Amended and Supplemental Complaint

<div style="margin-left:40%">

*Respectfully submitted,*

NER DATA CORPORATION, et al

*By their attorney,*

MORISI & OATWAY, P.C.

</div>

DATED: <u>March 25, 2019</u>   <u>/s/ Andrew C. Oatway</u>
Andrew C. Oatway
aco@morisi.com
MORISI & OATWAY, P.C.
730 Hancock Street
Quincy, MA 02170-2723
Tel     617.479.0400
Fax     617.479.6885

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 25, 2019, a true copy of the above document was filed with the clerk of court using the CM/ECF system, which will notify the following counsel of record:

Robert C. Podoll, Esq.
Podoll & Podoll, P.C.
5619 DTC Pkwy, Ste 1100
Greenwood Village, CO 80111
303 861-4000
Rob@podoll.net

DATED:  <u>March 25, 2019</u>          <u>/s/ Andrew C. Oatway          </u>