Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO
----------------------------------------
IT PORTFOLIO, INC., a Colorado

Corporation,


                    Plaintiff,

          -vs-

NER DATA CORPORATION, a Delaware
Corporation; NER DATA PRODUCTS,
INC., a New Jersey Corporation;
STEPHEN F. OATWAY, an Individual;
and ATLANTIC TECHNOLOGY
INTEGRATORS, LLC, a Delaware
Limited Liability Corporation,
                    Defendants,

Civil Action No.: 15-cv-00179-WYD-STV
----------------------------------------

                    April 4, 2017
                    9:17 a.m.



    Videotaped deposition of STEPHEN FRANCIS OATWAY,

taken by Plaintiff, pursuant to Notice, held at the

offices of Kantrowitz, Goldhamer & Graifman P.C,

747 Chestnut Ridge Road, Chestnut Ridge, New York,

before Bridget Lombardozzi, a Certified Court

Reporter, and Notary Public within and for the

State of New York.



PRECISION REPORTING SERVICE          908-642-4299

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

```
                                              Page 2

 1    A P P E A R A N C E S :

 2

 3       PODOLL & PODOLL, P.C.

 4          Attorneys for Plaintiff

 5          5619 DTC Parkway, Suite 1100

 6          Greenwood Village, Colorado   80111

 7          303.861.4000 (Telephone)

 8          303.861.4004 (Fax)

 9          rob@podoll.net

10          dustin@podoll.net

11       By:   DUSTIN J. PRIEBE, ESQ.

12             ROBERT C. PODOLL, ESQ.

13

14

15       MORISI & OATWAY, P.C.

16          Attorneys for NER and Stephen Oatway Defendants

17          730 Hancock Street

18          Quincy, Massachusetts   02170-2723

19          617.479.0400 (Telephone)

20          617.270.9070 (Cell)

21          aco@morisi.com

22       By:   ANDREW C. OATWAY, ESQ.

23

24

25
```

Page 3

1    A P P E A R A N C E S  (Continued)

2

3        KANTROWITZ, GOLDHAMER & GRAIFMAN P.C.

4            Attorneys for Atlantic Defendant

5            747 Chestnut Ridge Road

6            Chestnut Ridge, New York  10977

7            845.356.2570 (Telephone)

8            845.356.4335 (Fax)

9            bkantrowitz@kgglaw.com

10       By:   BARRY S. KANTROWITZ, ESQ.

11

12

13   A L S O   P R E S E N T :

14

15       LARRY MOSKOWITZ, Videographer

16

17

18

19

20

21

22

23

24

25

Page 53

1        A.    At what point in time?

2        Q.    Sure.  For any period of time from 2010

3    to  20 -- 2009 to 2014.

4        A.    I can't be sure that it was only Rachel,

5    but I'm pretty sure Rachel was our primary general

6    ledger accounting person during that time.

7        Q.    Okay.  It may have been others, but

8    Rachel was the one that was primary responsible --

9        A.    Correct.

10        Q.    -- for assembling that information?

11             MR. PRIEBE:  Forty-seven.

12             (Whereupon, exhibit is received and

13        marked Exhibit 47 for identification.)

14             MR. PRIEBE:  Forty-seven.

15             MR. KANTROWITZ:  Thank you.

16    BY MR. PRIEBE:

17        Q.    Okay.  Mr. Oatway, do you recognize

18    Exhibit 47?

19        A.    I do.

20        Q.    Okay.  What is Exhibit 47?

21        A.    NER Data Corporation managed print

22    services division confidential business review

23    prepared by Everingham & Kerr.

24        Q.    Okay.  And this is what Everingham &

25    Kerr prepared to send out to prospective

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 54

1    purchasers who had expressed an interest in --

2    in -- in buying the NER business, is that correct?

3         A.    I believe so.   I don't know whether

4    there was an abbreviated version of this or

5    whether this was the full one, but -- because I

6    didn't see what they responded to inquiries with,

7    but this would have been certainly a piece of it.

8         Q.    Okay.   And -- and with respect to the

9    preparation of -- of this document, Deposition

10   Exhibit 47, the confidential business review, did

11   you review a draft of that before a final version

12   was created?

13        A.    I did.

14        Q.    Okay.   And did -- did you go through the

15   confidential business review to ensure everything

16   in there was accurate and true and correct?

17                    MR. ANDREW OATWAY:   Objection.

18        A.    *I went through it.   I reviewed it in the*

19   *context of this was a marketing memorandum to*

20   *generate interest, buyer interest, in potential*

21   *purchase of the business.*

22        Q.    Okay.   I just -- and I just wanted to

23   make sure I understand what -- what you're saying.

24                    When you -- when you reviewed it, did

25   you -- were you -- were you seeking to ensure that

Page 60

1   was transferred over?

2        A.   All of the remaining -- they transferred

3   the business assets associated with the managed

4   print services, the data center infrastructure

5   business.  All of the assets and liabilities

6   associated with those two businesses were

7   transferred into the new NER Data Corporation --

8        Q.   Okay.

9        A.   -- so that we could take a $5 million

10  investment from United Stationers for 27 and 1/2

11  percent interest.

12       Q.   Okay.  So how -- how -- how was the

13  transfer, though, from NER Data Products to NER

14  Data Corporation?  How was that documented?

15       A.   I would a -- it was --

16            MR. ANDREW OATWAY:  Don't assume

17    and don't guess.  Just --

18       A.   I don't --

19            MR. ANDREW OATWAY:  -- what you know.

20       A.   -- I don't know.  Either you need to be

21  more specific in your question or...

