Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
----------------------------------------
IT PORTFOLIO, INC., a Colorado
Corporation,

                    Plaintiff,

          -vs-

NER DATA CORPORATION, a Delaware
Corporation; NER DATA PRODUCTS,
INC., a New Jersey Corporation;
STEPHEN F. OATWAY, an Individual;
And ATLANTIC TECHNOLOGY.
INTEGRATORS, LLC, a Delaware.
Limited Liability Corporation,
                    Defendants,

Civil Action No.: 15-cv-00179-WYD-STV
----------------------------------------

                    April 3, 2017
                    9:19 a.m.


     Deposition of JASON M. WEISS, taken by

Plaintiff, pursuant to Notice, held at the

offices of Kantrowitz, Goldhamer & Graifman P.C,

747 Chestnut Ridge Road, Chestnut Ridge, New York,

before Bridget Lombardozzi, a Certified Court

Reporter, and Notary Public within and for the

State of New York.



PRECISION REPORTING SERVICE          908-642-4299

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

```
                                                    Page 2
 1    A P P E A R A N C E S :

 2

 3        PODOLL & PODOLL, P.C.

 4            Attorneys for Plaintiff

 5            5619 DTC Parkway, Suite 1100

 6            Greenwood Village, Colorado   80111

 7            303.861.4000 (Telephone)

 8            303.861.4004 (Fax)

 9            rob@podoll.net

10            dustin@podoll.net

11        By:   ROBERT C. PODOLL, ESQ.

12              DUSTIN J. PRIEBE, ESQ.

13

14

15        MORISI & OATWAY, P.C.

16            Attorneys for NER and Stephen Oatway Defendants

17            730 Hancock Street

18            Quincy, Massachusetts   02170-2723

19            617.479.0400 (Telephone)

20            617.270.9070 (Cell)

21            aco@morisi.com

22        By:   ANDREW C. OATWAY, ESQ.

23

24

25
```

1   A P P E A R A N C E S  (Continued)

2

3        KANTROWITZ, GOLDHAMER & GRAIFMAN P.C.

4            Attorneys for Atlantic Defendant

5            747 Chestnut Ridge Road

6            Chestnut Ridge, New York  10977

7            845.356.2570 (Telephone)

8            845.356.4335 (Fax)

9            bkantrowitz@kgglaw.com

10       By:   BARRY S. KANTROWITZ, ESQ.

11

12

13   A L S O   P R E S E N T :

14

15       STEPHEN F. OATWAY

16

17

18

19

20

21

22

23

24

25

Page 28

```
 1              record for a moment.
 2                      (Whereupon, a discussion is held
 3              off the record.)
 4                      MR. PODOLL:  Let's mark this as 25.
 5                      (Whereupon, exhibit is received and
 6              marked Exhibit 25 for identification.)
 7                      MR. PODOLL:  Back on the record.
 8    BY MR. PODOLL:
 9         Q.    You've been handed what's been marked as
10    Exhibit 25.
11              Do you recognize that document?
12         A.    I do.
13         Q.    Identify it for us, please.
14         A.    This is a -- an NDA with Everingham &
15    Kerr, an investment banker retained by NER to sell
16    the business.
17         Q.    Okay.  And is there a date on it?
18         A.    May 19th, 2015.
19         Q.    Does it contain your signature?
20         A.    It does.
21         Q.    Do you recall this document?
22         A.    I do.
23         Q.    Okay.  When did you -- on what occasion
24    or for what purpose did you receive this document?
25         A.    Everingham & Kerr sends regular e-mails
```

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1   out to its distribution list with opportunities

2   for purchase.

3        Q.    And how did you manage to obtain a

4   confidentiality agreement?

5        A.    I believe I requested it.

6        Q.    And to your recollection is the date

7   accurate?

8        A.    I'm sure it is.

9        Q.    The designation of client and the

10  company, is that a reference to the managed print

11  service business of NER to your understanding?

12       A.    Yes.  After the fact we learned it was.

13  We requested it specifically to find out.

14       Q.    Okay.  "After the fact" meaning after

15  you signed the confidentiality agreement and

16  received the materials?

17       A.    Yes.

18       Q.    Okay.  When did you receive the

19  materials?

