IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:15-cv-00179-DDD-STV

IT PORTFOLIO, INC.,

    Plaintiff and Counter Defendant,

v.

NER DATA CORPORATION;
NER DATA PRODUCTS, INC.; and
STEPHEN F. OATWAY,

    Defendants and Counter Claimants.

---

**ORDER DENYING MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

Defendants NER Data Corporation and NER Data Products, Inc. (collectively, "NER") and Stephen F. Oatway move for summary judgment with respect to certain claims brought by Plaintiff IT Portfolio, Inc. Doc. 175. For the following reasons, summary judgment is denied.

### BACKGROUND[1]

IT Portfolio is a Colorado corporation doing business in Colorado. NER Data Products is a New Jersey corporation that was based in New Jersey. NER Data Corporation is a Delaware corporation that was based in New Jersey. Mr. Oatway is an individual who resides in New Jersey and was the president and a director of NER at all relevant times.

---

[1] Absent citation to another part of the record, the following facts are drawn from the parties' statements of material fact, Doc. 175 at 3-9; Doc. 186 at 1-3, and are undisputed for purposes of this motion unless otherwise noted.

- 1 -

In October 2005, IT Portfolio and NER "contracted to combine ITP's Profit software with NER's Printhelpline software into a new product known as Print4." Doc. 213 ¶ 14; Doc. 217 ¶ 14. In February 2010, NER Data Products and IT Portfolio signed a "Software Development and Assignment Agreement" with an effective date of January 1, 2009. Doc. 213-1. That agreement related to software and services in connection with NER's managed print services business. In the agreement, IT Portfolio assigned its Profit software, which had by that point become "irrevocably integrated into the Print4 Software," to NER while reserving the right to market, sell, and distribute the Print4 software in the event that NER "abandoned" it. *See id.* at 2, 7. IT Portfolio alleges that NER failed to pay its obligations under the agreement and brought this lawsuit.

NER Data Corporation was formed in April 2010, and it operated a managed print services business and owned managed print services assets. From the time of its formation, NER Data Corporation lost money at the rate of approximately $100,000 per month as it was trying to build business. In 2010 or 2011, Hewlett Packard approached NER about purchasing its managed print services business. Although NER and HP entered into a letter of intent, HP ultimately walked away from the deal in the first quarter of 2011.

NER reduced its operating expenses by selling its data center business and improved its contract profitability, and it first turned a profit in January 2015. At that time, it engaged an investment banking firm, Everingham & Kerr, to find potential buyers of its managed print business. The defendants assert that the goal in engaging Everingham & Kerr was "to maximize the value of what was left of the NER DC business, [and] to shut it down once and for all and to wind down operations." Doc. 175 at 5 (citing Doc. 175-2 at 39-40 (Apr. 4, 2017 Oatway

- 2 -

deposition)). IT Portfolio disputes this, noting that "the stated goal in the offering materials produced by Everingham & Kerr was to sell the managed print service business." Doc. 186 at 1 (citing Doc. 186-1 (NER Data Corporation Managed Print Services Division Confidential Business Review prepared by Everingham & Kerr)).

Everingham & Kerr prepared a confidential business review of NER to send out to prospective purchasers who had expressed an interest in buying the managed print business. Doc. 186-1. There were several management calls following the preparation of the confidential business review and at least one site visit by a potential buyer. One potential buyer was a reseller out of New York/New Jersey who used to be called Westwood Computer, and another was in the thermal bar code business and was looking to see whether this would be a good fit for their business. Both prospective inquiries passed and did not make any offer to purchase the business.

In 2015, OfficeMax was NER's largest customer, accounting for approximately 60% of NER's revenues, but business was declining. Revenues from OfficeMax went from $3,630,000 in 2013 to $1,627,194 in 2015. OfficeMax notified NER that it was cancelling its managed print contract, and that the revenues from OfficeMax would be going to zero. NER had engaged Everingham & Kerr prior to receiving the notice that OfficeMax was cancelling its contract, and the notice from Office-Max came around the same time Everingham & Kerr's was preparing the confidential business review for prospective buyers. By August 2015, when the last contracts for OfficeMax stopped, NER believed that its business was no longer viable.

Facsimile Communications Industries, Inc., which does business as "Atlantic Tomorrow's Office," was also a NER customer. Atlantic had

received a copy of the Everingham & Kerr confidential business review in May 2015. Prior to May 2015, Atlantic had no interest in acquiring NER's managed print assets. In August 2015, Mr. Oatway received a call from Atlantic asking him to discuss the relationship and the business. At that time, Atlantic was NER's largest remaining customer. Atlantic was concerned with the profitability of its business that it was running with NER. Atlantic told Mr. Oatway that it did not believe the business was sustainable and that it needed to potentially move its business to another platform. Atlantic made it clear that the current prices it was paying to NER would not continue and that if some other arrangement hadn't been made or couldn't be made, Atlantic would transition off of NER's software to something else. Mr. Oatway knew that if NER lost Atlantic's business after the loss of OfficeMax, that would be the end of the company.

