IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 1:15-cv-00179-WYD-NYW

IT PORTFOLIO, INC., a Colorado Corporation

      Plaintiff,

v.

NER DATA CORPORATION, a Delaware Corporation, NER DATA PRODUCTS, INC., a New Jersey Corporation, and Stephen Oatway,

      Defendants.

---

### AFFIDAVIT OF LARI MASTEN

---

The undersigned, having attained the age of 18, and being otherwise competent, being first duly sworn, hereby states and affirms as follows:

1.    I am a Certified Public Accountant with a Master of Science in accounting.

2.    I have earned several certifications, including accredited in business valuation, certified in financial forensics, master analyst in financial forensics, certified valuation analyst, and accredited in business appraisal review.

3.    I have taught extensively in business valuation, business financial analysis and financial forensics to audiences focused on continuing professional education and credentialing, as well as at the University level.

4.I have been engaged by the Plaintiff in this action to formulate opinions concerning the financial performance of NER Data Corporation, including transactions undertaken by the company during insolvency.

5.I have been asked, among other issues, to evaluate the claim of the Defendants that they achieved fair value for the sale of the Print4 software platform by engaging a broker to market the business of NER Data Corporation for a period of 4 months before agreeing to sell the software to a customer in a secret transaction for a tiny fraction of the presumed earning capability of the software.

6.I have reviewed the financial performance of NER Data Corporation from 2011 through 2015, which shows gross income from the managed print service business at a height in 2012 of more than $13 million dollars.

7.I have reviewed the sale to United Stationers, a public company, in 2010 of 27.5% of NER Data Corporation for a reported sale price of $5,000,000 (indicating a value of $18.18 million). This transaction was based upon the managed print service business, and thus upon the Print4 software.

8.NER Holdings had revenue $42,036,114 in 2009, of which $26,728,798 was from discontinued operations relating to Image1. The remaining $15,307,316 of revenue represents operations including NER Data Corporation's managed print services. Using revenue as a basis, the implied revenue multiple paid by United Stationers in the 2010 transaction for a 27.5% interest was at least 1.19 times revenue.

9.I have reviewed the business review prepared by Everingham and Kerr in 2015 to market the sale of the business of NER Data Corporation.

10.I have reviewed the description of the Print4 Software prepared in 2014 for Office Depot by NER Data Corporation.

11.I have reviewed the Martin Wolf Investment Analysis prepared for United Stationers in June of 2012.

12.Based on my review of these third-party analyses prepared contemporaneously with specific valuation events, it is apparent that the Print4 Software was a complex, sophisticated, commercially-viable software product with proven potential to generate significant revenue and income in the managed print services market.

13.It is also apparent that the managed print services industry had a significant barrier to entry and that generally it would have required a company with adequate capital and national marketing expertise to realize the potential of the Print4 Software. Most likely, this target buyer would have been a public company that was consolidating similar software assets and operations in the managed print services space.

14.The business review prepared by Everingham and Kerr was finalized in May 2015.

2

15. By August 2015, after two inquiries, and less than four months, NER Data Corporation determined that selling its business to a customer for a price which was little more than a few months of gross income from that customer, was the only viable option for moving forward. Mr. Stephen Oatway admits in his deposition that this sale to NER Data Corporation's customer was a "fire sale". The term "fire sale" is commonly used to describe a liquidation, typically forced, that does not allow for adequate marketing of the assets, and results in a below market value for the sale.

16. Essentially the software, that generated $8.7 million in revenue in 2014 (the prior year) and was the basis of a previous sale for an implied 1.19 times prior year revenues was sold in 2015 for $150,000.00 (plus 70% of profit from the business for the following year.) Using the $8.7 million in revenue for the prior year here, this "fire sale" transaction amount results in a revenue multiple of 0.0172. Not even 2% of revenues, let alone close to the 1.19 multiple (119%) earned in the sale of a fractional interest of 27.5% to United Stationers Supply Co.