22       Q.   Sure.

23            So all -- and all -- all I'm trying

24  to -- to determine is your -- because my

25  understanding of your testimony is that you moved

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 110

1    Products and NER Holdings, is that correct?

2         A.   Yes.

3         Q.   Okay.   Why were -- why were all -- just

4    your understanding.   Why were all three of the NER

5    entities listed on this stock purchase agreement?

6         A.   I don't -- I believe it was because the

7    NER Holdings was the holder of all outstanding

8    shares of the capital stock of the seller and

9    that's the reason why that was listed.

10        Q.   Okay.   Because NER Holdings was the

11   holder of all the outstanding shares of NER Data

12   Products, is that what you're saying?

13        A.   Yes.

14        Q.   Okay.   And so I just -- I want to just

15   go through a couple of these terms here.

16             The first one, as we've discussed, in

17   paragraph 1.1, what's being sold is -- is 27.5

18   percent of the outstanding shares of NER Data

19   Corporation, is that right?

20        A.   Yes.

21        Q.   Okay.   And -- and take me through, if

22   you can, just tell me what -- what's the -- what's

23   the consideration and what's the actual, you know,

24   money being paid for the purchase of that stock as

25   set forth in this agreement?

1  dictated in this document.

2       Q.   Okay.  And so immediately after the --

3  the -- the purchase took place, NER Data

4  Corporation then kind of continued the ongoing

5  business of NER, is that right?

6       A.   Yes.

7       Q.   Okay.  And after this, you know,

8  purchase transaction in April of 2010, was -- was

9  NER operating at a profit?  Were the business

10 operations profitable?

11      A.   No.

12      Q.   Okay.  Do -- do you have an idea for

13 approximately how much money NER was losing on a

14 monthly basis?

15      A.   Yes.

16      Q.   Okay.  And how -- I mean, how much is

17 that?

18      A.   Over $100,000 a month.

19      Q.   Okay.

20      A.   At the time.

21      Q.   And what -- what was the reason for --

22 for that -- that operating loss?  What -- what was

23 the -- the difficulty with the business?

24      A.   We were funding a multi-million-dollar

25 investment in building a managed print services

1  business.

2  Q.   Okay.  So did -- did -- did NER view the

3  operating losses as -- as being -- as being an

4  investment?  Is that effectively what I'm -- how I

5  understand your answer?

6  A.   It's interesting that you ask that

7  question because some could argue that those

8  losses should have been capitalized as an

9  investment, but our investment occurred in the

10  form of effectively monthly losses, monthly

11  operating losses, yes.

12  Q.   Okay.  But -- so was -- was -- I'm

13  assuming at -- at the time of the stock purchase

14  agreement, United was aware of the operating

15  losses of the --

16  A.   Yes.

17  Q.   -- NER business?

18  Okay.  And did -- did -- did they

19  indicate to you, did United ever state to you that

20  they were looking for some type of a business plan

21  to -- to turn that into some type of

22  profitability?

23  A.   Yes.

24  Q.   Okay.  And what -- what did they -- they

25  say exactly?  How did they express that?

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1    received these documents quickly.  So I -- I'm

2    trying  to -- I'm trying to figure that out.  I

3    did see -- I think there's a promissory note, I

4    think, that's in some of the -- the materials.

5         A.   So to answer your question, and I'm

6    going to try to help give a little --

7         Q.   Yes, please --

8         A.   -- bit of light -- shed some light on

9    this.  Clearly there was a well-defined agreement

10   at the time of this transaction in 2010 that

11   called for a facility -- for the primary

12   shareholder to loan money to the new entity.

13        I don't think anybody anticipated at the

14   time that that loan would remain outstanding or

15   would be a permanent commitment of capital to NER

16   Data Corporation, because I think everybody

17   expected that the performance of the business at

18   that point would more than -- would -- would

19   generate returns to shareholders instead of

20   shareholders having to invest more into it.  This

21   point in time, at April of 2010.

22        Now, I know you're also aware of the

23   fact that we had conversations during the year of

24   2010 and then into -- into early 2011 with Hewlett

25   Packard where they approached us on an unsolicited

1    basis to -- to buy the managed print services

2    business from NER Data Corporation.

3              That process and conversations occurred

4    over at least a six-month period of time at the

5    end of 2010 and the first part of 2011.

6         Q.    Okay.

7         A.    During that time, your client was

8    involved in all of these meetings with Hewlett

9    Packard.  They part -- he part -- they

10   participated in those meetings, so they knew what

11   was going on.

12             The earnings profile of the NER Data

13   Corporation business at the same time these

14   conversations with Hewlett Packard were going on

15   was not getting any better.  The revenue growth

16   was not occurring.  And, in fact, the level of

17   investment was increasing, so we were burning cash

18   a lot faster than anybody had ever anticipated

19   when this transaction was contemplated early on.

20   We were increasing our level of investment as --

21   and that also included Hewlett Packard funding

22   through co-op and through the program losses in

23   the business as well.

24             So this investment -- Hewlett Packard

25   invested at least a million dollars in this -- in

You created this PDF from an application that is not licensed to print to novaPDF printer (                    )

1   this development at the same time.

2           We eventually went under a letter of --

3   accepted a letter of intent, signed letter of

4   intent, to purchase the business from Hewlett

5   Packard and they went into their due diligence

6   process.  That was late 2010 and early 2011.

7           At that point, the business, NER Data

8   Corporation, was losing well north of $100,000 a

9   month.  Bleeding cash well north of 100,000 a

10  month.