20       A.    I don't know, but I'm sure it was

21  shortly after signing this.

22       Q.    Within a week or two?

23       A.    I would bet, yes.

24       Q.    Okay.  So what was going on in May 2015

25  concerning this, at that point, opportunity?  Were

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

1  you beginning to evaluate it?

2      A.   No, we weren't, actually, but we were

3  concerned about what was happening with NER

4  because we had customers that were on their

5  product and that they were providing service to.

6      Q.   What led to you have concerns about NER

7  in May of 2015?

8      A.   That they were selling themselves

9  through Everingham & Kerr.  We believe based on

10 the description that it was NER.

11     Q.   So you requested the materials to

12 determine whether, in fact, it was NER?

13     A.   Correct.

14     Q.   And your suspicion was justified.  It

15 turned out to be NER?

16     A.   Correct.

17     Q.   Okay.  What materials did you receive?

18     A.   It would be a confidential business

19 review which would basically summarize the

20 opportunity at a high level.  I myself don't

21 believe I reviewed it thoroughly.  I would have

22 sent it to Bill McLaughlin.

23     Q.   On the high-level confidential business

24 review, was NER actually identified?

25     A.   I don't recall.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 32

1        A.    There were not.  Not as far as I know.

2        Q.    Did anyone decide to contact NER and

3   find out what was going on?

4        A.    Not to my knowledge.

5        Q.    Okay.  When after May of 2015 did you --

6   meaning Facsimile or Atlantic Technology

7   Integrators -- pick up on the idea of, well, maybe

8   we can buy this thing?

9             MR. KANTROWITZ:  Do you want to

10        separate them?  It's a compound question,

11        so...

12             MR. PODOLL:  All right.  You mean

13        because of the two entities?

14             MR. KANTROWITZ:  Sure.  I mean,

15        it's two distinct entities.  We know ATI

16        didn't exist until October of 2015.  Object

17        to the form of the question.

18             MR. PODOLL:  So we're back to one

19        entity.

20   BY MR. PODOLL:

21        Q.    When did Facsimile pick up on the idea

22   of perhaps purchasing the managed print services

23   platform from NER?

24        A.    So, again, I have no firsthand knowledge

25   of this other than reading the information

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)

Page 33

1   produced in discovery here.  But based on the

2   letter I saw from Steve to Bill, it appears that

3   it was somewhere in late August.

4       Q.    Of 2015?

5       A.    Mid to late August of 2015.

6       Q.    Okay.

7       A.    And I don't know if that was something

8   that -- it doesn't appear that that originated

9   from the Facsimile side.

10      Q.    And you got involved in September you

11  said?

12      A.    Correct.

13      Q.    Let's see if I have something that can

14  help us.

15            (Pause)

16      Q.    In September of 2015, Facsimile still

17  was operating under its contractual relationship

18  with NER regarding the managed print services

19  platform, is that correct?

20      A.    I believe so.

21      Q.    And payments were still being made from

22  Facsimile to NER according to contract to your

23  knowledge?

24      A.    I don't have any firsthand knowledge of

25  that, but I would assume.

1  largest customer, comprising 70 percent of their

2  revenue.  And I guess, from my understanding, we

3  learned about that -- we, Facsimile, learned about

4  that in August.

5       Q.   Of?

6       A.   Of 2015.  And those are the issues that

7  I would interpret this as.  Because at that point,

8  when you lose 70 percent of your revenue, your

9  organization is not going to be around for a

10  terrible amount of time.

11      Q.   I know that you're inferring.  Let me

12  point out that Bill goes on to say that he was

13  interested in "acquiring certain assets before the

14  profile went out from Joe," so that would put it

15  somewhere before May, I believe, correct?

16      A.   It would.

17      Q.   Okay.  And I understand you're just

18  trying to infer from what we see here.

19      A.   I am.  I am.

20      Q.   So that's fine.

21           Did you know of the interest to acquire

22  the Print4 platform prior to May of 2015?

23      A.   No.

24      Q.   That hadn't come across your desk?

25      A.   Not at all.

You created this PDF from an application that is not licensed to print to novaPDF printer (http://www.novapdf.com)