In mid to late August 2015, discussions about Atlantic purchasing NER's assets began. There was discussion about Atlantic making an asset purchase of the managed print software so that the Atlantic customers on that platform could be handled by Atlantic if something happened to the NER business. The defendants contend that Mr. Oatway recognized this as a potential opportunity to create value for NER's unsecured creditors, and that in negotiating with Atlantic for the sale of the managed print assets, Mr. Oatway's goal was to get as much value out of the transaction as he could for the unsecured creditors. Doc. 175 at 8 (citing Doc. 175-2 at 22-33, 43). IT Portfolio contends, though, that Mr. Oatway ultimately dissipated NER's assets without satisfying debts owed to creditors, including IT Portfolio. Doc. 186 at 2.

Sometime in September 2015, Atlantic and NER agreed on a purchase price for the sale of the managed print assets. Atlantic formed Atlantic Technology Integrators, LLC ("ATI"), to which the managed print

services business would be sold. The agreement to sell the managed print assets from NER to Atlantic/ATI closed on October 31, 2015. From early 2015 when NER engaged Everingham & Kerr to list the managed print business for sale until October 2015 when ATI purchased the assets, NER had suffered more than a 50% reduction in its customer base, and at the time of the sale, NER had between 200-300 unsecured creditors. The purchase price was $150,000 plus 70% of net profit generated in the first year through sales to NER's former customers.

The defendants assert that NER received a fair value from ATI for the managed print assets, and that there were no other entities in the marketplace interested in purchasing NER's assets—not its customer list, the Print4 software, or any combination of them. Doc. 175 at 8-9 (citing Doc. 175-2 at 43-44, 45). IT Portfolio disputes this and asserts that the defendants "did not properly access the marketplace, did not allow enough time to find a Buyer, did not offer the Print4 platform to logical buyers, and did not market the Print4 platform for sale independent of its failing business." Doc. 186 at 2-3 (citing Doc. 186-2 (affidavit of Lari Masten, CPA); Doc. 186-3 (affidavit of IT Portfolio principal familiar with value of Print4 platform, customers, and logical potential buyers); Doc. 186-4 (affidavit of IT Portfolio principal familiar with Print4 platform capabilities and its value to users); Doc. 186-9 (Jan. 19, 2016 Oatway deposition, calling NER's sale of assets a "fire sale")). IT Portfolio contends that NER "essentially gave away the Print4 platform" to ATI, and that NER should have returned the platform to IT Portfolio to market and sell pursuant to the abandonment provisions of the Software Development and Assignment Agreement. *Id.*

## STANDARD OF REVIEW

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.*

In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Id.*; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). And "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

## DISCUSSION

IT Portfolio brings nine claims against the defendants. *See generally* Doc. 213. At issue in this motion are (1) its seventh claim for relief for fraudulent transfer, asserted against NER and Mr. Oatway; (2) its eighth claim for relief for civil conspiracy, asserted against NER and Mr. Oatway; and (3) its ninth claim for relief for breach of fiduciary duty, asserted directly against Mr. Oatway or in the alternative as a derivative claim against NER Data Corporation.

### I. Fraudulent Transfer and Civil Conspiracy

The parties dispute which state's substantive law applies to the claims at issue. The defendants contend that Delaware law applies, while IT Portfolio contends that Colorado law applies. Doc. 175 at 10-14; Doc. 186 at 4-15; Doc. 203 at 1-3. The choice-of-law question is addressed below in connection with the claim for breach of fiduciary duty, but I need not decide which state's law applies to the claims for fraudulent transfer and civil conspiracy because the parties have not pointed to, nor have I found, any outcome-determinative conflict between the two states' laws with respect to these claims. *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 946 F. Supp. 861, 866 (D. Colo. 1996) ("Unless [an outcome-determinative] conflict exists, courts do not make choice of law decisions.").