17. This purchase price, at less than 2% of the implied price of $10.4 million (based on the 2010 sale of the 27.5% interest) is not justified by the inadequate three to four-month time period allocated to marketing and selling the business of NER Data Corporation.

18. NER Data Corporation had 13 managers and reportedly less secretarial and clerical employees.

19. NER Data Corporation was a small business and had to pay more for standard operating expenses and cost of goods sold than a larger company that could leverage its size and purchasing power in order to reduce costs and operating expenses.

20. Even a cursory review of the financial performance of NER Data Corporation shows a cost of sales of 87 – 99% which immediately eliminates the possibility of any meaningful profit.

21. To realize the economic potential of the Print4 Software, the software, and not the business of NER Data Corporation, should have been marketed to companies that could have realized synergies and economies of scale on the national level.

22. Even if done properly, it is unrealistic to expect any actual sale results or even a realistic indication that a transaction might occur based on the short marketing campaign of less than four months for this sophisticated asset.

23. A normal and usual time expectation to sell a sophisticated asset, whether a software platform or otherwise, into either the private or public sector would be 6 to 18 months from the date a vetted potential buyer has been identified.

24. From a timing perspective, a public company as the prospective buyer would require months of due diligence. In addition, two years of audited financial statements would

3

have to be prepared and used in the due diligence process prior to purchasing a sophisticated software product.

25. A large company would require an appraisal of the software asset to satisfy the public disclosure requirements of Generally Accepted Accounting Principles for business combinations (ASC 805) to book an acquired asset on its financial statements.

26. It is unrealistic to think that small to medium-sized businesses which were not already in the national managed print service space would be viable options as the buyers of NER Data Corporation.

27. In my opinion, the sale of the Print4 Software to a customer of NER Data Corporation in a secret sale for only $150,000, after a less than four-month marketing period failed to adequately capture the appropriate market and the realistic market value of the Print4 software.

28. In my opinion the implied value of the software would have been significantly more than the $150,000 transacted for, and likely more in the range of the at least 1.19 times revenue range achieved in the purchase by United Stationers.

29. As shown in the 66 page memorandum and analysis prepared by Martin Wolf in June 2012, the key to unlocking the value of the Print4 software and the business centered on the software was to expand to additional markets and take advantage of the increased scale of business.

30. It was apparent in 2015 that NER Data Corporation, continuing to operate as a small business, was too small to achieve economies of scale and should have been looking to sell to a larger and possibly public company buyer long before 2015.

31. Generating a loss of over a million dollars in 2012, as a service business with $13 million in gross revenue in should have been a strong indication that the NER Data Corporation business model was not working.

32. A seasoned corporate manager would have evaluated ways to shift the business plan, including the possibility of a sale to a larger company which could have applied the economies of scale to the potential of the Print4 platform, rendering it much more profitable.

33. In addition, a review of the Software Development and Assignment Agreement between IT Portfolio and NER Data Products, Inc (assumed by NER Data Corporation) shows that NER Data Corporation did not have the right to decide to go out of business and engage in a quick and secret sale of the Print4 platform to a third party.

34. Upon deciding not to further market and license Print4, the software and the right to market and license it reverted to IT Portfolio.

35. In quickly and secretly selling the Print4 platform, NER Data Corporation denied IT Portfolio the right to properly market the software for sale, as well as to re-build the business with partners of its choosing.

36. Based upon the observations herein, it is my opinion that the quick and secret sale to a customer did not result in a realistic sales price for the Print4 platform.

_____
Lari B. Masten, MSA, CPA, ABV, CFF, CVA, MAFF, ABAR

STATE OF COLORADO     }
                      } ss.
COUNTY OF DOUGLAS     }

Signed and sworn to before me on this 23 day of April 2019 by Lari B. Masten MSA, CPA, ABV, CFF, CVA, MAFF, ABAR.

Witness my hand and official seal.

My commission expires: October 29, 2019

AARON JOHNSON
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20154042443
MY COMMISSION EXPIRES OCTOBER 29, 2019

_____
Notary public