11          In the first quarter of 2011,

12  approximately, Hewlett Packard decided that they

13  were not going to continue to go through with the

14  acquisition because they had concerns about a

15  variety of things, one of which may have been the

16  losses, but the -- they -- they -- they had

17  concerns about intellectual property rights.

18      Q.   Okay.

19      A.   So they walked.  And they told us all

20  along that they had a second -- second option.

21  When they walked or abandoned the letter of

22  intent, excuse my language, we had our "holy shit"

23  moment.  We're in deep doo-doo because we're

24  bleeding and we don't have any sources of capital

25  at this point.  It was largely exhausted.

You created this PDF from an application that is not licensed to print to novaPDF printer ( tp://www.novapdf.com)

Page 142

1   Data Corporation was formed in April of 2010, it

2   was immediately operating at -- at a loss,

3   correct?

4            MR. ANDREW OATWAY:   Objection.

5        A.   The earnings, in -- net income?

6        Q.   Yes.

7        A.   I don't remember exactly what the

8   projections were or what the actual earnings were,

9   but, yes, it was -- we were in -- we were spending

10  more than we were taking in.

11       Q.   Okay.  And at -- at any point in time

12  from April of 2010 until, I suppose the present,

13  did -- has that ever changed?

14       A.   Yes.

15       Q.   Okay.  And when -- when did that change?

16       A.   January 2015.

17       Q.   Okay.  And -- and what happened in

18  January of 2015?

19       A.   The revenue exceeded costs and we had a

20  profit.

21       Q.   Okay.  And why -- why was that?  What

22  had happened to -- to finally allow NER to -- to

23  turn a profit?

24       A.   We had sold our data center business.

25  We had reduced our operating expenses.  And the

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 143

1    biggest thing was specifically the contract

2    profitability effort that we -- that we undertook

3    after the Hewlett Packard transaction didn't

4    close.

5         Q.   Okay.   Okay.   In January of 2015, that's

6    about the same time that you -- or NER approached

7    Everingham & Kerr about potentially selling the --

8    the business, is that correct?

9         A.   Yes.

10        Q.   Okay.   And was -- was -- was that

11   because of the timing, that NER had now just

12   finally begun to turn positive revenue?  Or, I'm

13   sorry, to -- to somehow turn a profit?

14             MR. ANDREW OATWAY:   Object to the

15        form.

16        A.   So there was two -- there were two

17   things that were occurring at that time:   One,

18   when we sold the business, the data center

19   infrastructure business, in -- in June of 2014,

20   there was a period of time after that transaction

21   where either it was accrual accounting or other

22   things that were going on where the -- the

23   earnings profile of the business still didn't look

24   as good as probably what the -- the underlying

25   business was starting to look like it was

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1   services business, correct, to sell the entire

2   business?

3        A.   Yes.

4        Q.   Okay.  And I think we've established

5   that at this point in time, in early 2015, that

6   was the only remaining business that NER had, is

7   that correct?

8        A.   Yes.

9        Q.   Okay.  Okay.  And did NER receive any

10  responses from any prospective purchasers of the

11  NER managed print business?

12       A.   At what point in time?

13       Q.   At any point in time.

14            MR. ANDREW OATWAY:   Object to the

15     form.

16       Q.   Following -- following -- following the

17  preparation of confidential business review in

18  early 2015.

19       A.   So your question was did NER what?  Did

20  NER receive any offers?

21       Q.   Yes.

22       A.   No.

23       Q.   Did it receive any inquiries?

24       A.   There were at least -- there was at

25  least one management call -- no, there were

Page 168

1    multiple management calls.

2         Q.   Okay.

3         A.   And -- and at least one site visit.

4         Q.   Okay.  And do you remember, who were the

5    management calls with?

6         A.   The two that I remember, one was a

7    reseller based out of New York/New Jersey area.  I

8    think they used to be called Westwood Computer.

9    I'm not sure what -- what their -- what they were

10   called at the time they expressed interest.

11            And then there was a company, which I

12   can't remember the name of, that was in the bar

13   code thermal -- thermal bar code printer business

14   --

15        Q.   Okay.

16        A.   -- that was looking to see whether this

17   would be a fit for their business.

18        Q.   Okay.

19        A.   Those two were the ones that had -- were

20   the most substantive conversations that I remember

21   through this process.

22        Q.   Okay.  Okay.  And -- and ultimately was

23   any ever, I mean, put forth that you can recall?

24        A.   No.

25        Q.   Okay.

Page 169

1      A.    They passed in both cases.

2      Q.    Passed in both cases.  Okay.

3            MR. PRIEBE:  This would be 51?

4            (Whereupon, exhibit is received and

5      marked Exhibit 52 for identification.)

6            MR. PRIEBE:  Oh, wait, that's mine.

7      This is yours.

8            MR. KANTROWITZ:  We're up to 52,

9      right?

10           MR. PRIEBE:  Fifty-one, I believe,

11     right?

12           MR. KANTROWITZ:  I have 51.

13           MR. PRIEBE:  Do we have 51 already?

14           MR. KANTROWITZ:  Fifty-one to me is the

15     guaranty of payment.

16           MR. PRIEBE:  Okay.  Then, yes, 52.  Oh,

17     this is yours.  I think I gave one to him.

18     BY MR. PRIEBE:

19     Q.    Okay.  Mr. Oatway, do you recognize

20     Exhibit 52?

21     A.    No.

22     Q.    Okay.  Had -- had you ever seen this

23     e-mail before today?

24     A.    No.

25     Q.    Okay.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 174

1   August of 2015, I got a phone call from Bill

2   McLaughlin at Atlantic asking me to come up to

3   meet with them to talk about the relationship and

4   the business.