Both Colorado and Delaware require as an element of a fraudulent-transfer claim that the transfer in question was made "without receiving a reasonably equivalent value in exchange." Colo. Rev. Stat. § 38-8-105(1)(b); Del. Code Ann. tit. 6, §§ 1304(a)(2), 1305(a). "Reasonably equivalent value" is a factual question that depends on the totality of circumstances in each case. *Silverberg v. Colantuno*, 991 P.2d 280, 287 (Colo. App. 1998); *Cleveland-Cliffs Burns Harbor LLC v. Boomerang*

*Tube, LLC*, C.A. No. 2022-0378-LWW, 2023 WL 5688392, at *9 to *10 & n.121 (Del. Ch. Sept. 5, 2023); *accord Clark v. Sec. Pac. Bus. Credit, Inc.* (*In re Wes Dor, Inc.*), 996 F.2d 237, 242 (10th Cir. 1993); *PHP Liquidating, LLC v. Robbins* (*In re PHP Healthcare Corp.*), 128 F. App'x 839, 847-48 (3d Cir. 2005).[2]

The defendants contend that there is no genuine dispute of material fact that NER received a reasonably equivalent value from ATI for its managed print assets, arguing that Atlantic was the only interested buyer; that "[t]he best evidence of the fair value of the assets is what a willing buyer paid for them"; and that IT Portfolio "has no evidence of fair value to the contrary." Doc. 175 at 14-16. But IT Portfolio has presented evidence that a share of NER's managed print services business was sold for a substantially higher value in 2010; that another company was acquiring other managed print service providers between 2006 and 2018 for substantially higher values; that the Print4 software was well-regarded by users, but NER made no attempt to sell the software independently of its failing business; that NER did not market the sale effectively; and that the sale to Atlantic, which had an officer who was a personal friend of Mr. Oatway, may not have been an arms-length transaction. *See* Doc. 186-2; Doc. 186-3; Doc. 186-4. In reply, the defendants focus only on the choice-of-law question and the claim for breach of fiduciary duty and make no attempt to explain why the evidence

---

[2] Because the language of the Colorado and Delaware fraudulent-transfer statutes is substantially similar to the related federal bankruptcy statute, 11 U.S.C. § 548, bankruptcy cases interpreting Section 548 are persuasive when analyzing these state statutes. *CB Richard Ellis, Inc. v. CLGP, LLC*, 251 P.3d 523, 529 (Colo. App. 2010); *Ki-Poong Lee v. So.*, C.A. No. N14C-08-173 PRW, 2016 WL 6806247, at *3 & n.20 (Del. Super. Ct. Nov. 17, 2016).

presented by IT Portfolio does not demonstrate a genuine factual dispute as to the reasonably equivalent value of the sale. *See* Doc. 203.

Viewing the facts in the light most favorable to and drawing all reasonable inferences in favor of IT Portfolio, I cannot say as a matter of law that NER received a reasonably equivalent value for the sale. Genuine disputes of material fact on this element preclude summary judgment on the fraudulent-transfer claim.[3] *See In re Wes Dor*, 996 F.2d at 242 ("[w]hether the transfer is for 'reasonably equivalent value' . . . in every case is largely a question of fact, as to which considerable latitude must be allowed to the trier of the facts"); *VMI Liquidating Tr. v. United States ex rel. IRS* (*In re Valley Mortg., Inc.*), Bankr. No. 10-19101-SBB, Adv. Proc. No. 12-01277-SBB, 2013 WL 5314369, at *6 (Bankr. D. Colo. Sept. 18, 2013) ("[R]easonably equivalent value . . . . [is] rarely decided on summary judgment and given the disputed material facts here, the Court finds this case to be no exception."). As the parties appear to agree that the claim for civil conspiracy should rise and fall with the claim for fraudulent transfer, and the defendants have made no attempt to separately demonstrate the absence of a genuine dispute of material fact as to the civil-conspiracy claim, *see* Doc. 175 at 17; Doc. 186 at 16-18, summary judgment will be denied on that claim as well.

---

[3] The defendants argue that summary judgment should be granted to NER Data Products on the fraudulent-transfer claim because that entity was not involved in the transfer of NER Data Corporation's managed print assets to ATI. Doc. 175 at 16. But the defendants cite no evidence or law in support of this argument, and IT Portfolio contends that NER Data Products owned a portion of the assets sold to Atlantic. Doc. 186 at 16 n.3. I will not grant summary judgment to NER Data Products on this claim based on such a limited record.

- 9 -

## II. Breach of Fiduciary Duty

As noted above, the defendants contend that Delaware law applies to the claim for breach of fiduciary duty, while IT Portfolio contends that Colorado law applies. Doc. 175 at 10-14; Doc. 186 at 4-15; Doc. 203 at 1-3. Unlike the claims for fraudulent transfer and civil conspiracy, the choice of law is outcome-determinative for this claim because it affects whether IT Portfolio may bring the claim directly against Mr. Oatway or must bring a derivative claim on behalf of NER Data Corporation, in which case there will be a dispute at trial regarding whether IT Portfolio made an adequate pre-suit demand. *See* Doc. 216 at 1-2. The defendants are correct that Delaware law applies to this claim.