5       Q.   Okay.  Was -- was that the first time

6   you had heard from anyone at Atlantic about

7   potential interest in -- in the NER business

8   itself?

9                   MR. ANDREW OATWAY:   Object to the

10          form.

11                  MR. KANTROWITZ:   Object to the

12          form, too.

13      A.   The initial discuss -- the initial visit

14  was to go in to talk, to see how things were going

15  and how the business was and what -- and I thought

16  there was a chance that there might be some

17  interest in potentially buying the business at the

18  time.

19                  But what became clear was there were a

20  series of conversations that needed to occur, one

21  of which was -- that seemed to be the biggest

22  driver was that there was a major concern on

23  Atlantic's part about the profitability of their

24  business that they were running through with NER.

25      Q.   Okay.  Okay.  And that -- that was

You created this PDF from an application that is not licensed to print to novaPDF printer (                    )

1    the -- the topic that was brought up in this

2    conversation in -- in August?

3        A.    That was one of the conversations, yeah.

4    One of the topics, yeah.

5        Q.    One of the topics for conversation.

6    Okay.

7              And who -- who was at that meeting in

8    August?

9        A.    Bill McLaughlin, Russ Klein, and myself.

10       Q.    Okay.  Okay.  All right.  So -- so tell

11   me about the meeting.  What -- what happened at

12   the meeting?

13       A.    Well, if you understand the nature of

14   Atlantic's offices in New York City, they got a

15   lot of activity going on in a bunch of different

16   places.  So they got big bullpens of salespeople

17   and all kinds of things going on.

18              So we were in a conference room that

19   people were literally coming in and out, doors

20   were opening and closing.  But the gist of it was

21   that we had a discussion around what was going on

22   with NER, how were things going?  Where did we

23   stand with regards to Office Max?

24              And we had a specific discussion around

25   the fact that Atlantic's management believed

1   that -- well, they -- their concern about the

2   profitability of the relationship with NER and

3   that specifically Bill was dealing with the

4   challenge of a -- I don't remember if it was 6

5   cents or 7 cents or 9 cents per device per-month

6   charge from FM Audit, whereas our comparable

7   charge was closer to $3 per device per month.

8           And even though that was not necessarily

9   a fair apples-to-apples comparison, Bill was

10  struggling with the fact that his management

11  couldn't see beyond $3 versus 6, 7, 8, 9 cents a

12  device.

13      Q.   Okay.  Was that the first time that

14  concern had been mentioned to you?

15      A.   The cost of the platform?  The cost of

16  the service?

17      Q.   Yes.

18      A.   I think in that -- in that way,

19  probably, yes, but we had -- probably had -- we

20  clearly had had conversations at different times

21  about NER's performance as a supplier to Atlantic,

22  the cost, and -- and -- and even the structure of

23  what we would -- what we would bill for or what we

24  would be responsible for.

25      Q.   Okay.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1       A.    So it wasn't the first time, but it was

2   the first time very clearly.

3       Q.    Okay.   What -- what else was discussed

4   at the -- the August meeting?

5       A.    Well, at that point, I was trying to

6   figure out whether we were now dead in the water

7   because if we -- well, let's put it this way:   We

8   had already gotten to the point where we had

9   figured out that the business could potentially

10  break even without Office Max, but clearly could

11  not support management.   It would be just purely

12  on a gross profit basis.

13            So we had -- we -- we'd gotten to a

14  point where we knew we weren't going to be able to

15  make a profit, but we were close.   And then, you

16  know, with the news that if we didn't -- you know,

17  that there was a potential that we could lose the

18  Atlantic business, that was going to be the end of

19  it.   We were going to just have to shut the doors.

20      Q.    Okay.   And did Atlantic tell you that

21  they had learned about the loss of the Office Max

22  business?

23      A.    No, I would have told them.

24      Q.    You would have told them that?

25      A.    Mm-hmm.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 180

1   Max agreement would not be renewed, yet we had a

2   continuing obligation to support them to the term

3   of the agreement.  We -- we -- and we were making

4   a profit at this point.

5            We -- we said, okay, what expenses are

6   going to have to come out?  We look -- we resized

7   the business and looked at it to see whether we

8   could make a profit as a pure operating business.

9            And we got to -- we came to the

10  conclusion that we would be close, but it

11  certainly wouldn't support me and/or any of the

12  other selling, general, and administrative

13  expenses in the business.

14           So we -- we were at -- we were -- at

15  that point in time, we were either going to have

16  to shut it down or we were going to -- you know,

17  we were going to shut it down.  We were moving to

18  that -- to that point very quickly.

19      Q.   Okay.  Okay.  So did -- did the

20  conversation at any point shift to Atlantic buying

21  NER or -- buying NER?

22      A.   It did.

23      Q.   Okay.  And what -- what happened there?

24  How did that happen?

25      A.   We talked about it.  I recognized it as

Page 181

1   a potential opportunity to create value for our

2   unsecured creditors at the point -- at that -- at

3   that point in time.

4           So I didn't get the sense in that

5   conversation that what Atlantic thought it might

6   be worth was necessarily the last number that I

7   thought we might be able to get for the creditors.

8   So I -- listening to them, I then went back and

9   spent some time trying to think about how might I

10  structure a transaction with them to potentially

11  sell the business to them where we could get more

12  than what I had perceived would be what they were

13  prepared to pay?

14      Q.   Okay.  And did they tell you what they

15  were prepared to pay at the meeting?

16      A.   I don't think they -- they -- I don't

17  think we ever had a definitive discussion, but I

18  clearly came out of that meeting with $150,000.