A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Mem'l Hosp. of Laramie County v. Healthcare Realty Tr. Inc.*, 509 F.3d 1225, 1229 (10th Cir. 2007). Colorado courts follow the Restatement (Second) of Conflict of Laws, which in the absence of a binding contractual choice-of-law provision,[4] generally directs courts to assess which state has the "most significant relationship" to the parties and the claims at issue. *See AE, Inc. v. Goodyear Tire & Rubber Co.*, 168 P.3d 507, 508-10 (Colo. 2007); *Kipling v. State Farm Mut. Auto. Ins. Co.*, 774 F.3d 1306, 1310 (10th Cir. 2014) (citing *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau*, 601 P.2d 1369, 1372 (Colo. 1979) (contract

---

[4] IT Portfolio is incorrect that its claim for breach of fiduciary duty falls within the purview of the choice-of-law provision in the Software Development and Assignment Agreement, which provides that "[t]he validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Colorado." Doc. 213-1 at 13. While this contractual provision may be relevant when evaluating choice of law for the fraudulent-transfer and civil-conspiracy claims, the corporate duty at issue in the claim for breach of fiduciary duty does not derive from the parties' contractual relationship.

actions); *First Nat'l Bank v. Rostek*, 514 P.2d 314, 319-20 (Colo. 1973) (tort actions)).

Claims alleging a corporate officer's breach of fiduciary duty, however, are unique:

> The local law of the state of incorporation will be applied to determine *the existence and extent of a director's or officer's liability to the corporation['s] creditors* . . . except where, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the parties and the transaction,[5] in which event the local law of the other state will be applied.

*Restatement (Second) of Conflict of Laws* § 309 (1971) (emphasis added). The reason for this rule is that:

> the need for certainty and predictability of result[] weigh[s] heavily in favor of applying the law of the state of incorporation to the question of the scope of corporate fiduciaries' duties. Otherwise, a director or officer of a corporation could be faced with conflicting obligations when attempting

---

[5]  Section 6 provides that:
  (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
  (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
    (a) the needs of the interstate and international systems,
    (b) the relevant policies of the forum,
    (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
    (d) the protection of justified expectations,
    (e) the basic policies underlying the particular field of law,
    (f) certainty, predictability and uniformity of result, and
    (g) ease in the determination and application of the law to be applied.
*Restatement (Second) of Conflict of Laws* § 6.

> to discharge the duties that arise from this relationship to the corporation and its constituents.

*Hill v. Gibson, Dunn & Crutcher LLP* (*In re ms55, Inc.*) [*ms55 I*], 420 B.R. 806, 821-22 (Bankr. D. Colo. 2009) (citing *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982)), *aff'd* No. 10-cv-00042-PAB, 2011 WL 1084967 (D. Colo. Mar. 21, 2011).

Section 309 of the Restatement applies to the claim for breach of fiduciary duty here. IT Portfolio's argument that this so-called "internal affairs doctrine" does not apply to claims of external creditors is unavailing. Section 309 explicitly states that it applies to "a director's or officer's liability to the corporation['s] creditors." *See Hill v. Gibson, Dunn & Crutcher LLP* (*In re ms55, Inc.*) [*ms55 II*], No. 10-cv-00042-PAB, 2011 WL 1084967, at *6 (D. Colo. Mar. 21, 2011) ("[T]he Court agrees with the Bankruptcy Court that the Trustee's claims arising out of a director's alleged breach of his fiduciary duties to creditors are subject to the [Section 309] 'internal affairs doctrine.'"). IT Portfolio cites to no Colorado case holding to the contrary.

Applying this doctrine to the instant case, because NER Data Corporation is incorporated in Delaware, then Delaware law applies to the claim for breach of fiduciary duty unless Colorado has a more significant relationship to the parties and the transaction. It does not. Although IT Portfolio may well be correct that Colorado has the "most significant relationship" to the case under the more general provisions of the Restatement, that relationship is of less significance when applying the internal affairs doctrine, and the Section 309 "exception to the general rule is narrowly drawn." *Id.* (quoting *Chalk Line Mfg., Inc. v. Frontenac Venture Ltd.* (*In re Chalk Line Mfg., Inc.*), Bankr. No. 93-42773 (11),

Adv. No. 94-40003, 1994 WL 394978, at *5 (Bankr. N.D. Ala. July 26, 1994)). The Restatement commentary provides that:

> The reasons for applying the local law of the state of incorporation carry less weight when the corporation has little or no contact with this state other than the fact that it was incorporated there. In such situations, some other state will almost surely have a greater interest than the state of incorporation in the determination of the particular issue. *Nevertheless, in the absence of an explicitly applicable local statute, the local law of the state of incorporation has almost invariably been applied.*

*Restatement (Second) of Conflict of Laws* § 302 cmt. g (emphasis added); *see also id.* § 309 cmt. c (incorporating rationale of Section 302 Comments e-g).