19      Q.   Okay.  Now, you were here yesterday when

20  Jason Weiss was testifying, is that right?

21      A.   Yes.

22      Q.   Okay.  Did -- did you hear Mr. Weiss

23  testify that he had received a copy of the

24  confidential business review sometime in

25  approximately May of 2015 that was put out by

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 182

1    Everingham & Kerr?  Do you recall that?

2         A.    I heard him say that, yes.

3         Q.    Okay.  Did -- did you know that?  Did --

4    did you know that in August of 2015, that Atlantic

5    had received a copy of the confidential business

6    review?

7         A.    I don't know when I knew that, but at

8    some point, Bill McLaughlin told me that he had

9    received a copy of it and asked me if it was --

10   if, in fact, there was a memorandum out there.

11        Q.    Okay.  Can you -- can you recall if that

12   would have been before or after the August 2015

13   meeting?

14        A.    It would have been probably right around

15   or be -- right around the same time.  Maybe a

16   little before.

17        Q.    Of the 2015 meeting?

18        A.    It was in between May of 2015 and August

19   of 2015.

20             MR. PRIEBE:  Oh, five minutes?

21        Okay.  We can just do it real quickly.  What

22        time is it right now?

23             MR. KANTROWITZ:  3:20, 3:25.

24        MR. PRIEBE:  Okay.

25             THE VIDEOGRAPHER:  We are going off

Page 183

```
 1        the record.   The time is 3:21 p.m.   This is
 2        the end of Tape 4.
 3                (Whereupon, a recess is taken.)
 4                THE VIDEOGRAPHER:   We are back on
 5        the record.   The time is 3:36 p.m.   This is
 6        the start of Tape 5.
 7   BY MR. PRIEBE:
 8        Q.   Okay.   So, Mr. Oatway, when was there
 9   finally a time when there was a -- a purchase
10   price agreed upon between you and Atlantic for
11   what would be the -- the purchase price paid for
12   the managed print business?
13                MR. ANDREW OATWAY:   Object to the
14        form.
15        A.   I would think maybe approximately a
16   month after the meeting.
17        Q.   So sometime --
18        A.   The initial meeting.
19        Q.   Sometime in September of 2015?
20        A.   I believe so, yes.
21        Q.   Okay.   And who did you discuss the --
22   the purchase price with specifically?   Do you
23   recall?
24        A.   Bill McLaughlin.
25        Q.   Okay.   And the -- the purchase price
```

```
 1    agreed upon was -- was it actually a set number,

 2    or were there conditions attached to it, or what

 3    was your understanding of it?

 4                    MR. ANDREW OATWAY:  Object to the

 5        form.

 6        A.    There was a set number for two payments

 7    and then there was an earnout on what I called

 8    retained contracts, retained business that was

 9    based on the split of profits 70/30.

10        Q.    Okay.  And -- and what specifically --

11    what was your understanding of what Atlantic was

12    going to be purchasing from NER?

13        A.    Can you ask the question again?

14        Q.    Sure.

15              What exactly was -- was Atlantic going

16    to be buying from NER?

17        A.    The assets that were listed in the bill

18    of sale.

19        Q.    Okay.  Okay.  Was -- was it -- was it

20    your understanding that -- that they were

21    effectively going to be taking the -- the entire

22    NER business?

23        A.    Could you ask that question again?

24        Q.    Sure.  I mean --

25        A.    Or a little differently?
```

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1      Q.    Sure.

2            Was -- was NER going to be continuing

3      business after the sale to Atlantic?

4      A.    No.

5      Q.    Okay.  And -- and why not?  Why would it

6      not be continuing business after that sale?

7      A.    Because we -- we may -- we were not

8      going to be able to survive after we were done.

9      Q.    My -- my question is this:  Was -- was

10     it -- is there any part of the NER business that

11     was being retained by NER --

12                    MR. KANTROWITZ:  Object to the

13          form.

14     Q.    -- through -- through this asset sale?

15                    MR. KANTROWITZ:  Object to the

16          form.

17     A.    No.

18     Q.    Okay.  Everything that -- that NER had

19     was going to Atlantic, is that correct?

20                    MR. KANTROWITZ:  Objection.

21                    MR. ANDREW OATWAY:  Objection.

22     A.    Well, just as an example, we retained

23     all the liabilities.

24     Q.    Well, was there anything that was

25     necessary to conduct NER's business that was not

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 186

1   transferred over to -- to Atlantic?

2            MR. ANDREW OATWAY:   Objection.

3        A.   I don't understand your question.

4        Q.   Sure.

5            What -- what parts of the business

6   did -- did NER retain after the sale to Atlantic?

7        A.   We retained -- primarily it was

8   liabilities.

9        Q.   Okay.  And when you approached

10  Everingham & Kerr -- this might be an easier way

11  to get there -- who put together this confidential

12  business review that's Exhibit 47, right, you were

13  seeking to sell -- or NER was seeking to sell its

14  managed print services division, correct?

15       A.   Correct.

16       Q.   And that's what was being marketed for

17  sale in the confidential business review, is that

18  correct?

19       A.   Correct.

20       Q.   Okay.  How is what happened in the sale

21  to Atlantic different than what you were

22  contemplating through this confidential business

23  review?  What was being offered for sale through

24  that?

25       A.   Not much was different.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 187

1    Q.   Can you think of anything at all that

2  would actually be a difference?

3    A.   Well, as an example, I see in this

4  Exhibit 40 -- is that the one you referred me to?

5    Q.   I -- what I referred you to is Exhibit

6  47, the confidential business review.

7            MR. ANDREW OATWAY:  Can you give

8       him the question again?