In attempting to distinguish this case from *ms55*, IT Portfolio cites to *Ficor, Inc. v. McHugh*, but in that case "[e]xcept for its incorporation in the District of Columbia and the fact that some of its officers, directors, and shareholders reside in or near the District of Columbia, all of Ficor's activities were conducted in Colorado and all of its assets were located here," and the choice of law between Colorado and the District of Columbia was not outcome-determinative. 639 P.2d 385, 390-92 & n.11 (Colo. 1982) (corporation formed solely for purpose of acquiring and developing land in Colorado). In this case, Mr. Oatway resides in and NER Data Corporation is headquartered in New Jersey, and NER appears to conduct business in multiple states. This case's relationship to Colorado is not as strong as the one in *Ficor*. *See ms55 I*, 420 B.R. at 821 (Section 309 exception did not apply where corporation at issue "engaged in legitimate and substantial business operations throughout the United States and worldwide").

What is more, *Ficor* has been undermined, if not outright overruled, by Colorado statute. At the time *Ficor* was decided, Colorado statute

- 13 -

provided that "[a] foreign corporation . . . shall be subject to the same duties, restrictions, penalties, and liabilities imposed upon a domestic corporation of like character." Colo. Rev. Stat. § 7-9-104 (repealed effective July 1, 1994). But Colorado statute now provides that "[a]s to any foreign entity transacting business or conducting activities in this state, *the law of the jurisdiction under the law of which the foreign entity is formed shall govern* the organization and internal affairs of the foreign entity and *the liability of its owners and managers*." Colo. Rev. Stat. § 7-90-805(4) (effective July 1, 2004) (emphases added); *see also ms55 II*, 2011 WL 1084967, at *7 (Colorado statute in effect at relevant time was "arguably a relevant 'statutory directive . . . on choice of law'" and "conceivably intended to overrule *Ficor*" (citing Colo. Rev. Stat. § 7-115-105(3) (effective July 1, 1994) ("[T]his title do[es] not authorize this state to regulate the organization or internal affairs of a foreign corporation authorized to transact business in this state."))). The Section 309 exception incorporates the principles of Section 6, which provides that "[a] court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law." *Restatement (Second) of Conflict of Laws* § 6(1).

In sum, IT Portfolio has not shown that Colorado's relationship to the parties and the transaction is so significant that the Section 309 presumption that Delaware law applies is overcome. Accordingly, Delaware

- 14 -

law applies to the claim for breach of fiduciary duty,[6] and this claim must be brought as a derivative claim. As the defendants recognize, the parties' disputes regarding this claim are best resolved at trial upon a more complete factual record. Doc. 216 at 2. Summary judgment on this claim is therefore denied.

## CONCLUSION

It is **ORDERED** that:

Defendants' Motion for Partial Summary Judgment, **Doc. 175**, is **DENIED**;

On or before **March 6, 2024**, the parties must file a Joint Status Report not to exceed 1,400 words, identifying the following: (1) the prospects for settlement; (2) the anticipated length of trial; (3) whether the parties are available for trial to commence on June 24, 2024; (4) three mutually agreeable alternative dates for trial to commence in October 2024, February 2025, or March 2025; and (5) any other issues the parties wish to bring to the Court's attention; and

The Motion to Amend Pretrial Order, **Doc. 223**, is **DENIED WITHOUT PREJUDICE**. The Court will set a trial date and pretrial

---

[6] This does not necessarily mean that Delaware law applies to the claims for fraudulent transfer and civil conspiracy, as the internal affairs doctrine does not apply to those claims. *See United Int'l Holdings*, 946 F. Supp. at 866 ("[T]he choice of law in a given case is not made once for all issues; each issue is to receive separate consideration if it is one that would be resolved differently under the local law rule of two or more of the potentially interested states."); *Mem'l Hosp.*, 509 F.3d at 1229 (under Wyoming choice-of-law rules, tort claims at issue were governed by Wyoming law, and contract claims were governed by Tennessee law).

deadlines, including a deadline for submission of an amended Final Pretrial Order, after receiving the parties' status report.

DATED: February 22, 2024        BY THE COURT:

                                                   Daniel D. Domenico
                                                   United States District Judge