9            MR. PRIEBE:  Sure.

10   Q.   What --

11           MR. ANDREW OATWAY:  Listen to the

12      question.

13           THE WITNESS:  I am.

14 BY MR. PRIEBE:

15   Q.   What -- what is -- what is different

16 from what's -- what's being offered here in

17 Exhibit 47, the managed print services division,

18 how was that different from what was actually

19 purchased by Atlantic?

20   A.   Well, let's start with the biggest

21 difference, which was I wasn't included, although

22 I guess that said, this was -- I wasn't going to

23 be included with this as well either.  That all

24 has to do with value.

25           I mean, this was -- I don't -- this was

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 188

1   an introduction to potential buyers of the

2   business itself.  I don't know that in here it

3   talks specifically about anything other than the

4   process of a sale.  So -- so I don't, you know --

5        Q.   And I can ask the question this way:

6   When -- when you --

7                 MR. ANDREW OATWAY:  For the record,

8        the witness was referring to Exhibit 47 when

9        he said "this."

10                Go ahead.

11   BY MR. PRIEBE:

12        Q.   The purpose of Exhibit 47 was to obtain

13   offers for a potential purchase of -- of NER's

14   business at that point in time, correct?

15        A.   The managed print services business,

16   yes.

17        Q.   Okay.  And there were no other

18   businesses of NER at that point in time other than

19   the managed print services division, is that

20   right?

21        A.   Correct.

22        Q.   Okay.  So how -- how is the transaction

23   with Atlantic different from the transaction you

24   were contemplating when you sent out this

25   confidential business review?  What are the

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1   differences?

2        A.   Well, when this was done, we had Office

3   Max under contract.

4        Q.   And I'm not -- I'm not talking about the

5   value of it.  I'm just talking about --

6        A.   Well, that's the biggest issue, is the

7   value.

8             MR. ANDREW OATWAY:  Don't interrupt

9        him.

10             THE WITNESS:  I'm sorry.

11             MR. ANDREW OATWAY:  Wait.

12        Q.   And -- and I -- I -- I understand the

13   point.  And I think you're saying, well, we --

14   when -- when this was first prepared, you

15   didn't -- and tell me if I'm wrong.  I think what

16   you're getting at is that when this was first

17   prepared, your testimony is that we didn't know

18   about -- that Office Max would not be retained as

19   a customer, is that correct?

20        A.   I said that I did not know that they

21   would not renew.

22        Q.   Okay.  But I'm just talking about not

23   the purchase price, but just the -- the -- the

24   structure of what's occurring.

25             Here you're -- you're -- NER is

Page 190

1     marketing its managed print services division for

2     sale, correct?

3          A.    Correct.

4          Q.    Okay.  Other than the difference in --

5     in purchase price, how was the transaction with

6     Atlantic different from what you were

7     contemplating when you sent out this confidential

8     business review, Deposition Exhibit 47?

9          A.    Well, the -- the -- the situation with

10    the business at that point in time was very

11    different when the conversation occurred with

12    Atlantic versus when this was put together.  And

13    so you're asking me what was contemplated.  What

14    was contemplated at the time this was put together

15    was there was an opportunity to try to maximize

16    value based on an improving earnings picture, a

17    desire to exit, and whether that result of that

18    contemplation, the hope would be that it would

19    yield a higher value.  And what the structure of

20    that transaction would be was not determined in

21    this document.  It would be based on what an

22    offer -- a buyer would potentially be interested

23    in buying.

24                So we didn't know what would come out of

25    it.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1    Q.   Okay.

2    A.   And what came out of it was nothing.

3    Q.   Okay.  But -- but my -- my point is you

4    were -- you were trying to sell the managed print

5    services division, correct?

6    A.   Yes.

7    Q.   Okay.  Did you sell the managed print

8    services division to Atlantic?

9    A.   We sold a -- a series of assets that

10   were listed on the bill of sale, but -- but it was

11   the -- the assets that were tied to the managed

12   print services business.

13   Q.   Okay.  And what -- what liabilities were

14   not included in that purchase?

15   A.   All of the -- all liabilities.

16   Q.   Okay.  All right.  We've talked a -- a

17   little bit about Deposition Exhibit 6, which is

18   the software agreement between NER and IT

19   Portfolio.

20        When -- when did Atlantic become

21   aware -- at least to your knowledge, when did

22   Atlantic become aware of the software agreement

23   between NER and IT Portfolio?

24   A.   I can't be -- I can't tell you exactly.

25   I know it was disclosed and put in a drop box for

Page 227

1    conversation that you had with Bill McLaughlin in

2    or around August of 2015.

3              Do you recall that?

4        A.    Yes.

5        Q.    Is it fair to say that Mr. McLaughlin

6    told you when you met with he and -- when you met

7    with him and -- and Russ Klein in the Atlantic

8    office that the current arrangement with NER that

9    Facsimile -- you understand Facsimile is Atlantic,

10   Tomorrow's Office, correct?

11       A.    Yes.

12       Q.    So is it fair to say that Mr. McLaughlin

13   and Mr. Russ Klein made clear to you at that

14   meeting that the current price levels and the

15   current arrangement that Atlantic was paying to

16   NER could not continue?

17       A.    It was like being hit in the side of the

18   head.  Yes, very clear.

19       Q.    And did they -- did they also make clear

20   to you that if some other arrangement hadn't been

21   made or couldn't be made, that they would be

22   transitioning off of the P4 software to something

23   else?

24       A.    That was very clear.

25       Q.    Okay.  And did you already know at that

Page 228

```
 1    point in time that they were using FM Audit and

 2    that they were providing managed print services

 3    outside of Print4, both the software and the

 4    platform, for a portion of their managed print

 5    services business?

 6        A.    I was aware of that.

 7        Q.    Okay.  And -- and that's where they told

 8    you the cost of using FM Audit and their -- their

 9    system as opposed to Print4 was irreconcilable for

10    them, right, the -- the cost differential?  It was

11    unacceptable to them, correct?

12        A.    Yes.

13        Q.    Did -- at this conversation that you had

14    the first time in the office, everybody at that

15    point was aware that Office Max had terminated its

16    contract with NER, correct?

17        A.    Yes.

18        Q.    And in 2015, Office Max was NER's

19    biggest customer, correct?

20        A.    Yes.

21        Q.    And when they terminated, that made

22    Atlantic NER's biggest customer, correct?

23        A.    Yes.

24        Q.    And if you were to take a look at

25    Schedule 4.1 P in the asset purchase agreement,
```

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1    Q.   So that one customer, which would be the

2    second largest customer behind Office Max in 2013,

3    went down to a relatively small customer, is that

4    correct?

5         I'll rephrase.  That was a bad -- that

6    was a bad -- bad question.

7         The revenue, if we go from the -- from

8    the payment column to the revenue column, the

9    revenue from the United Stationers Supply went

10   from $485,794 in 2013 to $49,635 in 2015, correct?

11   A.   Yes.

12   Q.   That's a large loss of revenue, correct?

13   A.   Yes.

14   Q.   Similarly, Office Max went from

15   $3,630,000 in 2013 to $1,627,194 in 2015, correct?

16   A.   Yes.

17   Q.   And it was going to zero after that,

18   correct, because they had canceled their contract,

19   correct?

20   A.   Yes.

21   Q.   That left Atlantic, Tomorrow's Office as

22   the next largest customer of NER, is that correct?

23   A.   Yes.

24   Q.   And if you look at the revenue lines for

25   the 2015 year, at least to date, you know, as of

Page 231

1    September of 2015, Atlantic was almost three and a

2    half times larger than the next largest customer

3    that existed as of that time, is that correct?

4         A.   Yes.

5         Q.   And beyond that, the customers were

6    substantially smaller.  Four times higher than

7    perhaps the next highest customer, correct?

8         A.   Yes.

9         Q.   Because Atlantic, Tomorrow's revenue --

10   Atlantic, Tomorrow's Office revenue for NER as of

11   September 2015 was about $415,000.  The next

12   highest was, looks like, 136,000.

13             Do you see that?

14        A.   Yes.

15        Q.   And the next highest after that was

16   about 95,000, correct?

17        A.   Yes.

18        Q.   Okay.  So if Atlantic -- and did

19   Atlantic, Tomorrow's Office, did Facsimile

20   Communications know, when you met with them in

21   August of 2015, that since Office Max had left,

22   they were the largest customer of NER?

23        A.   Yes.

24        Q.   Okay.  And did Mr. McLaughlin explain to

25   you that he was concerned that, given the

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 233

1      Q.    Okay.  And was that on an accrual basis?

2      A.    It would have been on a -- yes, on an

3   accrual basis.

4      Q.    Okay.  And what was the cash flow

5   situation from the end of 2014 until June of 2015?

6      A.    It was improving.

7      Q.    Was -- did the company's liabilities

8   exceed its assets in the summer of 2015?

9      A.    Yes.

10     Q.    And was that also the case in January of

11  2015?

12     A.    Yes.

13     Q.    Was that also the case in June of 2014?

14     A.    Yes.

15     Q.    Was that the case in January of 2014?

16     A.    I believe so, yes.

17     Q.    Is it fair to say that if Atlantic,

18  Tomorrow's Office, Facsimile Communications that

19  did business as Atlantic, Tomorrow's Office,

20  pulled its business from NER, that NER would have

21  had to shut the doors of the business and not go

22  forward?

23     A.    Yes, it's true.

24     Q.    Now, you -- you talked about a

25  transaction that was contemplated with HP in 2011,

Page 247

1   through Everingham & Kerr and the ultimate sale to

2   Atlantic Technology Integrators.

3         Do you recall that line of questioning?

4   A.   Yes.

5   Q.   Okay.  Was there a substantial

6   difference in the customer base when you were

7   listing with the sale -- listing for sale with

8   Everingham & Kerr as opposed to when Atlantic

9   Technology Integrators bought assets from you in

10  2015?

11  A.   More than a 50 percent reduction.

12  Q.   Okay.  Now, what portion of your revenue

13  came from Office Max?  Do you recall?

14  A.   It was right around 60 percent.

15  Q.   Okay.  And what portion of your revenue

16  came from United Stationers?

17  A.   A small percentage.

18  Q.   Okay.  But a *bigger percentage than*

19  Atlantic's in the 2013/'14 time period?

20  A.   No, I would say Atlantic was larger at

21  that point than United was.

22  Q.   Okay.  At the time that you listed with

23  Everingham & Kerr, what was your goal?  What were

24  you trying to do?

25  A.   To maximize the sale of the business, to

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 248

1    shut NER down once and for all, and to maximize

2    the value of -- of what was left and to wind down

3    the operations.

4         Q.   And at that time, were you concerned

5    that NER was in imminent danger of closing, at the

6    time you listed with Everingham & Kerr?

7         A.   That was -- that was right around the

8    same time where we received the notice from Office

9    Max.  I believe the conversations with Everingham

10   & Kerr started before we received the notice from

11   Office Max.  And the book came out right as the

12   Office Max termination was being -- nonrenewal

13   letter was being received.

14        Q.   Was that office termina- -- Office Max

15   termination known throughout the industry, that

16   they were leaving Print4 at some point?

17        A.   I think that's a safe statement, yes.

18        Q.   And would you agree with me that that

19   would -- that that was negative news in the

20   marketplace for NER?

21        A.   Clearly, yes.

22        Q.   Okay.  At the time that you met with

23   Mr. McLaughlin and Mr. Klein, were you concerned

24   at that time that there was imminent likelihood

25   that NER would have to close its doors?

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1    A.    We had gotten to -- at that point in

2    time, we had gotten to the point where we -- we

3    knew that the business could not support -- could

4    not continue to support the existing profile of

5    people and services and goods because we couldn't

6    make -- we -- we -- when we -- with the loss of

7    Office Max, we couldn't -- we couldn't make it

8    work.

9          And that -- and that was done --

10   removing my salary specifically was -- I mean,

11   that would have been -- and it wasn't even enough,

12   but...

13          So did we know exactly what we were

14   going to do at August 2015 when the last contracts

15   for Office Max stopped?  No, I don't think we knew

16   exactly, but we -- we knew we weren't viable.

17    Q.    And what about when Atlantic told you

18   that either things had to change or they were

19   going to leave?  What was your concern at that

20   time?

21    A.    It was more focused on is this a

22   bankruptcy filing or, you know, can we shut it --

23   just shut it down?

24    Q.    Had you -- had NER missed payrolls in

25   2015?

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 250

1        A.     We were delayed in making payrolls, yes.

2        Q.     To employees?

3        A.     Yes.

4        Q.     How many employees did you have in -- in

5   approximately October of 2015?  Do you know?

6        A.     We probably had eight or ten.

7        Q.     Okay.  And how many unsecured creditors

8   did you have in October of 2015?

9        A.     Probably somewhere between two and --

10   two and -- 200 and 350 would be my guess.

11        Q.     I'm sorry, I thought you were going to

12   say two, but you said 200?

13        A.     Two hundred and three hundred.

14        Q.     Oh --

15        A.     We had a lot of small ones.

16        Q.     Okay.  And was ITP one of your unsecured

17   creditors?

18        A.     Yes.

19        Q.     Okay.  And how much debt did you have to

20   your unsecured creditors in October of 2015?

21        A.     I believe it was roughly $2.8 million.

22        Q.     And in that $2.8 million, how much of

23   that did you have on the books for ITP?

24        A.     We had roughly $180,000 in trade

25   payables, posted invoices.  And I -- and I believe

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1      Q.   In the 2015 time period.  August 2015

2  and on, after the conversation with Bill

3  McLaughlin at Facsimile.

4      A.   I did not.

5      Q.   Okay.  And at that point in time, I

6  assume your attorneys were dealing with the

7  attorneys for ITP, is that correct?

8      A.   Yes.

9      Q.   Okay.  In negotiating with -- with

10  Atlantic for the sale of assets, what were your

11  goals?

12      A.   To scratch and claw to get the most I

13  could possibly get for our --

14      Q.   Do you believe --

15      A.   -- unsecured creditors.

16      Q.   I'm sorry, I interrupted you.  Could you

17  say that again?

18      A.   To fight as hard as I could to get as

19  much value out of the transaction as I could for

20  our unsecured creditors.

21      Q.   Under the circumstances, do you think

22  you were successful given the -- the facts and

23  circumstances at the time?

24      A.   Yes.

25      Q.   To your knowledge, was there any other

Page 254

1   entity in the marketplace interested in purchasing

2   your customer list or the Print4 software or any

3   combination of them?

4       A.   No, we had no other options.

5       Q.   At what point in time did NER switch

6   from Print4 on site to FM Audit?

7       A.   In the 2014/2015 time period.

8       Q.   Okay.  And why was that switch made?

9       A.   Largely because of the Sharp

10  dissatisfaction and cost.

11      Q.   Do you know when Atlantic, Tomorrow's

12  Office switched from Print4 on site to FM Audit?

13      A.   You -- I think you need to ask that

14  question a little bit more.  With NER?

15      Q.   That's right.  Atlantic, Tomorrow's

16  Office was using FM Audit for part of its managed

17  print services and it was using on site for its

18  managed print services through NER, correct?

19      A.   Yes.

20      Q.   Okay.  At some point, even in the NER

21  portion of managed print services, Atlantic

22  dropped the on-site tool and went to FM Audit,

23  correct?

24      A.   Yes.

25      Q.   Do you know when that was and why that

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 261

1  moved.

2      Q.   And in terms of machines, Supplies

3  Network, do you have knowledge based upon your

4  knowledge in the industry of approximately how

5  many machines in the marketplace Supplies Network

6  has on -- on an MPS program, on its MPS program?

7      A.   I don't.  I just know it's large.

8      Q.   Okay.  A multiple of what NER had?

9      A.   I would -- they were so much larger than

10  us.  Yes.

11      Q.   Ten times larger, perhaps?

12      A.   I don't know that I ever had specific

13  insight in terms of what Supplies Network's

14  exact size of their -- size of their program was.

15      Q.   Do you know what the Print4 software's

16  share of the MPS marketplace was in October of

17  2015?

18      A.   Less than 1 percent.

19      Q.   Okay.  Is it fair to say that you

20  believe you got fair value for the Print4 software

21  and your customer list in October of 2015 when you

22  sold the assets to Atlantic?

23      A.   Yes.  Obviously I would have liked more,

24  but...

25          MR. KANTROWITZ:  Okay.  I know we're at

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)