```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO

                            - - -

IT PORTFOLIO, INC., a      : Civil Action
Colorado Corporation,      :
                           : No.: 1:15-cv-00179-WYD-NYW
          Plaintiff,       :
                           :
             vs.           :
                           :
NER DATA CORPORATION,      :
A New Jersey               :
Corporation,               :
                           :
          Defendant.       :
                            - - -
                TUESDAY, JANUARY 19, 2016
                            - - -


        Oral Videotape Deposition of STEPHEN FRANCIS
OATWAY, taken pursuant to notice, at the offices of
Class Act Reporting, LLC, 133 Gaither Drive, Suite H,
Mount Laurel, New Jersey, commencing at approximately
2:52 p.m., on the above date, before Catherine T.
McLaughlin, CCR and Notary Public.


                            - - -


              CLASS ACT REPORTING, LLC
2149 South 3rd Street          133 H Gaither Drive
Philadelphia, PA 19148         Suite H
(215) 928-9760                 Mount Laurel, NJ 08054
www.classactreporting.com      (856) 235-5108
          classact@classactreporting.com
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

2

```
 1   APPEARANCES:

 2

 3        DUSTIN J. PRIEBE, ESQUIRE

 4        Of Podoll & Podoll, P.C.

 5        5619 DTC Parkway

 6        Suite 1100

 7        Greenwood Village, Colorado  80111

 8        (303) 861-4000

 9        dustin@podoll.net

10        Counsel for Plaintiff

11

12        ANDREW C. OATWAY, ESQUIRE

13        Of Morisi & Oatway, P.C.

14        730 Hancock Street

15        Quincy, Massachusetts  02170-2723

16        (617) 479-0400 Ext. 106

17        aco@morisi.com

18        Counsel for Defendant

19

20   ALSO PRESENT:

21

22        Mark Lessner

23        Ron Sherr, Videographer

24

25
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

```
 1                   I N D E X

 2

 3   WITNESS:                          PAGE

 4

 5       STEPHEN FRANCIS OATWAY

 6

 7          BY MR. PRIEBE                6

 8             MR. A. OATWAY

 9

10                 E X H I B I T S

11

12   No.              Description          Page

13

14   NER 10    December 11th, 2014 letter    15

15             from J. Lee Gray to Robert

16             Podoll

17

18   NER 11    Defendant's Answers to        21

19             Interrogatories, Responses

20             to Requests for Production of

21             Documents and Responses to

22             Request for Admissions by

23             Plaintiff

24

25   Exhibits continued on Page 4.
```

CLASS ACT REPORTING LLC
215.928.9760          856.235.5108

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

4

```
 1              E X H I B I T S  (Continued)

 2

 3   No.              Description              Page

 4

 5   NER 12    August 25th, 2014 letter        36

 6             From Robert Podoll to NER

 7             Data Products, Inc.

 8

 9   NER 13    September 12th, 2014 letter      37

10             sent from Robert Podoll to

11             NER Data Products, Inc.

12

13   NER 14    Letter from Stephen Oatway      39

14             to Mark Lessner

15

16   NER 15    Overview of NER's managed      104

17             print business

18

19   NER 16    Asset Purchase Agreement       136

20             dated October 31st, 2015

21

22   NER 17    Affidavit of Stephen Oatway    149

23

24

25
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

5

```
 1                    THE VIDEOGRAPHER:  This is a
 2     videotape deposition of Stephen oakway --
 3     Oatway, sorry, taken by Dustin Priebe,
 4     Esquire in the matter of IT Portfolio, Inc.
 5     versus NER Data Corporation, in the U.S.
 6     District Court, District of Colorado,
 7     1:15-00-00179-WYD-NYW (sic).  This
 8     deposition is being held at 133 Gaither
 9     Drive, Mount Laurel, New Jersey, on January
10     19th, 2016.
11                    My name is Ron Sherr from the
12     firm of Class Act Reporting, with offices in
13     Mount Laurel, New Jersey, and I am the
14     videographer.  Reporter is Cathy McLaughlin,
15     also from Class Act.
16                    We're going on the video
17     record at 2:52 p.m.  Counsel will please
18     state their appearances for the record.
19                    MR. PRIEBE:  Yes.  Dustin
20     Priebe, appearing on behalf of the plaintiff
21     IT Portfolio, and with me is Mark Lessner
22     with IT Portfolio.
23                    MR. A. OATWAY:  Andrew Oatway
24     for NER Data Corporation.
25                    THE VIDEOGRAPHER:  The court
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    reporter will now please swear in the

2    witness.

3                        - - -

4            STEPHEN FRANCIS OATWAY, having been

5    duly sworn or affirmed, was examined and

6    testified as follows:

7                    THE VIDEOGRAPHER:  We may

8    proceed.

9                        - - -

10                    EXAMINATION

11                        - - -

12   BY MR. PRIEBE:

13        Q.   Okay.   Good afternoon, Mr. Oatway.

14        A.   Good afternoon.

15        Q.   Could you please state your full

16   name for the record?

17        A.   Stephen Francis Oatway.

18        Q.   And where do you reside?

19        A.   1 Exton Circle, Cherry Hill, New

20   Jersey.

21        Q.   And, Mr. Oatway, you are the, uh,

22   president of the defendant in this matter,

23   NER Data Corporation; is that correct?

24        A.   Correct.

25        Q.   And how long have you been the

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

7

1    president of NER Data Corporation?

2        A.   Since April of 2010.

3        Q.   Okay.  What was your position

4    before that?

5        A.   President of NER Data Products.

6        Q.   Are you still the president of NER

7    Data Products?

8        A.   Yes.

9        Q.   So you're the president of both NER

10   Data Corporation and NER Data Products,

11   Inc.; is that correct?

12       A.   Yes.

13       Q.   You said that you've been the

14   president of NER Data Corporation since

15   April of 2010.  What happened in April of

16   2010?

17       A.   NER Data Corporation was formed.

18       Q.   Okay.  What was the reason for

19   forming NER Data Corporation?

20       A.   We contributed the operating assets

21   of the NER products business to a new

22   company, in order to bring a minority

23   investor into the business.

24       Q.   Okay.  And you said the operating

25   assets, was that correct?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

8

```
 1        A.   I believe that's what I said.

 2        Q.   Okay.  Those operating assets

 3   include the Print4 software?

 4        A.   I don't recollect whether the

 5   Print4 software specifically was identified

 6   as an asset.

 7        Q.   It was just all of the operating

 8   assets, is that a fair statement?

 9        A.   I'd have to look back at the

10   document to see exactly what the assets were

11   defined as.

12        Q.   Okay.

13        A.   But if -- the intent was to

14   contribute the assets and liabilities of the

15   operating businesses, specifically the data

16   center business and the manage print

17   business.

18        Q.   Okay.  If you can take a look at

19   Exhibit 6, at least I hope it's labeled

20   Exhibit 6 in there, but it's the January

21   1st, 2009 Software Development and

22   Assignment Agreement.

23             Do you recognize that agreement?

24        A.   Yes, I do.

25        Q.   Okay.  Was this agreement one of
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

9

1    the items -- and I forget your language.

2    Was your language transferred or assigned?

3    Was this Software Development and Assignment

4    Agreement, was that transferred or assigned

5    to NER Data Corporation?

6         A.   I believe the answer is yes.  I

7    believe there was a, an assignment agreement

8    between NER and IT Portfolio to do that.

9         Q.   Okay.  Was there also, was there

10   also an assignment from NER Data Products,

11   Inc. to NER Data Corporation per this

12   Software Development and Assignment

13   Agreement?

14        A.   I don't remember the specific

15   aspects of the way the transaction was

16   specifically structured.

17        Q.   Okay.  But did NER Data Corporation

18   assume the liabilities under this software

19   agreement, Exhibit No. 6?

20        A.   Clearly, the intent was --

21        Q.   Right.

22        A.   -- that NER Data Corporation would

23   assume the liabilities of the managed print

24   business and the data center business of

25   NER.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

10

```
1       Q.   Okay.   And I'm just talking about,
2    just specifically, Exhibit 6, the January
3    1st, 2009 Software Development and
4    Assignment Agreement.
5            Did, did NER, did NER Data
6    Corporation, Inc. transfer both the benefits
7    and the liabilities of this contract to NER
8    Data Corporation?
9                   MR. A. OATWAY:  Objection.
10                  THE WITNESS:  I think you
11   asked a couple different questions.
12                  MR. PRIEBE:  Sure.
13                  THE WITNESS:  So if you could
14   just be a little bit clearer.
15   BY MR. PRIEBE:
16       Q.   Sure.  With respect to the January
17   1st, 2009 Software Development and
18   Assignment agreement, you're familiar with
19   this agreement; correct?
20       A.   I've already said that I am, yes.
21       Q.   So with respect to this agreement,
22   were the liabilities for this agreement
23   transferred from NER Data Products, Inc. to
24   NER Data Corporation?
25       A.   Not specifically the way you're
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

11

 1    asking that question.

 2        Q.   Okay.  How was, how was it done?

 3        A.   I assume you understand, as a

 4    lawyer, that you understand the way

 5    businesses transact or conduct transactions

 6    between them.  There were schedules

 7    associated with, uh, the creation and the

 8    formation of the new company.  And I'm 99.9

 9    percent sure, no, I'm not 99.9, I'm a

10    hundred percent sure that this agreement was

11    specifically scheduled as a disclosure in

12    the transaction documents.

13        Q.   Okay.  And you're saying

14    transaction documents.  Are you saying, as,

15    as one of the documents or contracts that

16    was assigned to NER Data Corporation?

17        A.   I believe I already said to you

18    that I thought that the agreement was

19    assigned.

20        Q.   Okay.

21        A.   I also have said that I am one

22    hundred percent sure that the agreement was

23    scheduled --

24        Q.   Okay.

25        A.   -- as a, as a schedule to the

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

12

 1   transaction documents.

 2        Q.   Okay.   And after April of 2010,

 3   who-- what entity made payments pursuant to

 4   this contract, the Software Development and

 5   Assignment Agreement?

 6        A.   NER Data Corporation.

 7        Q.   Okay.  So after April 10th of 2010,

 8   NER Data Corporation was the entity

 9   obligated to submit payments pursuant to

10   this contract, the January 1st, 2009

11   software agreement?

12                  MR. A. OATWAY:  Objection.

13                  THE WITNESS:  Embedded in

14   your question is an assumption.  So if you

15   could ask the question again a little bit

16   clearer, I'll more than be more than willing

17   to answer it.

18   BY MR. PRIEBE:

19        Q.   Sure.  After April, after April of

20   2010, was NER Data Corporation required to

21   make payments under this agreement?

22                  MR. A. OATWAY:  Objection.

23                  THE WITNESS:  I don't know

24   how you -- I don't know how you incorporate

25   the word "required" into that question.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    BY MR. PRIEBE:

2        Q.   Okay.  What entity --

3        A.   I, I've...

4        Q.   Go ahead.

5        A.   I've already said that NER Data

6    Corporation was making the payments to IT

7    Portfolio after April of 2010.

8        Q.   Okay.  What company was obligated,

9    what company was obligated under the January

10   1st of 2009 software agreement?

11              MR. A. OATWAY:  Objection.

12              THE WITNESS:  This agreement

13   I'm looking at that you're showing as

14   Exhibit 6 is an agreement between NER Data

15   Products and IT Portfolio.

16              MR. PRIEBE:  Correct.

17              THE WITNESS:  Prior to?

18   What's the question?

19   BY MR. PRIEBE:

20       Q.   Did that change at all after April

21   1st, after April, of 2010?

22              MR. A. OATWAY:  Objection.

23              THE WITNESS:  I'm not sure

24   how to answer your question any more

25   specifically than I already have, which is,

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

14

1    the assets of the business from NER Data

2    Products were contributed or put into a new

3    company called NER Data Corporation.

4                    There were agreements that

5    were assigned.  There were agreements that

6    were disclosed as part of that transaction

7    document.  I am confident that this

8    agreement was both assigned and disclosed in

9    those transaction documents.

10   BY MR. PRIEBE:

11       Q.   Okay.  Was NER Data Corporation

12   bound by this contract after April 1st of

13   2010?

14                    MR. A. OATWAY:  Objection.

15                    THE WITNESS:  I'm not a

16   lawyer.

17                    MR. PRIEBE:  Okay.

18                    THE WITNESS:  So I can't

19   really answer that question as bound.  NER

20   Data Corporation made the payments against

21   this agreement after April of 2010.

22   BY MR. PRIEBE:

23       Q.   And did it make those payments

24   because it was required to by the contract?

25                    MR. A. OATWAY:  Objection.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

15

```
 1                    THE WITNESS:  Again, I
 2    already said I didn't understand the word
 3    "required" in your question.
 4                    MR. PRIEBE:  Okay.
 5                    THE WITNESS:  If you can be a
 6    little bit more specific about what you're
 7    trying to get to, I can --
 8                    MR. PRIEBE:  Sure.
 9                    THE WITNESS:  -- try to
10    answer your question.
11                    (Whereupon request, Exhibit
12    NER 10 was marked for identification.)
13    BY MR. PRIEBE:
14        Q.   Okay.  I'm handing you what's been
15    marked as deposition Exhibit 10.  This is a
16    December 11th, 2014 letter from J. Lee Gray
17    to Robert Podoll.
18            Have you seen this letter before?
19        A.   Yes.  I believe so.
20        Q.   Okay.  The subject line of the
21    letter is:  IT Portfolio Software
22    Development and Assignment Agreement.
23            Is that correct?
24        A.   Re:?  IT Portfolio --
25        Q.   Correct.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

16

```
 1      A.   -- Software Development and

 2   Assignment Agreement.  Yes, I see that in

 3   the letter.

 4      Q.   Okay.  And the first sentence says,

 5   "I write concerning your recent letter to my

 6   client, NER Data Corporation."

 7           Did I read that correctly?

 8      A.   You did.

 9      Q.   Okay.  And there's a footnote 1,

10   after that sentence; is that correct?

11      A.   I see the footnote 1.

12      Q.   Can you read footnote 1 for me?

13      A.   "NER Data Products, Inc. is now NER

14   Data Corporation.  The agreement was

15   assigned to NER Data Corporation in 2010."

16      Q.   Okay.  Is that a true statement?

17      A.   No.

18      Q.   That's not a true statement?

19      A.   No.

20      Q.   Okay.  Did you see this letter

21   before it was sent?

22      A.   I may have seen a draft.

23      Q.   Okay.  Tell me what's wrong about

24   footnote 1.

25                   MR. A. OATWAY:  And before
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

17

1    you answer that question, I just want to

2    give you a cautionary instruction that

3    relates to the attorney-client privilege.

4                    Um, to the extent that your

5    answer to a question would cause you to

6    disclose privileged communications with your

7    attorney, you should refrain from doing that

8    and explain to the questioner that you can't

9    because you would be disclosing a privileged

10   communication.

11                   But to the extent you can

12   answer it without getting into a privilege,

13   then you should go ahead and answer the

14   question.

15                   Do you understand that

16   cautionary instruction?

17                   THE WITNESS:  I do.

18                   MR. A. OATWAY:  Okay.

19   BY MR. PRIEBE:

20      Q.   Okay.  So let's ask the question

21   again.  Footnote 1 states, "NER Data

22   Products, Inc. is now NER Data Corporation.

23   The agreement was assigned to NER Data

24   Corporation in 2010."

25                   Did I read that correct correctly?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

18

```
 1      A.   You did.

 2      Q.   You stated that that is not true.

 3  Correct?

 4      A.   Can you read back what I actually

 5  said?

 6      Q.   Sure.

 7      A.   I think I said, no, it's not true.

 8  That's not true.

 9      Q.   Okay.  Do you believe, do you

10  believe the statement in footnote 1 is true

11  or untrue?

12      A.   I already told you that that

13  footnote as it is written is not true.

14      Q.   Okay.  And I just wanted the

15  clarification.  How is it untrue?

16      A.   NER Data Products is now NER Data

17  Corporation is not a true statement.

18      Q.   Okay.

19      A.   The agreement was assigned to NER

20  Data Corporation in 2010 I have previously

21  said I believe to be a true statement.

22      Q.   Okay.  You believe to be or it is a

23  true statement?

24      A.   I believe that I said to you I am

25  highly confident that the agreement was
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

19

 1   assigned.  I don't have anything

 2   specifically in front of me that I can tell

 3   you with definitive answer.  But, yes, I

 4   believe that the agreement was assigned.

 5       Q.   Okay.

 6       A.   I've said that now three or four

 7   times.

 8                MR. A. OATWAY:  Just wait for

 9   a question.

10                THE WITNESS:  Sure.

11   BY MR. PRIEBE:

12       Q.   And the reason I want to clarify

13   this is now we've now been litigating with

14   about this agreement for over a year.  And

15   at this point, I mean, I, I would assume

16   that you would know for sure one way or

17   another whether this agreement was assigned

18   from NER Products, Inc. to NER Data

19   Corporation.

20                MR. A. OATWAY:  That's not a

21   question.  That's a statement of the lawyer.

22   You don't have to answer that.

23   BY MR. PRIEBE:

24       Q.   But at, at -- at this point in time

25   you cannot say with one hundred percent

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

20

1    certainty that the agreement was assigned

2    from NER Products, Inc. to NER Data

3    Corporation?

4                   MR. A. OATWAY:  That's been

5    asked and answered.  Can you please move on?

6    You, you have an answer to that question a

7    number of times on the transcript.

8                   MR. PRIEBE:  I'm going to ask

9    the question.

10                   MR. A. OATWAY:  I think, I

11    think you're now harassing the witness.  Can

12    you please move on?

13                   MR. PRIEBE:  Well, I'm going

14    to ask the question.

15                   MR. A. OATWAY:  I'll give it

16    one more time.

17                   MR. PRIEBE:  If you're going

18    to instruct him not to answer, do it.

19    BY MR. PRIEBE:

20       Q.   I just want to understand, at this

21    point in time, you cannot say with a hundred

22    percent certainty that the 2009 software

23    agreement was assigned from NER Data

24    Products, Inc. to NER Data Corporation, can

25    you?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

21

```
 1      A.   I can tell you that I have already

 2   stated that I believe that the Software

 3   Development and Assignment Agreement was

 4   assigned by -- from NER Data Products to NER

 5   Data Corporation, and that it was scheduled

 6   in the transaction documents.

 7      Q.   Okay.  So second sentence and in

 8   footnote 1 you believe to be a true

 9   statement?

10      A.   Correct.

11      Q.   Okay.  The first sentence in

12   footnote 1, "NER Products, Inc. is now NER

13   Data Corporation," you believe that is not a

14   true statement?

15      A.   Not I believe, I know it is not a

16   true statement.

17      Q.   Okay.  And why is that not a true

18   statement?

19      A.   They are two separate companies.

20              (Whereupon request, Exhibit

21   NER 11 was marked for identification.)

22              MR. PRIEBE:  I believe is

23   this 11?

24              COURT REPORTER:  Yes.

25   BY MR. PRIEBE:
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

22

```
 1       Q.    Mr. Oatway, I've handed you Exhibit
 2   11.  Do you recognize Exhibit 11?
 3       A.    I do.
 4       Q.    Okay.  And what is this?
 5       A.    Defendant's Answers to
 6   Interrogatories, Responses to Requests for
 7   Production of Documents and Responses to
 8   Request for Admissions by Plaintiff.
 9       Q.    Okay.  And if you can turn to the
10   second-to-last page of this document,
11   towards the bottom of the page, it says,
12   "Signed under the pains and penalty of
13   perjury, NER Data Corporation, by its
14   president, Stephen Oatway."
15           Did I read that correctly?
16       A.    You did.
17       Q.    And did you sign these responses on
18   behalf of NER Data Corporation?
19       A.    I did.
20       Q.    And you're aware that in this
21   discovery, the plaintiff IT Portfolio served
22   you with a set of discovery requests, or
23   served NER with a set of discovery requests;
24   is that correct?
25                   MR. A. OATWAY:  Different
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

23

 1    than this?

 2                 MR. PRIEBE:  Well, these are

 3    the answers.  All right.  These, these --

 4    these were...

 5                 MR. A. OATWAY:  We'll, we'll

 6    stipulate that these are answers to

 7    discovery that was propounded to the

 8    company.

 9                 MR. PRIEBE:  Well, thank you.

10    I'm just asking him.  I'd just like an

11    answer to my questions, though.  Thank you,

12    though.

13                 MR. A. OATWAY:  You're

14    welcome.

15    BY MR. PRIEBE:

16        Q.   Did you, did you prepare -- you

17    prepared all of these responses that I'm

18    seeing here; is that correct?

19                 MR. A. OATWAY:  Objection.

20    Objection.

21                 THE WITNESS:  These are my,

22    signed under the pains and penalties of

23    perjury, these are my answers for the

24    company.

25                 MR. PRIEBE:  Okay.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

24

```
 1                    THE WITNESS:  To the

 2     interrogatories, response to request for

 3     production of documents and responses to

 4     requests for admissions.

 5     BY MR. PRIEBE:

 6          Q.   Okay.  In compiling the information

 7     for these responses, did you enlist the

 8     assistance of anyone other than your

 9     counsel?

10          A.   I'd have to go one by one.

11          Q.   Sure.

12          A.   To specifically answer --

13          Q.   Okay.

14          A.   -- your question.

15          Q.   All right.  So under the first

16     heading, Answers to Interrogatories, or,

17     Answers and Objections to Interrogatories,

18     okay, the first, and this is Interrogatory

19     No. 1, the interrogatory is:

20               "Identify each time you objected to

21     the amount of any invoice submitted to you

22     by ITP."

23               Did I read that correctly?

24          A.   "Identify each time you objected to

25     the amount of any invoice submitted to you
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

25

```
 1    by ITP," yes.

 2        Q.    Okay.

 3        A.    I'm reading the same thing.

 4        Q.    And NER's response is:

 5             "Periodically throughout the

 6    relationship, monthly invoices would be

 7    questioned due to the nature in which the

 8    amount due was calculated.  Typically, that

 9    communication was between Scott Steele and

10    Mark Lessner."

11             Is that correct?

12        A.    That is my answer to that...

13        Q.    Okay.

14        A.    Question.

15        Q.    And how did you compile the

16    information for that?  Was that based off

17    your own understanding?

18        A.    How did I compile the answer to

19    point number 1 --

20        Q.    Correct.

21        A.    -- in this?  That was my

22    understanding.

23        Q.    Okay.  Did you speak with Scott

24    Steele at all about responses in this

25    interrogatory?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

26

1       A.   No.

2       Q.   And then, No. 2:

3            "Identify each time you indicated

4    that any payment you made to ITP was being

5    made under protest."

6            Did I read that correctly?

7       A.   You did.

8       Q.   Okay.  And your answer is:

9            "No specific payment under protest

10   statement was made, but at various times NER

11   communicated its disagreement with the

12   amount of certain ITP invoices."

13           Is that your response?

14      A.   That was my response.

15      Q.   Okay.  How, how was this

16   disagreement communicated, do you recall?

17      A.   Which disagreement?

18      Q.   Sure.  You said, "At various times

19   NER communicated its disagreement with the

20   amount of certain ITP invoicing."  Correct?

21      A.   Correct.

22      Q.   Okay.  What disagreements are you

23   referring to?

24      A.   My recollection, over a period of

25   six, seven years, probably between 75 and a

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

27

```
 1   hundred invoices, that, during that period

 2   of time, there would often be email and

 3   phone communication back and forth between

 4   Scott and Mark, Scott and Chris, Mark and

 5   Chris, and potentially even at times with me

 6   with regards to amounts that were billed

 7   and/or paid and what, what the status of

 8   those were.

 9       Q.   Okay.  Are you talking about the --

10   you said status of those.  Were you talking

11   about the, the time of the payments?

12       A.   Can you be a little bit more

13   specific about the question that you're

14   asking?

15       Q.   Well, I, I didn't write this

16   response.  I'm just asking for, for what you

17   meant by this.

18            You said, "NER communicated its

19   disagreement with the amount of certain ITP

20   invoicing."  What does that mean?

21       A.   So I'll start with the specific

22   words that were used in point 2, which

23   states, "Identify each time you indicated

24   that any payment you paid made to ITP was

25   being made under protest."
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

28

1        Q.    Correct.

2        A.    I don't believe there was ever a

3    time where there was a protest statement

4    made.

5             Having said that, over a period of

6    six or seven years, and over a period --

7    over 75 to a hundred invoices, and likely a

8    hundred and fifty different payments to IT

9    Portfolio, there were multiple discussions

10   and correspondence and communication with

11   regards to dollar amounts of invoices,

12   timing of payments, um, accuracy of the

13   invoicing, questioning about how -- whether

14   revenue was calculated properly or all

15   revenue was included or what rates were

16   used, to...

17       Q.    Oh.   Okay.

18       A.    Some directly with me, some

19   indirectly.

20       Q.    Okay.  If you can go to the next

21   page, Interrogatory 4.

22             Mr. Oatway, are you aware that in

23   this litigation, NER is asserting, uh, that

24   it made certain overpayments to IT

25   Portfolio?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

29

1      A.   I am, yes.

2      Q.   And do you recall, uh, the months

3    and the years of those overpayments?

4      A.   I believe the overpayments would

5    have started in 2012, maybe early 2013; late

6    2012, early 2013.

7      Q.   Okay.  And did you ever indicate to

8    IT Portfolio that you believed you were

9    overpaying on these invoices?

10      A.   In the specific point 4 that you've

11    referred to me in this document, I said

12    already we did not identify the fact that

13    overpayments were made until this lawsuit.

14      Q.   Correct.  So how did you identify

15    that overpayments were made?

16      A.   We went to our accounting records

17    and looked at payments and audited the

18    payments versus the invoices.

19      Q.   What do you mean you audited the

20    payments?  What does that mean?

21      A.   Do you know what the word "audit"

22    means?

23      Q.   I'm asking, what do you mean by the

24    term "audit"?

25      A.   We checked the -- there is a

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

```
 1    provision, I believe, in one or more of our

 2    agreements with IT Portfolio where they have

 3    a right to audit, which they did at least

 4    once.  And an audit, I believe, is when you

 5    go back retrospectively and you test the

 6    accuracy of your transactions to determine

 7    whether you did what you were supposed to

 8    do.  I believe that's what an audit is.  I

 9    don't know the generally accepted accounting

10    principle definition of "audit," but going

11    back and auditing and testing.

12        Q.   So with respect to the payments

13    that were submitted by NER to ITP, were you

14    here in the room when Mr. Steele was

15    calculating as to how those invoice amounts

16    were determined?

17        A.   I was.

18        Q.   Okay.  And, and I believe his

19    testimony was that, well, NER would provide

20    the adjusted gross sales numbers.  Correct?

21              MR. A. OATWAY:  Objection to

22    the form.

23              THE WITNESS:  I believe Scott

24    said a couple of different things.

25              MR. PRIEBE:  Okay.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

31

```
 1                    THE WITNESS:  But, clearly,
 2    NER and its representatives provided
 3    adjusted gross sales reports to IT Portfolio
 4    on a monthly basis.
 5    BY MR. PRIEBE:
 6         Q.   Well, my understanding was that the
 7    adjusted gross sales numbers were just
 8    basically put into an equation that then
 9    provided a monthly payment number.
10              Was your understanding something
11    different?
12         A.   Can you ask that question again?
13         Q.   Sure.
14         A.   I'm not trying to be difficult.
15         Q.   No, not at all.
16         A.   I just want to understand where
17    you're going here.
18         Q.   Mr. Steele indicated that, based on
19    the adjusted gross sales, the numbers would,
20    those adjusted gross sales numbers would
21    just be put into a formula, to arrive at a
22    monthly invoice number.  Correct?
23         A.   I heard that they were put into a
24    formula, "formula," for the first time
25    today.  What I do know is that the revenue
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

32

1    adjusted gross sales were, were reported out

2    of our Enterprise Resource Planning, the ERP

3    Nuvision system, and they would be

4    generated, I, I am -- by Chris, provided to

5    Scott, provided to Mark.  Mark would then

6    generate an invoice off of those revenue

7    numbers.

8        Q.   So what I'm hearing from you, and

9    tell me if this is wrong, is that you really

10   were not involved in the process in terms of

11   calculating the amount of the monthly

12   payments to ITO; is that correct?

13       A.   No.

14       Q.   Okay.  But then after the

15   initiation of this lawsuit, you went back

16   and looked at some of those payments;

17   correct?

18       A.   Are you asking me that question

19   with regards to the previous question or is

20   this a new question?

21       Q.   Well, I'm just asking you, your

22   statement in response to Interrogatory No.

23   4, is that, "We did not identify the fact

24   that overpayments were made until this

25   lawsuit."

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

33

```
 1           Is that correct?

 2      A.   That was my statement, yes.

 3      Q.   Okay.  Were you the one who was

 4  involved in going back to review the past

 5  payments?

 6      A.   I was involved in going back to

 7  review the past payments, yes.

 8      Q.   And that's the first time that you

 9  had been involved in that process, is that

10  correct?

11      A.   Of -- in what process?

12      Q.   Going back and reviewing the

13  calculation of the monthly payments to IT

14  Portfolio?

15      A.   I cannot say definitively that we

16  did not audit the payments only one time

17  during a six- or seven-year period of time,

18  but, yes, certainly I was involved in

19  auditing the payments for this lawsuit.

20           I was also intimately aware of the

21  process of paying invoices to our vendors,

22  as the president of the corporation.

23      Q.   I'm sorry, you were involved in

24  what?

25                MR. A. OATWAY:  It's on the
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

34

```
 1   record.  Do you want it reread, read back?

 2                  MR. PRIEBE:  Counsel, please

 3   stop interrupting --

 4                  MR. A. OATWAY:  No, no.

 5                  MR. PRIEBE:  -- the

 6   deposition.

 7                  MR. A. OATWAY:  If you didn't

 8   hear him, he will have his answer read back.

 9                  MR. PRIEBE:  Okay, that's

10   fine.  Can you please read it back?

11                  MR. A. OATWAY:  That's all I

12   offered.

13                  (Whereupon, the previous

14   answer was read back by the court reporter.)

15   BY MR. PRIEBE:

16       Q.   Okay.  With respect to paying of

17   the vendors, how does that tie into any of

18   the question that I had just asked you?

19       A.   If you want to repeat the question

20   again --

21       Q.   Sure, sure.  Sure, well --

22       A.   -- I can go back and answer it.

23       Q.   I had asked you about when the

24   first time was that you conducted an audit

25   looking for overpayments to IT Portfolio.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

35

1    Okay?  Is that correct?  My, my

2    understanding is that the first time you did

3    that was after this lawsuit was initiated.

4    Correct?

5         A.   Me, personally.

6         Q.   Yes.

7         A.   Yes.

8         Q.   So did NER, did NER have someone go

9    back and audit the payments to IT Portfolio

10   prior to the time this lawsuit was filed?

11        A.   We would have an audit performed by

12   an independent accounting firm on an annual

13   basis.  I cannot tell you definitively

14   whether IT portfolio as a vendor was audited

15   or not.

16        Q.   Okay, okay.  So --

17             MR. A. OATWAY:  Before we get

18   to the next question, can we please have a

19   five - minute break?

20             MR. PRIEBE:  Sure, that's

21   fine.

22             MR. A. OATWAY:  Thank you.

23             MR. PRIEBE:  Mm-hmm.

24             THE VIDEOGRAPHER:  Hold on,

25   please.  Off the video record at 3:31.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

36

```
 1                    (Whereupon, a recess was

 2    taken at this time.)

 3                    THE VIDEOGRAPHER:  Back on

 4    video record.  It's 3:35 p.m.

 5    BY MR. PRIEBE:

 6        Q.   Okay.  Mr. Oatway, to the best of

 7    your recollection, when did NER stop making

 8    payments to IT Portfolio under the software

 9    agreement?

10        A.   I believe it was at the end of

11    2014.

12        Q.   Okay.

13                    (Whereupon, Exhibit NER 12

14    was marked for identification.)

15    BY MR. PRIEBE:

16        Q.   Mr. Oatway, Exhibit 12 is an August

17    25th, 2014 letter from Robert Podoll to NER

18    Data Products, Inc.  Is that correct?

19        A.   It is

20        Q.   Have you seen this before?

21        A.   I have.

22        Q.   And, Mr. Oatway, would you agree

23    with me that in this letter, where this

24    letter sets forth a number of missed

25    payments by NER Data, is that correct?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

37

```
 1       A.   It's showing three, a little over

 2    three months outstanding.

 3       Q.   Okay.  To the best of your

 4    recollection, were these amounts outstanding

 5    as of August 25th of 2014?

 6       A.   I believe our accounts reconciled a

 7    with IT Portfolio's.

 8       Q.   Okay.

 9                 (Whereupon, Exhibit NER 13

10    was marked for identification.)

11    BY MR. PRIEBE:

12       Q.   Mr. Oatway, I'm showing you

13    deposition Exhibit 13, which is a September

14    12th, 2014 letter sent from Robert Podoll to

15    NER Data Products, Inc.

16            Have you seen this letter before?

17       A.   Yes.

18       Q.   Okay.  And this letter lists, I

19    believe it's five payments that are

20    outstanding, from NER Data to ITP; is that

21    correct?

22       A.   It shows five balances on --

23    against invoice numbers.

24       Q.   Okay.  And as of September 12th of

25    2014, is this your recollection of the
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

38

```
 1   amount that was due under the software
 2   agreement?
 3                 MR. A. OATWAY:  Objection.
 4                 THE WITNESS:  The --
 5   approximately?
 6                 MR. PRIEBE:  Yes.
 7                 THE WITNESS:  I -- these were
 8   the invoices that we were -- I believe these
 9   invoices, the invoice amounts in the column
10   that said "Amount," the first one,
11   twenty-five o one thirty, was likely the
12   balance of an invoice that had partial
13   payments made against it.
14   BY MR. PRIEBE:
15       Q.   Okay.  But the remaining amounts
16   had not been paid, correct?
17       A.   Those amounts had not been -- no,
18   they were still open.
19       Q.   Okay.
20       A.   In our, in our accounts payable.
21       Q.   And to the best of your
22   recollection, why had those invoices not
23   been paid?
24       A.   Because we didn't have any cash to
25   pay them.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

39

```
 1                    (Whereupon, Exhibit NER 14

 2      was marked for identification.)

 3      BY MR. PRIEBE:

 4          Q.   Okay.  Mr. Oatway, deposition

 5      Exhibit 14 is a letter from you to Mr. Mark

 6      Lessner of IT Portfolio.

 7               Do you recognize this exhibit?

 8          A.   I do.

 9          Q.   Okay.  Did you prepare and send

10      this letter?

11          A.   I did.

12          Q.   Okay.  Mr. Oatway, was this letter

13      sent in response to the payment demands by

14      Mr. Podoll?

15          A.   I started the letter, "We're in

16      receipt of Podoll and Podoll's letters,"

17      dated the 25th and the 12th."

18          Q.   Okay.  And in this letter, Mr.

19      Oatway, what was the reason that you stated

20      for being unable to pay the outstanding

21      invoices?

22          A.   In this particular letter, I

23      reminded Mark, who the letter was addressed

24      to, about the financial challenges that the

25      business had been experiencing over the
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

40

1    previous, not just months, but years, but

2    more recently since June of '14 with our

3    working capital line.

4        Q.   Okay.  And what were the problems

5    that NER was having with its working capital

6    line?

7        A.   We were in default of our loan

8    agreement.

9        Q.   And who is that loan agreement

10   with?

11       A.   Keltic Financial.

12       Q.   And what was the reason for the

13   default?

14       A.   There were probably a couple of

15   specific defaults, but it primarily had to

16   do with earnings.

17       Q.   So NER was not able to make

18   sufficient earnings to make payments on its

19   capital line?

20       A.   It was a, it was a, it was a

21   working capital line that was collateralized

22   by all the assets of the business.  It had

23   formulas.  There were covenants.  We were in

24   default of one or more of the covenants.

25   And because we were in default, the lender

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

41

1    had the right to, to not lend.

2              They did continue to lend, but

3    during this period of time our working

4    capital line was being reduced from

5    approximately two million down to a lesser

6    number.

7        Q.   Okay.  So the working capital line

8    was reduced from two million to a lesser

9    number.

10             Do you recall what the lesser

11   number was?

12       A.   I recall that when we finally paid

13   Keltic off, approximately eight months from

14   this letter, eight or nine months from this

15   letter, their balance was approximately

16   500,000.  Between this point in time and

17   June of 2015, the line was reduced on a

18   monthly basis by, by different amounts.

19   Basically each month there would be a new

20   target given by the bank.

21       Q.   So was, was NER unable then to

22   create any kind of a cash flow during this

23   period of time?

24       A.   We were able to, during the

25   majority of this time we were able to, once

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

42

1    we, once we, once we -- if we were within

2    the formulas and once we reduced, met the

3    reduction requirement of the bank we were

4    able to make payments after that.

5        Q.   Okay.  I guess I'm saying, what was

6    the reason for, for the problems with the,

7    um, for the problems with the margins?

8            Was it, did it have to do with just

9    not bringing in enough revenue?  Was that

10   the problem?  Or was the problem on the cost

11   side?

12               MR. A. OATWAY:  Objection.

13               THE WITNESS:  What was the

14   problem for the bank for?  For NER?

15   BY MR. PRIEBE:

16       Q.   Yeah, I think that's a good

17   distinction.  What was the problem with NER?

18   Was NER cash flowing at this point in time?

19               MR. A. OATWAY:  Objection.

20               THE WITNESS:  We were, we

21   were, in September of 2014, we were cash

22   flowing negative.

23   BY MR. PRIEBE:

24       Q.   Okay.  And what was the reason for

25   the negative cash flow?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

43

```
 1        A.   Any number of reasons.  Revenue

 2    levels, cost levels, bad contracts.  We

 3    weren't making any money.

 4        Q.   Okay.  What bad contracts are you

 5    referring to?

 6        A.   We have any number of contracts.

 7        Q.   Okay.  Were you referring to any

 8    specific contracts when you said "bad

 9    contracts"?

10        A.   No, specifically.  However, I had

11    had a conversation with IT Portfolio three

12    to six months before this time about

13    revisiting the nature of our agreements with

14    them, because our total cost of development

15    and support for the managed print business

16    was more -- was, I think, I believe, our

17    second highest expenditure in the company

18    behind payroll.  That's the July 15th call

19    that I referenced in the letter.

20        Q.   Okay.  So your recollection, on

21    July 15th, 2014, there's a conference call

22    between yourself, Mark Lessner and Jack

23    Drose; is that correct?

24        A.   What was the date that you said?

25        Q.   July 15th of 2014?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

44

 1      A.   Yeah, there was a conference call

 2   with Mark, Jack and my father.

 3      Q.   And who's your father?

 4      A.   Bud Oatway.

 5      Q.   And what was discussed during that

 6   phone call?

 7      A.   The challenges we were facing,

 8   financially, from an earnings perspective;

 9   the challenges we were facing with the bank;

10   the concerns we had with regards to the high

11   cost of technical development and support

12   for the managed print business,

13   specifically.

14      Q.   And if we can take a look at the

15   last sentence of the second paragraph, it

16   says, "As of September 30th, 2014, NER will

17   have a balance outstanding to ITP of

18   approximately 132,000."

19           Is that correct?

20      A.   That's correct, that's what that

21   sentence says.

22      Q.   Okay.  And was that true at the

23   time?

24      A.   That sentence is specifically

25   referring to, and, the hundred and

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

45

```
 1    thirty-one five seventy-six point ten, as

 2    saying we have a general agreement that our

 3    balances are approximately the same.

 4        Q.   The same, okay.  And, Mr. Oatway,

 5    is there any provision at all in this letter

 6    where you make any assertion that any part

 7    of this hundred-and-thirty-two-thousand

 8    dollar balance is not due or is not valid?

 9        A.   Well, I certainly would have had a

10    discussion with Mark about late charges at

11    some point.  At various times, he would

12    threaten to charge late charges and then

13    credit them out.

14            If your question is specifically

15    with regards to was I making a comment about

16    whether the amounts we specifically agreed

17    to, I wasn't.  So let me see if I can

18    provide some insight here.  Because you're

19    asking specifically about the monthly

20    minimum, I believe.

21        Q.   Well, I'm asking --

22                MR. A. OATWAY:  Why don't,

23    why don't you let him ask a question, Steve.

24    BY MR. PRIEBE:

25        Q.   Yeah, what, what I'm asking about
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

46

1    is I'm just asking that, as you identified

2    in your letter of September 12th, 2014 sent

3    to NER from Robert Podoll, you identified an

4    amount as being due and owing to IT

5    Portfolio; correct?

6         A.   I checked our general ledger and

7    our accounting system, and I was able to

8    verify that those invoices were posted in

9    the system.

10        Q.   Okay.  And then you send a response

11   letter on September 22nd of 2014; correct?

12        A.   I did, yes.

13        Q.   And you don't challenge the amount

14   that's due, correct?

15        A.   That wasn't the purpose of the, the

16   letter.

17        Q.   What was the purpose of the letter?

18        A.   It was to acknowledge receipt of

19   their letters, from my mark that we had

20   discussed how we had gotten to where we

21   were, acknowledged that he had notified us

22   that he was no longer going to support the

23   environment, the Print4 hosting environment.

24   And I proposed a, a method or a path to try

25   to get our balance paid and to get our

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

47

1     relationship back on track.

2          Q.    Okay.

3          A.    It was not to verify the balance

4     outstanding.

5          Q.    Okay.  And was one of the requests

6     that you made of IT Portfolio to reduce the

7     amount of the monthly payments it was

8     receiving?

9          A.    Can you ask that question again?

10         Q.    Sure.  Was, was one of the demands

11    that you made of IT Portfolio -- and I'll

12    actually ask this again.

13               Was one of the requests that you

14    made of IT Portfolio to cut the amount of

15    the monthly invoices, to reduce the amount

16    of the monthly invoices?

17         A.    In July of 2015, when we had the

18    call with Mark and Jack, we talked

19    specifically about trying to find a way, if

20    I'm not mistaken, to take roughly 20 to 25

21    percent of our forty to fifty thousand a

22    month of expenses out of the equation.

23         Q.    Okay.

24         A.    And I was asking Mark for his

25    recommendations or a way to try to

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

48

 1    accomplish that, in those discussions, and

 2    that would have come through a combination

 3    of things that were elements of the costs

 4    per month.

 5        Q.   Do you, do you recall what

 6    particular suggestions you may have had?

 7        A.   Prior to this letter?  Or in this

 8    letter?

 9        Q.   Well, I think in the conference

10    call; correct?  So, in the letter you're

11    referring to a conference call of July 15th,

12    2014?

13        A.   Yes.

14        Q.   And I'm assuming that that's when

15    you had made discussions suggestions

16    regarding potential cost-cutting measures;

17    correct?

18        A.    I told Mark that I believed, I

19    believe that we needed to take out, I think

20    I already answered the question, I believe

21    in that call we talked about trying to take

22    out 20 to 25 percent, to find a way to

23    reduce our expenses in this category by 20

24    to 25 percent of the average monthly costs.

25    And that was somewhere, I believe, between

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

49

1    seven to ten thousand dollars a month.

2        Q.   And did you make any suggestions

3    for how you wanted that to be accomplished?

4        A.   No.  We were actually asking Mark

5    for his recommendations on how to do that.

6        Q.   You were asking Mark for

7    recommendations on now NER Data could save

8    money?

9        A.   Yeah, because it was almost all

10   tied to his expenses and Cybage and hosting

11   and other stuff that Mark was responsible

12   for.

13       Q.   You say other stuff that Mark was

14   responsible for.  What was Mark responsible

15   for?

16       A.   Mark, IT Portfolio?

17       Q.   IT Portfolio.  What did you believe

18   IT Portfolio was responsible for?

19       A.   IT Portfolio was responsible for

20   all of our application development,

21   specifically with Cybage.  Because at that

22   time IT Portfolio had started using their

23   own Cybage resources, and there was a mixing

24   of resources between stuff that IT Portfolio

25   was paying for and what NER was paying for.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

```
 1              I was also, I also -- Mark was also
 2    responsible for or managed, IT Portfolio
 3    managed the third-party hosting environment.
 4    So the combination of the third-party
 5    hosting, the IT Portfolio fees, and the
 6    Cybage fees probably added up to $45,000 a
 7    month.
 8         Q.   How much how much were you paying
 9    IT Portfolio for the hosting?
10         A.   We weren't paying IT Portfolio
11    directly.
12         Q.   Who were you paying?
13         A.   At that point, it was a company
14    called Hosting dot com.
15         Q.   How much were you paying?
16         A.   I believe it was roughly 7,000 a
17    month.
18         Q.   All right.  And why did you believe
19    that was an IT Portfolio responsibility?
20         A.   Because they had set up the
21    environment, configured the environment,
22    specked the environment.  We were simply
23    paying for it.
24         Q.   How long had that gone on for?
25         A.   We moved to Hosting shortly after
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

51

1    Scott left.  But prior to that we were in a,

2    also in a third-party hosting environment

3    that IT Portfolio also managed for us.  I

4    believe it was NeoSpire, and it may have

5    been another name after that as well.

6        Q.   Okay.  And how long --

7        A.   I think it was two companies.

8        Q.   And how long had the hosting gone

9    on with NeoSpire for?

10       A.   I don't know.  Probably -- I don't

11   know.

12       Q.   Okay.  And you also said Cybage.

13   Tell me the portion of, of Cybage that you

14   believed IT Portfolio was responsible for.

15       A.   All of the resources at Cybage took

16   all of their direction from Mark.

17       Q.   Okay.  So you believe that since

18   they took all of their direction from Mark

19   that they were an IT Portfolio

20   responsibility?

21       A.   Yes.  Mark had been managing the

22   Cybage relationship for years.

23       Q.   So Mark had been managing the

24   Cybage relationship for years.  And by Mark,

25   I assume we're talking about IT Portfolio;

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

52

```
 1    correct?
 2        A.   No.  I'm talking about specifically
 3    Mark Lessner at IT Portfolio, but it was
 4    Mark's relationship.
 5        Q.   With Cybage, correct?
 6        A.   Correct.
 7        Q.   Okay.  And that had been going on
 8    for years, correct?
 9        A.   I believe so, yes.
10        Q.   Um, but yet now is the first time
11    that you're asking them to take on that
12    responsibility, in the fall of 2014?
13        A.   Can you ask that question again?
14        Q.   Sure.  You said that the
15    relationship with Cybage, correct, had been
16    ongoing for a number of years?  Right?
17        A.   Correct.
18        Q.   Okay.  And the first time that
19    you're talking about IT Portfolio taking on
20    that responsibility is in July of 2014?
21        A.   Where did I say I was asking IT --
22    I don't understand your question.
23        Q.   Sure.  When had you ever
24    communicated to IT Portfolio that you
25    believed all payments to Cybage were IT
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

53

```
 1    Portfolio's responsibility?

 2         A.   In the counterclaim.

 3         Q.   That's the first time you asserted

 4    that?

 5         A.   I can't say that definitively, but

 6    certainly I'm aware that it was done at that

 7    time.

 8         Q.   Okay.

 9         A.   I read the agreement.

10         Q.   Okay.

11         A.   And it said...

12         Q.   And let's, let's go to the

13    agreement.  I think by the agreement --

14              MR. A. OATWAY:  Are you

15    interrupting the witness?  He's still

16    talking.

17    BY MR. PRIEBE:

18         Q.   Do you have more to say?

19         A.   I, I read the agreement, and when I

20    read it, no different than auditing the

21    payments, it said that IT Portfolio was

22    responsible for all development services

23    including Print4 on-line, Print4 on-site and

24    all the other components, of the

25    application.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

54

1        Q.    Okay.  And so that's what the

2    counterclaim was based on then?

3        A.    Yes.

4        Q.    Okay.  Before asserting that

5    counterclaim, did you speak with Scott

6    Steele to verify that that was his

7    understanding?

8        A.    I can't say yes or no on that.

9        Q.    Okay.

10        A.    I, I can tell you that you have to

11    understand that in a period of about a year,

12    both Chris and Scott left.  Scott, who had

13    the primary relationship with Mark; Chris,

14    who had a financial relationship with Mark.

15    And after both of them left, those

16    relationships transitioned directly to me.

17            Prior to that, I had an indirect

18    relationship and knowledge of it.  It was at

19    that time where I started to look at and

20    have a better understanding of the costs and

21    the agreements and I started to question

22    them.

23        Q.    So, again, my, my question was just

24    before you asserted the counterclaims in

25    this lawsuit, did, did you speak with Scott

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

55

1    Steele to verify that your understanding of

2    the agreement comported with his

3    understanding of the agreement?

4         A.   In what specific aspect of the

5    agreement?

6         Q.   Sure.  With respect to the

7    obligation to pay for Cybage services?

8         A.   I clearly talked to Scott at one

9    point or another about the fact that both

10   NER and IT Portfolio were paying Cybage for

11   resources, and that what was appeared to be

12   clear to me was that there was a blending of

13   the utilization of those resources that had

14   occurred, and I could no longer tell what

15   was NER resources that NER was paying for

16   versus what was IT Portfolio resources that

17   IT Portfolio was paying for.

18        Q.   Okay.

19        A.   At that point, Scott had left,

20   however.

21        Q.   Okay.

22        A.   So it was more a casual social

23   conversation than a specific business

24   conversation.

25        Q.   Okay.  Did you ever explain to him

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

56

```
 1    the counterclaims you were considering

 2    bringing?

 3         A.    No.

 4         Q.    Okay.  Was Scott Steele the primary

 5    representative of NER who negotiated the

 6    2009 software agreement?

 7         A.    Scott was the person who dealt with

 8    Mark directly, but Scott and I both were

 9    involved on the NER side.

10         Q.    Okay.

11         A.    Mark didn't like me.

12         Q.    And what, what, what was, what was

13    your involvement?  Was there language you

14    suggested at all?

15         A.    My involvement was guiding Scott,

16    providing direction, setting some goals and

17    objectives, and just making sure that the

18    process was moving along.

19         Q.    Okay.  Now, at the time of this

20    September 22nd, 2014 letter, had you gone

21    back and reviewed any portions of the, the

22    software agreement as all?

23         A.    In order to -- can you ask the

24    question --

25         Q.    Sure.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

57

1        A.   -- a little bit differently?

2        Q.   Sure.  In order to prepare the

3    September 22nd, 2014 letter, did you review

4    any portions of the 2009 software agreement?

5        A.   I'm sure that I -- yes, clearly.

6        Q.   All right.  And the first time --

7    well, let's do this.

8            At that point in time, there was an

9    outstanding balance due, correct, to IT

10   Portfolio?

11       A.   Yes, there was an outstanding

12   balance due.

13       Q.   Okay.  And then, ultimately, that

14   spawned this litigation that we're in right

15   now; is that correct?

16                MR. A. OATWAY:  Objection.

17                THE WITNESS:  I probably

18   talked to Mark in the six months, nine

19   months before this letter at least once a

20   week via phone or email, and we would talk

21   about payments, specifically, and how much

22   cash NER was going to get him on a monthly

23   weekly or monthly basis.

24                MR. PRIEBE:  Okay.

25                THE WITNESS:  We made a

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

58

1    change to weekly or biweekly to help him

2    with his timing of his, his payroll and his

3    cash requirements, instead of doing it at

4    one time at the end of the month, which

5    seemed to be working and helped for awhile.

6    BY MR. PRIEBE:

7        Q.   All right.  But at least the first

8    time that you started taking a look at, um,

9    whether or not you believed there were any

10   payments NER was making that were IT

11   Portfolio responsibilities, the first time

12   you started looking into that was after a

13   dispute arose regarding payment; is that

14   correct?

15       A.   Scott left in two -- in February of

16   2013, I believe it was.  Um, and at some

17   point after that, I started getting more

18   involved.

19       Q.   All right.

20       A.   Directly.

21       Q.   Okay.  And can you take a look at

22   Exhibit No. 6, which is the 2009 software

23   agreement?

24           Do you have it in front of you?

25       A.   Yep.  I do.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

59

```
 1        Q.   And I believe what you stated was,
 2    what you previously stated was that your,
 3    NER's counterclaims would assert that the
 4    payments to Cybage were the responsibility
 5    of IT Portfolio came from your review of
 6    this contract.  Is that correct?
 7        A.   Among other things, yes.
 8        Q.   Okay.  All right.  What is it in
 9    this contract that you believe obligates IT
10    Portfolio to pay for those portions of the
11    Cybage development?
12        A.   1.4 definition, "Development
13    services means the designing, writing and
14    testing of machine-readable object code or
15    source code for the Print4 software, and
16    further defined in article 2 below."
17        Q.   Okay.
18        A.   The definition of Print4 software,
19    1.11, means, "The software programs and
20    related databases.  The Print4 database
21    currently referred to as Print4 on-site,
22    Print Helpline and/or Print4 on-line in
23    machine-readable object code and source
24    code, including additions, modifications and
25    enhancements."
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

60

1     Q.   Okay.   If you can go up to the

2     first page here under "Recitals," look at

3     recital B.

4           Is that where it says, "NER and ITP

5     also contracted for ITP to enhance Print4 on

6     an ongoing basis for 20 hours per week for

7     work for hire?"

8           Did I read that correctly?

9     A.   Not correctly, exactly but, yes,

10    work week as a work for hire, I believe.

11    Yes.  I under -- I read that.

12    Q.   Okay. All right.  So is it, is it

13    your understanding that at the time this

14    Software Development Assignment Agreement

15    was executed, NER was working for

16    approximately 20 hours per week on a

17    work-for-hire basis?

18    A.   NER was working or ITP was working?

19    Q.   ITP was working?

20    A.   When the agreement was signed or

21    when it was dated?

22    Q.   Well, I believe it was signed in

23    February of 2010.  Correct?

24    A.   I believe that's the case.

25    Q.   Okay.  Is there any difference

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

61

1    between the two?

2        A.   Between signed and dated?

3        Q.   No, no, no, not my question.

4             Was, was ITP working more than 20

5    hours per week?

6        A.   I'm sure there were, yes.

7        Q.   Okay.  Well, what had they

8    contracted for?  What was the contracted

9    hours that they had contracted to work for?

10               MR. A. OATWAY:  Objection.

11               THE WITNESS:  Are you asking

12   me to read the recital B?

13               MR. PRIEBE:  Yes, please.

14               THE WITNESS:  Recital B says,

15   "Any NER and ITP also" -- "also contracted

16   for ITP to enhance Print4 on an ongoing

17   basis for 20 hours per week as a work for

18   hire."

19       Q.   Okay.  At the time this agreement

20   was executed in February of 2010, NER was

21   paying for the development services for

22   Cybage; correct?

23       A.   NER was paying for some of the

24   development work for Cybage.

25       Q.   Okay.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1       A.   Not all.

2       Q.   Okay.   And who was, who was paying

3    for the other part of it?

4       A.   IT Portfolio.

5       Q.   Okay.  Did --

6       A.   I believe IT Portfolio was.  I

7    didn't know -- I don't know that --

8       Q.   You don't know that?

9       A.   -- specifically, but I've, I've

10   been told that IT Portfolio had a, had a

11   direct relationship with Cybage.  I then

12   found out later that, you know, it's -- I

13   then knew that for a fact.

14      Q.   Okay.  Okay.  If you can go to page

15   4 of this agreement?

16      A.   I'm there.

17      Q.   Okay.  If you can look under

18   section 3.3(b).

19      A.   (Views document.)

20      Q.   Okay.  The last sentence of 3.3(b)

21   of the agreement states, "NER agrees that

22   the present level of resources devoted by

23   ITP is appropriate to provide the services

24   required hereunder subject to additional

25   resources as provided below."

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

63

1            Did I read that correctly?

2      A.   Yes.

3      Q.   Were you aware of this provision in

4   the agreement?

5               MR. A. OATWAY:  Objection.

6               THE WITNESS:  I, I know that

7   the specific, I believe that the specific --

8   the intent was to state that the current way

9   things were working was the status quo.

10              There was also, if you go to

11  the next paragraph, that as revenue grew,

12  that there would be additional resources

13  required.

14              MR. PRIEBE:  Correct.

15              THE WITNESS:  I also, I also

16  believe that, that you can't read that

17  question in an absolute without reading the

18  rest of the agreement, which states that,

19  um, "statements of work would be provided,

20  expectations would be set of work that would

21  be required at part of this broad

22  relationship," and that ITP was required to

23  do that.

24  BY MR. PRIEBE:

25      Q.   Okay.  I want to take a look at the

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

64

1    following sentence that you're referring to.

2    Correct?  Because the agreement does

3    indicate at what point in time IT Portfolio

4    would provide additional resources.

5              Is that correct?

6         A.    I think you are asking -- can you

7    ask that question a little bit more

8    specifically?

9         Q.    Sure.  The agreement provides that

10   IT Portfolio would provide additional

11   resources once NER Data made payments in

12   excess of $800,000 in any year; is that

13   correct?

14        A.    I think there's a lot of things in

15   this agreement that don't necessarily state

16   exactly what the intent of the agreement

17   was, but I do remember the discussions that

18   were occurring between Scott and Mark with

19   regards to the absolute expectation that

20   Mark would add additional resources to the

21   team when payments exceeded $800,000 in any

22   year.

23        Q.    Well, that's what's contracted for;

24   correct?  That's the agreement?

25        A.    What's contracted for and what was

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

65

1    occurring weren't necessarily the same.

2        Q.   Explain that to me.  What do you

3    mean they weren't the same?

4        A.   Well, I just, for example, I said

5    Mark was not, Mark was -- I believe Mark was

6    working and his team were working more than

7    20 hours per week.

8        Q.   So is the argument that because IT

9    Portfolio was exceeding its contractual

10   obligations it somehow became bound?

11               MR. A. OATWAY:  Objection.

12               THE WITNESS:  I'm not a

13   lawyer so I'm not making an argument.  I

14   think what was -- the expectation was that,

15   as requirements would be defined, Mark and

16   his team would work with Scott and they

17   would deliver that.  I don't, I'm not privy

18   to the specific conversations that were

19   going on with regards to the costs that Mark

20   had to deliver.

21               MR. PRIEBE:  Mm-hmm.

22               THE WITNESS:  If I remember

23   correctly, the, the, the specific comment

24   that, in that paragraph that you're

25   referring to that the fees would be used for

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

66

1    compensation of officers and staff was, um,

2    at Mark's request.  Why, I don't know.

3                    Um, I also remember that, and

4    I don't know the timing, but I believe at

5    that time Mark had people that were on his

6    direct payroll doing development.  And then

7    at some point they quit or left or were

8    fired, and that Mark then replaced those

9    people with people from Cybage.

10   BY MR. PRIEBE:

11       Q.   Let, let me just ask you this,

12   simply.

13                    Did NER agree in this agreement

14   that the present level of resources that ITP

15   was devoting was appropriate?

16       A.   In general, I believe that was,

17   that was the understanding.

18       Q.   Okay.  And the contract required

19   ITP to provide additional resources once NER

20   submits payments in excess of $800,000 per

21   year; is that correct?

22       A.   That's your reading of that, yes.

23       Q.   Okay.  Well, no, I want your

24   understanding.

25                    Is that what you believe this

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

67

```
 1   contract requires?

 2       A.   No.  I believe the contract

 3   required that, as work required, Mark would

 4   add resources to support the development, as

 5   required.  Because he was our single focus

 6   as it related to the development and support

 7   for the application.

 8       Q.   Okay.  So where is that part of the

 9   agreement?  Was there any language like that

10   in the agreement?

11       A.   I can't tell you specifically.  But

12   I clearly was aware of the nature of the,

13   the business relationship that was going on

14   back and forth between NER and IT Portfolio,

15   between Scott and Mark.

16       Q.   All right.  When you prepared your

17   counterclaims in this litigation, were you

18   aware of section 3.3(b)?

19       A.   No.

20       Q.   Okay.  Okay.  Let's go back to

21   deposition Exhibit 11, which is the answers

22   to interrogatories.

23           You can go to your response to

24   Interrogatory No. 8.  The pages don't appear

25   to be numbered, but I think it's page 3.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

68

```
 1              And that interrogatory asked you,
 2      with respect to paragraph 23 of your
 3      counterclaims, "Identify the employee you
 4      hired to perform obligations of ITP and
 5      identify every task performed by such
 6      employee instead of ITP, and identify the
 7      date each task was performed."
 8              Did I read that correctly?
 9         A.   Yes.
10         Q.   Okay.  And your response was that,
11      "NER hired Mike Walsh to perform the
12      obligations that ITP was supposed to be
13      performing under the agreement."
14              Did I read that correctly?
15         A.   Well, it's, this one says
16      "supported," but it's, it's supposed to be
17      "supposed," yes.
18         Q.   Okay.  Yeah.  Oh, that's right,
19      okay.  So what, what -- what did you mean by
20      that?
21              What did you think Mike Walsh was
22      doing that ITP was supposed to be performing
23      under the agreement?
24         A.   When Scott -- when, when I would
25      have conversations with Scott about
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

69

1    development, he, he would, he would say, he

2    would share with me that he felt that it

3    was, he was unable to get work done as

4    quickly as he needed to, and, um, and/or

5    that, uh, it wasn't able to get done

6    correctly, and, um, he had more confidence

7    in Mike Walsh to get work done.

8         So he, he started to funnel more

9    work to Mike, because he wasn't getting

10   things done on a timely basis from ITP.

11        Q.   Okay.

12        A.   Or from Cybage.

13        Q.   When did you have those discussions

14   with Mr. Steele?

15        A.   Over, over years.

16        Q.   And you were here today for Mr.

17   Walsh's testimony, correct?

18        A.   I was.

19        Q.   Okay.  Did you hear Mr. Walsh

20   testify that he never performed any work on

21   Print4 on-line?

22        A.   I heard him say that, yes.

23        Q.   Were you aware of that before you

24   submitted your answer to this interrogatory?

25        A.   No.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

70

```
 1        Q.   Did you speak with Mike Walsh

 2   before you submitted your response to this

 3   interrogatory?

 4        A.   Can you ask me that question again?

 5        Q.   Sure.  Before you submitted your

 6   response to Interrogatory No. 8, did you

 7   speak with Mike Walsh?

 8        A.   About the question 8?

 9        Q.   Sure.

10        A.   Or in general?  I used to talk to

11   Mike every day.

12        Q.   Okay.  That's a good clarification.

13             Before submitting your response to

14   Interrogatory No. 8, did you, did you

15   discuss your response at all with Mike

16   Walsh?

17        A.   Yes.

18        Q.   Okay.  And what did he say?

19        A.   My questions were more around,

20   refresh my memory on start date, projects

21   that you were working on earlier in, in the

22   point in time.

23        Q.   Okay.  And I think I'm just getting

24   a warning here, so we have to do a break

25   here for a tape change.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

71

```
 1                    THE VIDEOGRAPHER:  We have,
 2    you still have two minutes, you can ask
 3    another question.
 4                    MR. PRIEBE:  That's, okay,
 5    we'll, we'll start out -- we'll just let you
 6    change.
 7                    THE VIDEOGRAPHER:  Okay, very
 8    good.  Going off the video record at 4:34.
 9    This concludes tape number 3.
10                    (Whereupon, a recess was
11    taken at this time.)
12                    THE VIDEOGRAPHER:  We are
13    back on the video record at 4:46 p.m.
14                    This is tape number 4.
15    BY MR. PRIEBE:
16        Q.   Okay.  Mr. Oatway, referring back
17    to deposition Exhibit No. 11, which is the
18    answers to interrogatories, if you can take
19    a look at Interrogatory No. 11, and that
20    interrogatory asks NER to:  "Identify all
21    communications with ITP concerning ITP
22    hosting the exchange server."
23            Is that correct?
24        A.   Yes.
25        Q.   Okay.   And I believe your response
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

72

1    is that, in the 2014 time frame, "ITP took

2    certain action including shutting down the

3    exchange server, the effect of which was to

4    discontinue the Print4 email traffic."

5          Did I read that correctly?

6      A.   Yes.

7      Q.   What do you mean by that?

8      A.   My understanding, I learned during

9    this process that emails from the Print4

10   application were going to a exchange server

11   that ITP was hosting or had hosted

12   somewhere.

13         When NER went into payment default

14   with ITP, they started indicating their

15   unwillingness to provide certain levels of

16   services that had not been specifically

17   identified in the agreement, one of which

18   was the email traffic.

19         We received a -- found out, I found

20   out after the fact, but, and I think Mark

21   had indicated potentially as early as a

22   month or maybe before that it was his intent

23   to stop this and to tell -- had told NER

24   that we were required to find a way to

25   accommodate this.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

73

 1            That wasn't acted on, and within

 2    about a -- when the deadline came up that

 3    Mark had, had given to us, we asked for a

 4    little bit more time.  I can't remember if

 5    he gave us a little bit of time or not, but

 6    the -- we had to make accommodations to, to

 7    have all the email traffic for the

 8    application sent to a different exchange

 9    server.

10        Q.   Okay.  All right.  And that was

11    after you had, or NER had been in payment

12    default for a number of months; is that

13    correct?

14        A.   I believe it was right around the

15    time that the letter, the first letter came

16    from your firm.  And it was, I believe,

17    Mark's -- well, I can't say what Mark's

18    intent was.

19        Q.   But, regardless, ITP's statement

20    that it would no longer host the email

21    server arose after there had been a payment

22    default; correct?

23        A.   Yes.

24        Q.   Okay.  Did ITP communicate to you

25    that the reason for them no longer hosting

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    the server was because of the payment

2    default?

3        A.   I can't remember if, if that was

4    specifically communicated to me.  It was

5    certainly clear that there was a cause and

6    effect.

7        Q.   I, I don't suspect you believe IT

8    Portfolio would have been able to perform

9    without getting any kind of payment at all.

10   Correct?

11                MR. A. OATWAY:  Objection.

12                THE WITNESS:  I don't believe

13   that it was a cost issue that was the reason

14   why Mark shut the email traffic down.  I

15   believe it was to deliver a message.

16   BY MR. PRIEBE:

17       Q.   To deliver a message?

18       A.   That we were in payment default and

19   that we -- he was not going to go one hair

20   above what he viewed as the clear definition

21   of the terms in the, in the agreement of

22   what he was supposed to provide in terms of

23   development services and support.  Clearly,

24   the email traffic was not listed anywhere in

25   the agreement.

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

 1            A better example of that would have

 2    been their support of the hosting

 3    environment, where, on a much more critical

 4    basis at the time we were having a series of

 5    very significant and serious technical

 6    issues with the application, and/or with the

 7    hosting environment.  That occurred at

 8    several junctions along the way.

 9            But around this same time, Mark's

10    partner, Jack Drose, specifically, who I

11    believe supported the hosting environment,

12    refused to help us with the, uh, application

13    and stability issues.

14       Q.   All right.  Let's turn the page and

15    move on to Interrogatory No. 12.

16            That interrogatory says, with

17    respect to paragraph 28 of your

18    counterclaims:  "Identify every printer,

19    manufacturer, customer whose adoption of the

20    Print4 software was limited by the alleged

21    breach by ITP and explain how that

22    customer's adoption of the Print4 software

23    was limited."

24            Did I read that correctly?

25       A.   Yes.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

76

1      Q.   Okay.  And in response, NER

2    identifies two customers; is that correct?

3      A.   Correct.

4      Q.   Okay.  And these were the two

5    customers who NER allege had difficulty

6    adopting the Print4 software, is that

7    correct?

8      A.   These two OEMs had specific

9    problems with NER and with our managed print

10   business and the software.  Their reasons

11   were different, but, yes, they specifically

12   had problems.

13     Q.   Okay.  And --

14     A.   And were limited.

15     Q.   And the first customer you identify

16   is Brother, is that correct?

17     A.   Correct.

18     Q.   Okay.  So what was the, what was

19   the problem with Brother?

20     A.   Well, at the end it was, um, we

21   couldn't get the source code released, uh,

22   because, um, Cybage wouldn't release it and

23   because IT Portfolio hadn't paid, paid its

24   bill.

25     Q.   And I'm confused about the answer

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

77

1    to this.

2            Were you planning to deliver source

3    code to Brother?

4        A.   We needed to deliver certain

5    elements of the code to Brother in order for

6    them to be able to do the final machine

7    communication work.

8        Q.   So you were going to be developing

9    source code for the software directly to

10   Brother?

11       A.   I'm not sure I understand your

12   question.

13       Q.   Sure.  What's your understanding of

14   source code?

15       A.   What is my understanding of source

16   code?

17       Q.   Correct.

18       A.   Source code is the code that

19   programmers use that eventually gets

20   compiled.  I'm not a technical...

21       Q.   Sure.

22       A.   So...

23       Q.   I understand.  So who, who --

24   prepared the response to Interrogatory No.

25   12?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

78

1        A.    I did.

2        Q.    So what did you mean by, by source

3    code?

4              What could NER not deliver?

5        A.    We could not deliver the Brother

6    component of the application.  They would

7    not release the, the, the, maybe that --

8    okay.  So, let me explain.

9              Not just the source -- they would

10    not release the code.  They would not

11    release the enhancements to the code that

12    had been made to us because payment had not

13    been made.

14        Q.    Okay.  So --

15        A.    And that caused delays that

16    eventually had Brother go in a different

17    direction.  We lost that business.

18        Q.    So that had to do with a failure to

19    make payment, is that correct?

20        A.    That had to do with, that had to do

21    with the fact that we could not get the

22    application, the new development from, from

23    Cybage released to us to be able to give to

24    Brother, because payment had not been made

25    by IT Portfolio.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

79

```
 1      Q.   But by this point in time, hadn't
 2   it been a number of months since you had
 3   submitted any payment whatsoever to IT
 4   Portfolio?
 5      A.   I don't know the timing of this.
 6      Q.   Okay.
 7      A.   But this was IT Portfolio's bills
 8   to Cybage.
 9      Q.   Correct, but --
10      A.   Not NER's.
11      Q.   Do you remember how long it had
12   been at this point in time since NER had
13   submitted any payment at all to IT
14   Portfolio?
15      A.   I don't remember the timing,
16   specifically.
17      Q.   Okay.  Did you verify that timing
18   before you prepared your response to
19   Interrogatory No. 12?
20      A.   Did I verify the timing of what?
21      Q.   Of NER's payments to ITP versus
22   ITP's payments to Cybage?
23      A.   We, we were -- I don't, I don't, I
24   don't really understand your question.
25           What I can tell you is this, that
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    Cybage would not release code or release

2    upgrades and enhancements that we, NER had

3    been paying to them, on a monthly basis,

4    because among other things either NER's

5    account may have been in arrears and/or in

6    combination IT Portfolio's account was in

7    arrears with Cybage.

8         Q.   Okay.   But at this period in time,

9    NER's account with IT Portfolio was

10   certainly in arrears; is that correct?

11        A.   Again, I said I didn't know what

12   the timing specifically of this was.  I can

13   tell you we ended up paying IT Portfolio's

14   bill to Cybage.

15        Q.   Okay.  But the issue with Brother

16   was simply a payment issue, correct, it

17   wasn't a performance issue?

18        A.   It was a payment issue, but they

19   also had confusion about who owned the

20   rights to the software.

21        Q.   Okay.  And the second customer you

22   identify in Interrogatory No. 12 is Sharp.

23   Is that correct?

24        A.   Yes.

25        Q.   Okay.   And you say, "Sharp

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

81

```
 1    terminated its contract with NER due to
 2    several technical issues."
 3            Did I say that correctly?
 4        A.   Yes.
 5        Q.   Okay.  So what, what -- what do
 6    you mean by this?  What were the technical
 7    issues?
 8        A.   The ones that I became personally
 9    aware of and involved with had to do with
10    the nature of the way we were receiving
11    meters and pages printed, information from
12    the Sharp equipment into the system and the
13    way we were then presenting those, that data
14    back to Sharp.
15            Sharp had -- the development that
16    was done in support of Sharp was extensive,
17    in terms of integrating.  Sharp's specific
18    concern was with regards to being able to
19    verify and reconcile the meters that they
20    would get from their data collection agents
21    versus what we would provide to them through
22    the Print4 system.
23            As we went through those
24    discussions with them, and I then became
25    involved, it became clear that we were
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

82

1    creating and backing into meters instead of

2    actually getting the actual reads properly

3    from the equipment.

4        Q.   Okay.  And what, what did you do to

5    determine that?

6        A.   I listened to Mark explain how he

7    was calculating pages and what information

8    he was getting and not getting.  I listened

9    to him explain to our team internally.

10           I also listened to conversations

11   that occurred between our team and Sharp.

12   But Mark said that he was backing into

13   numbers.  He was creating formulas to make

14   it work instead of actually taking the right

15   meters from the devices.

16       Q.   Okay.

17       A.   The final straw?

18       Q.   Mm-hmm.

19       A.   There were two pieces of -- with

20   Sharp.  The final straw with Sharp, not

21   terminating -- they terminated their, a

22   piece of their contract with NER.  But the

23   final contract was terminated with Atlantic

24   about a month ago when the domain name for

25   Print4 on-site was shut down and the traffic

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    was redirected, and the only customer that

2    was affected by that was Sharp.  And as a

3    result of that, I'm told Sharp canceled the

4    remaining contract with Atlantic.

5        Q.   Okay.  So explain, explain the --

6    why do you refer to that as the last straw?

7        A.   That was the last piece of the

8    Sharp revenue, the Sharp relationship.

9        Q.   Okay.  Well, you said the last

10   straw just occurred.

11       A.   I believe it occurred about a month

12   ago.

13       Q.   Okay.

14       A.   From what I'm told.

15       Q.   Okay.  Interrogatory No. 12 was

16   asking about paragraph 28 of your

17   counterclaims.

18            Do you remember when your

19   counterclaims were submitted in this case?

20       A.   Say that again?

21       Q.   Sure.  Do you recall when you

22   submitted your counterclaims in this case?

23       A.   Yeah, generally.

24       Q.   About what time frame?

25       A.   About a month after you served the

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

84

1    initial claims, I believe.

2        Q.    Okay.

3        A.    This may be a little misleading.

4    It was, there were two pieces of the

5    contract.  The first piece of the contract

6    was terminated with NER, at that time.  The

7    second piece, the final piece of the

8    contract was just terminated.

9        Q.    So response to Interrogatory No.

10   12, the last sentence, when you say, "This

11   failure resulted in unresolved technical

12   issues that ultimately caused Sharp to

13   terminate the agreement," you're saying that

14   that may be misleading?

15       A.    What I'm say -- yeah, because that

16   makes it seem like the full contract was

17   terminated.

18       Q.    Correct.

19       A.    And the truth is only a portion of

20   the contract was terminated.  A portion

21   continued.

22       Q.    What portion continued?

23       A.    All of the non-MPS activities.

24       Q.    All of the nonmanaged print service

25   activities continued?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

85

```
 1        A.   The nature of the agreement with
 2    Sharp was a piece of it was managed print
 3    and a piece of it was integration with their
 4    ERP system.  The integration with their ERP
 5    system continued.  The managed print stuff
 6    was terminated.
 7        Q.   And the entire contract was then
 8    terminated, you said about a month ago?
 9        A.   I, I was told that Sharp no longer,
10    is no longer doing business with Atlantic
11    due to issues with the Print4 on-site domain
12    name and traffic.  I don't have firsthand
13    knowledge of that.  I was just told that.
14        Q.   Okay.  Who were you told that by?
15        A.   I was told that by, I believe
16    either Robert Belvin -- I believe Robert
17    Belvin, maybe Bill McLaughlin.
18        Q.   Okay.  Well, you're certainly
19    not -- are you claiming that as damages in
20    this lawsuit?
21        A.   No.
22        Q.   All right.  So, for --
23        A.   It does limit the, the payout on
24    the sale.
25        Q.   Explain that for me.  What are you
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

86

1    talking about?

2        A.   The value of the transaction, the

3    sale of the managed print business, um, has

4    an earnout based on retained contracts, and

5    the Sharp contract was one of them.

6        Q.   All right.  So what have you done

7    to determine, uh, your damages or NER's

8    damages with respect to the Brother and

9    Sharp issues that you identified here?

10       A.   We, um, we could not afford to go

11   hire an expert witness to try to calculate

12   the damages because of the financial

13   challenges that the business was facing.

14       Q.   Okay.  Did you do anything?

15       A.   In this stuff, I, I --

16              MR. A. OATWAY:  Don't get

17   into conversations with your lawyers.

18   BY MR. PRIEBE:

19       Q.   That's correct, I don't want

20   privileged communications with your lawyers.

21              I just want to know if, if you or

22   NER did anything to ascertain the value or

23   the amount of its claimed losses.

24       A.   I was aware of the, when, when that

25   was, when we did the response, I did

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

87

1    research on the value of the revenue and the

2    margin that those relationships were

3    contributing to NER at the time and had been

4    lost.

5        Q.   Did you ever disclose those, in the

6    litigation?

7        A.   I don't believe I was asked to.  I

8    don't think the -- the answer is, I don't

9    think, no.

10       Q.   Okay.  With respect to the issue

11   identified for Brother, that would have

12   happened sometime around the end of 2014; is

13   that correct?

14       A.   I said I couldn't remember the

15   specific time.

16       Q.   Okay.  But before the issue with

17   the delivery of the source code, correct,

18   there had been no issues with Brother that

19   you can recall; is that right?

20       A.   I don't believe I said that.

21       Q.   Okay.  Is that true?  Were there

22   other issues with Brother?

23       A.   Can you be more specific about what

24   issues you're, you're asking about?

25       Q.   Sure.  In your counterclaims,

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

88

1    correct, NER is alleging that certain

2    printer manufacturer customers, um, that

3    their adoption of the Print4 software was

4    limited.

5            We asked you to identify who those

6    customers were.  Correct?

7        A.    Mm-hmm.

8        Q.    Okay.  One of the customers you

9    identified was Brother.

10           Are you alleging that Brother's

11    adoption of the Print4 software was limited

12    prior to the series of events we discussed

13    related to the source code?

14       A.    We collectively, ITP and NER, were

15    very clear on what we were going to do and

16    deliver to Brother as part of the contract

17    that they engaged us with.

18       Q.    Okay.

19       A.    When that was exactly, I can't tell

20    you, but I know for a fact Scott Steele was

21    involved with it, as was Mark, so that will

22    give you a point in time to give you a, a

23    date or area of when this relationship

24    started.

25            We delivered initially what we

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

89

```
 1    thought was what we had promised, and then

 2    their requirements changed, and we worked

 3    with them, we collectively, ITP and NER, to

 4    try to appease the customer.

 5            As that process went on, we then

 6    got to a point where we were in the payment

 7    default.  And we were -- and Brother changed

 8    a lot of the requirements of the scope and

 9    took on more of the responsibilities

10    themselves versus us doing it, still part of

11    the original contract.

12            However, we couldn't meet the, um,

13    uh, kind of final step in the process

14    because we couldn't deliver the final

15    elements of the code to them because of the

16    contract situation that had occurred with IT

17    Portfolio.

18       Q.   And when you say contract situation

19    with ITP, are you really referring to the,

20    the payments to Cybage?

21       A.   It had to do with ITP's payments to

22    Cybage, as well as Cybage's questioning of

23    who owned the code, who had the right --

24    they would not release the software to us

25    without having it go through IT Portfolio.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

90

```
 1       Q.   Okay.
 2       A.   Including the software that they
 3   were doing work for us.  They would not
 4   release software to us.
 5       Q.   Okay.  Unless it went through IT
 6   Portfolio?  What do you mean by that?
 7       A.   They would not release for a period
 8   of months, they would not release software
 9   to us, enhancements, upgrades that had been
10   paid for by NER, um, because they, um, had
11   never done it that way.  They had always
12   released software directly to IT Portfolio.
13       Q.   Because NER, to your understanding,
14   NER had continued to pay Cybage -- or, I'm
15   sorry.
16            To your understanding, IT Portfolio
17   had continued to pay Cybage, even though NER
18   was not paying ITP?
19       A.   That's not what I said.
20       Q.   Okay.
21       A.   I don't know what ITP's direct
22   financial obligation or relationship with
23   Cybage was, other than at the end when we
24   were notified that they were three months
25   outstanding from IT Portfolio to Cybage.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

91

1        Q.   What was the total --

2        A.   Which we ended up eventually

3    paying.

4        Q.   What was that total amount of

5    payment?

6        A.   I believe it was about $10,000.

7        Q.   Did anyone, other than your

8    counsel, did anyone help you prepare, uh,

9    your responses to Interrogatory No. 12?

10       A.   No.

11       Q.   Okay.  Did you discuss this

12   response with anyone else at NER?

13       A.   There was only one other employee

14   of NER at this time.

15       Q.   Who was the other employee of NER?

16       A.   Rachel Arsenault.

17       Q.   Okay.  Did you discuss this with

18   her?

19       A.   Generally.

20       Q.   How so?  What do you mean by

21   generally?

22       A.   Did I discuss?  So, can you be more

23   specific?  What I did discuss?

24       Q.   Sure.  I'm assuming in preparing

25   your responses to Interrogatory No. 12, you

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

92

 1    the some degree of research.  Correct?

 2        A.   Yes.

 3        Q.   What, what did that research

 4    involve?

 5        A.   That research involved going back

 6    and looking at emails, looking at my notes

 7    and trying to remember exactly what

 8    occurred.

 9        Q.   Okay.  Did it involve speaking with

10    anyone else, other than your attorney?

11        A.   I think I said at one point I had

12    talked to Mike Walsh.  I may have at one

13    point talked to Robert Belvin specifically

14    about this.

15        Q.   Do you recall the conversation?

16        A.   I would have talked to Rachel in

17    general about the fact that there was a

18    litigation with IT Portfolio.

19        Q.   Okay.  So in general about the

20    litigation, but not specifically about these

21    responses?

22        A.   Rachel helped me prepare the

23    financial files.

24        Q.   And by financial files, are you

25    referring to some of the spreadsheets that

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    we've seen produced or that NER produced in

2    this litigation?

3        A.   You want to mention specifically

4    the document number?

5        Q.   Sure.

6        A.   So I can say yes to both of them?

7        Q.   Sure, I that's fine.  Deposition

8    Exhibit, uh, 5 is one of them.

9        A.   That's 9.  Yes, to 5.

10       Q.   Okay.  And I believe the other one

11   is 9.

12       A.   Yes, to 9.

13       Q.   Okay.  And how were both of those

14   charts compiled, Exhibits 5 and 9?

15       A.   I can't -- I don't know

16   specifically how Rachel did it, but I asked

17   her for the information that was requested

18   in the interrogatories, and she queried the

19   ERP system and brought back the payments and

20   the invoices.  In both cases, those files

21   relate to invoicing and payments.

22       Q.   Okay.

23       A.   They came directly out of our ERP

24   system and out of our general ledger.

25       Q.   All right.  Take a look at the next

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

94

1    page, and this is deposition Exhibit 11, the

2    responses to interrogatories.

3         A.   What number?

4         Q.   I'm not sure.  The pages aren't

5    numbered, but it's, it's the heading that

6    says "Responses to Requests for Production

7    of Documents."

8                   THE VIDEOGRAPHER:  You were

9    covering your microphone.

10   BY MR. PRIEBE:

11        Q.   Oh.  It's under the heading that

12   says "Response to Requests for Production of

13   Documents."

14        A.   Mm-hmm.

15        Q.   Looks as though it's on the fifth

16   page of the document?

17        A.   What number?  Am I looking at the

18   right one?

19        Q.   Sure.

20        A.   Document 11?

21        Q.   Correct.  Exhibit 11, it's your

22   responses to requests for production of

23   documents.  It's a separate heading that I

24   believe is on page 5.  Can you turn there?

25        A.   Okay.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

95

```
 1      Q.   Okay.  Have you reviewed these
 2   requests for production of documents?
 3      A.   Yes.
 4      Q.   Okay.  Were you the person within
 5   NER who searched for responsive documents?
 6      A.   I was one of them.
 7      Q.   Okay.  Who was the other one?
 8      A.   Robert Belvin, Eric Austin.
 9      Q.   Anyone else?
10      A.   I'm sure there was, but those were
11   the primary.  I mean we were going and
12   pulling as many files as we could.
13      Q.   Okay.  Now, at this point in time,
14   I believe, at the time you were searching
15   for these documents, was the only other
16   employee of NER Rachel Arsenault?
17      A.   No.
18      Q.   Okay.  So when you were searching
19   for responsive documents here, who -- was
20   Robert Belvin still an employee of NER?
21      A.   Yes.
22      Q.   And Eric Austin was still an
23   employee of NER?
24      A.   Yes.
25      Q.   So when, at what point this time
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    did you begin searching for responsive

2    documents?

3        A.   Shortly after Attorney Gray asked

4    us to.

5        Q.   Okay.  And I'm sure you recall that

6    these, or NER's response were not provided

7    within 30 days from the date that they

8    received discovery requests.  Correct?

9                MR. A. OATWAY:  Objection.

10               THE WITNESS:  You're certain

11   what?

12   BY MR. PRIEBE:

13       Q.   Did, did NER respond to the

14   discovery requests, in the time required by

15   the rules --

16               MR. A. OATWAY:  Objection.

17   BY MR. PRIEBE:

18       Q.   -- do you know?

19       A.   The, the date that I'm most

20   familiar with --

21       Q.   Mm-hmm.

22       A.   -- was the December 21st date that

23   I committed to the judge when I was out in

24   Colorado to produce the responsive

25   documents.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

97

1      Q.   Why were they not produced sooner?

2    Why did you not provide discovery responses

3    sooner than that?

4                MR. A. OATWAY:  Objection.  I

5    want to give you a cautionary instruction

6    there, that, to the extent that the answer

7    to this question would cause you to be

8    revealing communications with counsel, you

9    should not answer your question in a way

10    that reveals those communications.

11                And if you're not able to

12    answer the question without doing so, you

13    should tell the attorney that.  If you can

14    answer all or part of it without disclosing

15    attorney-client communication, then you may.

16                I also object to the form of

17    the question.

18                MR. PRIEBE:  Okay.

19                MR. A. OATWAY:  Go ahead.

20                THE WITNESS:  Given that any

21    of our communication with regards to this,

22    this case, my communication was with one or

23    more attorneys.  Um, my communication was

24    with one or more attorneys on, on responding

25    to this stuff.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

98

```
 1    BY MR. PRIEBE:

 2        Q.   Okay.  Um, and that's all right, I

 3    don't want privileged information.

 4             All I want to know is, was there

 5    any, was there any reason, other than

 6    discussions with counsel, why you did not

 7    provide or you were unable to provide

 8    responses sooner?

 9        A.   Can I answer that question with a

10    question to you?

11        Q.   You can answer it however you like.

12        A.   Are you aware of the reason why

13    Attorney Gray removed, was removed from

14    representing NER?

15        Q.   Okay, I am not.  It was not

16    disclosed.

17        A.   The nature of that was not

18    disclosed?

19        Q.   It was not disclosed, not to my

20    knowledge.  Was it your understanding that

21    that was disclosed?

22        A.   I would have thought it was

23    disclosed at some time, at some point, yeah.

24        Q.   Okay.  I'm not aware of that.  Is

25    that, is that going to be disclosed?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

99

```
 1                    MR. A. OATWAY:  I object.
 2     Let's move on.  Ask another question,
 3     please.  I'm not comfortable with --
 4                    THE WITNESS:  All of the
 5     responses --
 6                    MR. A. OATWAY:  Hold on, I'm,
 7     I'm saying something.  I am not comfortable
 8     with questions that are so close to the
 9     attorney-client privilege.
10                    So I want to repeat the
11     cautionary instruction that, um, discussions
12     about why your first lawyer withdrew, if
13     they're not, if they weren't disclosed you
14     should not be disclosing them, because they,
15     they may be attorney-client privilege.
16                    I don't know.  But I'm not
17     going to let you inadvertently waive that
18     privilege by making that disclosure.
19                    MR. PRIEBE:  Okay.
20                    MR. A. OATWAY:  If, if this
21     is something that's of a high priority to
22     you and you need an answer to this, then
23     we'll have to, uh, adjourn the deposition
24     for me to get information from Attorney Gray
25     to help you get -- to find out whether
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

100

```
 1    there's something discoverable for you.

 2                   I just don't know.  So, I'm

 3    not going to -- out of an abundance of

 4    caution, I'm not going to allow him to go

 5    there.

 6                   I would encourage you to

 7    continue on with the other topics, and tell

 8    me before the end of the day whether this

 9    narrow issue is, is something that you want

10    me to pursue with Attorney Gray.

11                   MR. PRIEBE:  No, that narrow

12    issue is nothing I want you to pursue --

13                   MR. A. OATWAY:  Okay.

14                   MR. PRIEBE:  -- at the end of

15    the day.  No, no.

16                   MR. A. OATWAY:  Let's move on

17    then.

18                   MR. PRIEBE:  Well, let, let

19    me finish.  I let you finish.

20                   That's nothing that I want to

21    pursue.  What I'm trying to get at is,

22    there's a long delay in failing to respond.

23                   I want to know, uh, and I,

24    and I also understand that there's a number

25    of things NER was doing from a business
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

101

1    standpoint during that same period of time.

2                   What I'm trying to get at is,

3    was there some practical impediment, whether

4    it be financial or something else, that

5    prevented NER from responding to the

6    discovery requests in a timely manner?

7                   That's my concern, and that's

8    what I'm trying to get at.  I don't need any

9    privileged communication, but that's what

10   I'm trying to get at.  So, I'll ask at that

11   question.

12   BY MR. PRIEBE:

13       Q.   Was there any, was there any

14   financial reason or financial impediment to

15   NER timely responding to the discovery

16   requests in this case?

17       A.   Can you ask that question just one

18   more time?  Because I was thinking while you

19   were --

20       Q.   Sure.

21       A.   -- asking the question.

22       Q.   I'm happy to do it.

23                   Was there any reason, was there any

24   financial reason why NER Data could not

25   provide timely responses to the discovery

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

102

1    requests in this case?

2        A.   I believe financing, financial

3    reasons was one of the reasons why.

4        Q.   Okay.  But around the same time

5    period, NER was actively marketing certain

6    portions of the business for sale; is that

7    correct?

8        A.   Can you give me the specific date

9    in which the first, um, request for

10   information was made, and when, when it was

11   due by?

12       Q.   I can.  It was submitted on August

13   7th of 2015.

14       A.   Okay.

15       Q.   Responses would have been due, I

16   believe, 35 days after that.

17       A.   The -- okay, so, ask the question

18   again.

19       Q.   Okay.   During the time frame,

20   during the time period, correct, in which

21   NER was not responding to the discovery

22   requests, it was actively marketing certain

23   portions of the business for sale; is that

24   correct?

25       A.   There was a, um, yes, we had hired

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

103

1    a firm called Everingham & Kerr to try to

2    sell the managed print business.

3        Q.   And when did you make the decision

4    to hire, is it Abraham and Kerr?

5        A.    Everingham & Kerr.

6        Q.    Everingham & Kerr.

7             Why did NER make the decision to

8    hire Everingham & Kerr to begin it -- was it

9    exploring options for sale of the business?

10       A.   We hired Everingham & Kerr to sell

11   the managed print business.

12       Q.   Who made the decision to sell the

13   managed print business?

14       A.   I did.

15       Q.   Okay.  What was the reason for that

16   decision?

17       A.   There were a number of reasons.

18   Um...

19       Q.   And what were they?

20       A.   And it's, we were, we were, we had

21   our largest shareholder was sick and no

22   longer wanted to continue to finance the

23   business.

24       Q.   And who was that?

25       A.   My father.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

104

```
 1      Q.   Other reasons?

 2      A.   That was the primary reason.

 3              MR. PRIEBE:  Look, I'm at a

 4   good breaking point now.  Do you want to --

 5              MR. A. OATWAY:  Is this on

 6   the record now?

 7              MR. PRIEBE:  Oh, I'm sorry.

 8   No.  We can go off the record.  Sorry.

 9              THE VIDEOGRAPHER:  Yeah,

10   okay, hold on, please.  Off the video record

11   at 5:31.

12              (Whereupon, a recess was

13   taken at this time.)

14              THE VIDEOGRAPHER:  Back on

15   the video record at 5:44 p.m.

16              MR. PRIEBE:  Okay.

17              (Whereupon, Exhibit NER 15

18   was marked for identification.)

19              (Discussion was held off the

20   record.)

21   BY MR. PRIEBE:

22      Q.   Mr. Oatway, you've been handed

23   deposition Exhibit 15.  Do you recognize

24   this?

25      A.   I do.
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

105

```
 1        Q.   And what is this?
 2        A.   Some people would call this a,
 3   well, they call it a confidential business
 4   review.  Some people would call it a
 5   confidential information memorandum.  It's
 6   an overview of our managed print business.
 7        Q.   Okay.
 8        A.   For the purposes of generating
 9   interest in somebody buying it.
10        Q.   Okay.  And did NER retain
11   Everingham & Kerr to prepare this?
12        A.   Yes.
13        Q.   Okay.  And do you recall about the
14   time when NER retained Everingham & Kerr?
15        A.    I don't remember exactly, because
16   we had conversations with them probably over
17   about a year.  But I would guess it was,
18   huh, it was probably right around the time,
19   just think about this a little bit, probably
20   the first quarter of 2015.
21        Q.   Okay, right around the first
22   quarter of 2015.  And you were going to say
23   that's about the time this lawsuit began,
24   correct?
25        A.   Well, I was --
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

106

```
 1                  MR. A. OATWAY:  Objection.

 2                  THE WITNESS:  -- starting to

 3     think that.  And then I said, no.  It was, I

 4     was trying to date it.  Because this was

 5     done right after OfficeMax told us they were

 6     not going to extend their agreement.

 7                  MR. PRIEBE:  Okay.

 8                  THE WITNESS:  Which was in

 9     the May time period of 2015.  And it

10     probably took them about a month and a half

11     to prepare.  So I would guess in the March,

12     April 2015 time period.

13     BY MR. PRIEBE:

14        Q.   Okay, around the March, April 2015

15     time frame is when you, you retained them;

16     correct?

17        A.   Yes.

18        Q.   Okay.  And this to be took about a

19     month or month and a half to prepare?

20        A.   I believe so.

21        Q.   Okay.  Do you know who this was

22     distributed to?

23        A.   No.

24        Q.   Okay.  Was that handled by

25     Everingham & Kerr --
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

107

```
 1       A.   Yes.
 2       Q.   -- distribution?  Okay.   And how,
 3    how did you know Everingham & Kerr?  Was
 4    there an existing relationship there or was
 5    that the first time you'd done anything with
 6    them?
 7       A.   It was the first time that we'd
 8    done anything with them, and they -- I was
 9    on their email list.  I would receive
10    communication and correspondence.  I knew of
11    them from a variety of different ways.
12       Q.   Okay.
13       A.   But I was impressed with their
14    ability to market mid-market technology
15    companies in, uh, in the area.
16       Q.   Okay.  And could you turn to page 2
17    of the report?  Okay.  You describe -- and
18    what was it, actually, that you were, that
19    NER was marketing here?
20            Was it marketing the entire managed
21    print service business?
22       A.   We, we were not try -- yeah, we
23    were selling the managed print division,
24    managed print services division.  It was not
25    likely that a buyer would want to acquire
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

108

1    the company, um, and the only operating

2    business of the company that remained was

3    the managed print business.  So this was,

4    the intent was to sell the business as part

5    of the wind-down of NER, in total.

6        Q.   Okay.

7        A.   This was the last piece.

8        Q.   I'm sorry, you said this was the

9    last piece of the, the wind-down of NER?

10       A.   Yeah.

11       Q.   Was NER winding down before it

12   began marketing its managed print service

13   business for sale?

14       A.   We sold our data center business in

15   June of 2014.

16       Q.   Okay.  Um, now, under the heading,

17   it says, "Business Highlights," uh,

18   bullet point 2 says, "The company has its

19   own proprietary intellectual property and

20   cloud-based software widely regarded as the

21   best in the industry."

22            Did I read that correctly?

23       A.   You did.

24       Q.   Okay.  Do you believe that to be a

25   true statement?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

109

1        A.   I believe it to be a true statement

2    in the context of a marketing piece to, to

3    create interest in buyers, to generate the

4    highest level of value that you possibly can

5    after the sale.

6        Q.   Okay.  Well did, did you believe

7    the intellectual property and cloud-based

8    software was widely regarded as the best in

9    the country?

10        A.   At one time I certainly did, yes.

11        Q.   Okay.  What time was that?

12        A.   Probably more in the 2011 to 2013

13    time period.

14        Q.   Okay.  So, after -- so, Mr. Steele

15    left the company around beginning the 2013

16    time period; correct?

17        A.   He told you when it was exactly.  I

18    think it was February.

19        Q.   Of 2013?

20        A.   Yeah.

21        Q.   Is my recollection.  And so as best

22    you can recall, it was around the time that

23    Mr. Steele left that the software note was

24    no longer widely regarded as the best in the

25    industry?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

110

```
1                    MR. A. OATWAY:  Objection.

2                    THE WITNESS:  It's kind of a,

3     with all due respect, it's kind of a --

4     Scott's leaving and you asking my opinion on

5     whether this statement is accurate in 2015

6     really don't have any relationship to each

7     other.

8                    MR. PRIEBE:  Well...

9                    THE WITNESS:  I, I said to

10    you when you asked me earlier do I generally

11    believe that we, did I believe that we, that

12    this statement was true?  And I said to you

13    at one time I did believe that it was true.

14    But I also believed that it was true in the

15    context of putting a marketing memorandum

16    together to generate interest in buyers for

17    the business.

18    BY MR. PRIEBE:

19        Q.   My, my question is just that you

20    stated that you believed that to be a true

21    statement, that the intellectual property

22    and cloud-based software was widely regarded

23    as the best in the industry, you said you

24    believed that to be a true statement for the

25    2011-to-2013 time period.  Correct?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

111

```
 1        A.   I did.

 2        Q.   Okay.  What happened after the 2013

 3   time period where you would no longer

 4   believe the intellectual property and

 5   cloud-based software was widely regarded as

 6   the best in the industry?

 7        A.   I don't believe we continued doing,

 8   we continued -- I don't believe that we

 9   continued to enhance and add more -- all of

10   the features, functionality and form to the

11   software application that was required that

12   the -- we weren't moving as quick in the

13   market as the market was moving.

14             The market was -- when we, when we

15   got into the business, we were first to

16   market and we had the best.  And as the

17   market caught up to us, we slowed down, and

18   I, and I didn't, I don't, I don't -- I

19   believe that in total we still had a very,

20   very good solution, but I believe that

21   others were moving and enhancing their

22   solutions much faster and more effective

23   than we were.

24        Q.   Okay.  Then bullet point No. 5

25   says, "Over 60,000 devices are currently
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

112

```
 1    being managed by the company representing

 2    over one billion printed pages annually."

 3            Did I read that correctly?

 4       A.   Yep.

 5       Q.   Is that a true statement?

 6       A.   It's pretty close, yeah.

 7       Q.   Okay.   And the last bullet point

 8    is bullet point 6.  It says, "The company

 9    conservatively estimates it will generate

10    approximately 5.5 million in revenue with

11    approximately 900,000 in gross profit in

12    2015."

13            Did I read that correctly?

14       A.   Yes.

15       Q.   Was that a true statement at the

16    time it was made?

17       A.   Yes.

18       Q.   Okay.  Mr. Oatway, can you explain

19    to me how it is $900,000 in, in gross profit

20    as an estimate, I guess, for 2015, how, how

21    was NER not able to submit timely payments

22    to ITP?

23       A.   Well, gross profit and net income

24    or cash flow are not necessarily the same

25    thing.  But, um, our business started to
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

113

 1    turn a profit in -- the business turned a

 2    profit in, a profit, in January of 2015 for

 3    the first time in years, and was profitable

 4    for the first three or four months, five

 5    months of 2015, for the first time in years.

 6         Q.   Okay.  Well, what was eating into

 7    the gross profit?  What was being offset

 8    against this gross profit that was eating

 9    into that?

10         A.   Selling, general, administrative

11    expense, overhead.

12         Q.   What kind of overhead was there?

13              MR. A. OATWAY:  Object to the

14    form.  Go ahead.

15              THE WITNESS:  Building costs,

16    insurance, overhead.

17    BY MR. PRIEBE:

18         Q.   You said administrative.  Do you

19    recall what kind of administrative costs you

20    you're talking about?

21         A.   I said selling, general and

22    administrative expenses, below, below the

23    gross profit line, interest expense,

24    nonoperating expenses.

25         Q.   Okay.  If you can go to page 4.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

114

```
 1        A.    Okay.

 2        Q.    Okay.  Okay.  The first line of the

 3   second paragraph says, "The company was

 4   originally established in 1971 manufacturing

 5   wide ribbons, high-speed toner and tape

 6   storage."

 7              Is that correct?

 8        A.    That's true for NER Data Products.

 9        Q.    Okay.  Okay.  About midway through

10   that same paragraph, sentence states, "In

11   2009 the company shifted its efforts to

12   focus primarily on managed print services

13   and data center infrastructure business with

14   the sale of its supplies and parts business

15   to Clover Technologies."

16              Did I read that correctly?

17        A.    You did.

18        Q.    Okay.  The next sentence says, "In

19   June 2014 NER sold 75 percent of its data

20   center business to perform its tuning

21   corporation and rebranded DCM solutions."

22              Did I read that correctly?

23        A.    DCIM solutions.

24        Q.    "DCIM solutions."  Is that a true

25   statement?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

115

```
 1       A.   Yes.
 2       Q.   Okay.  What was the data center
 3   business?
 4       A.   Scott called it technology
 5   solutions or technology, I can't remember
 6   what he called it, but it was our data
 7   center business.
 8       Q.   Okay.  Just generally, what did the
 9   data center business do?  What did it do, to
10   your understanding?
11       A.   You want me to add on top of what
12   Scott shared with you, or do you want me to
13   give you my take?  And, nd at the time we
14   sold it, or for the 20 years before?
15       Q.   Sure, no, at the time you sold it
16   what was it?
17       A.   At the time we sold it, it was
18   primarily focused on infrastructure
19   solutions for data centers, primarily around
20   power, space and cooling.
21       Q.   Then the paragraph says, "NER Data
22   is a Delaware C-Corp.  Although it started
23   in 1971, the NER Data Corporation was
24   actually incorporated in late 2009."
25            Did I read that correctly?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

116

```
 1        A.   You read it correctly.

 2        Q.   Is that a true statement?

 3        A.   NER Data Corp was actually

 4   incorporated in late 2009, I believe is a

 5   correct statement.  I think it was like

 6   December 31st.

 7        Q.   Okay.

 8        A.   NER Data Corp. is a Delaware

 9   corporation.  I think NER Data Products is a

10   New Jersey corporation.  I'm not sure.

11        Q.   Okay.  And it looks like the fourth

12   paragraph there, it looks like the third one

13   is blacked out, says, "In 2014, NER Data MPS

14   generated approximately six million in

15   revenue with over 700,000 in gross profit."

16             Is that correct?

17        A.   That's what the sentence says.

18        Q.   Okay.  Is that a true statement?

19        A.   Reasonably accurate, yeah.

20        Q.   Okay.

21        A.   This is a marketing memorandum.  It

22   would have been supported with financials

23   and other information, but it's, it's a

24   marketing memorandum to generate interest

25   prepared by consultants with help from the
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

117

1    company.

2        Q.   Okay.  I mean I'm just asking.  The

3    NER managed print services generated

4    approximately six million dollars in revenue

5    in 2014, is that correct?

6        A.   That's what that says and I believe

7    that's pretty darn close to what it was,

8    yes.

9        Q.   Okay.  Well, it should be very,

10   very close; correct?

11              MR. A. OATWAY:  Objection.

12   BY MR. PRIEBE:

13       Q.   Okay.   And over 700,000 in gross

14   profit in 2014, do you believe that to be a

15   true statement?

16       A.   Yes.

17       Q.   Okay.  All right.  And then in the

18   box below, it says, "Mr. Oatway is seeking

19   to sell the business to a qualified

20   acquisition candidate in order to retire."

21           Did I read that correctly?

22       A.   Yes.

23       Q.   Okay.  Was that the intent of the

24   sale?

25       A.   Which Mr. Oatway?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

118

```
 1        Q.   Was this, was this, and, and --
 2    and, and that's a very important
 3    clarification.
 4             Which Mr. Oatway was this paragraph
 5    regular to?
 6        A.   I, I believe they were probably
 7    referring to me, but the intent of it was to
 8    let a potential buyer know that they didn't
 9    have to take on me as part of a transaction.
10        Q.   Okay.  So, but your, your
11    classification, the Mr. Oatway that was
12    looking to retire I assume was Bud Oatway?
13             MR. A. OATWAY:  Objection.  I
14    think he just explained that to you.
15             MR. PRIEBE:  I'm, I'm not,
16    I'm confused as to what this was meant to be
17    referring to.
18             THE WITNESS:  Okay.  It's a
19    marketing document prepared by an investment
20    bank to try to sell a business.  They're
21    trying to put the most positive light on all
22    aspects of it, okay, and they're getting
23    documents from us.
24             I don't know why they put
25    that specific thing in a box other than they
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

119

1    knew from me that I wouldn't -- I could go

2    with the business, or, I didn't need to go

3    with the business, and if a buyer was going

4    to take my cost on, with that business, it

5    would be considerably less valuable than it

6    would be if it was sold without me.

7    BY MR. PRIEBE:

8        Q.   Okay.  Did you review any of this

9    this, this marketing piece --

10       A.   Sure.

11       Q.   -- before it went out?  Okay.  Were

12   you, in fact, looking to retire?

13       A.   No.

14       Q.   Okay.  Did you inform ITP at all of

15   NER's intention to market the managed print

16   services business for sale?

17       A.   Yes.

18       Q.   When did you inform them?

19       A.   We informed them when we were

20   having our discussions with HP.

21       Q.   Okay.

22       A.   I don't believe that there were any

23   other communications at different -- we

24   marketed the business to determine, try to

25   determine what kind of value we could get at

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

120

```
 1    different times over our business over a

 2    number of years.  But I don't believe I ever

 3    discussed that specifically with Mark.

 4        Q.   Okay.

 5        A.   Or with IT Portfolio.

 6        Q.   With, with respect to the, this

 7    confidential business review put together by

 8    Everingham & Kerr, Exhibit 15, did you ever

 9    disclose this to IT Portfolio?

10        A.   No.

11        Q.   Okay.

12        A.   Why would I?

13             MR. A. OATWAY:  Wait, jUST

14    answer the question.

15    BY MR. PRIEBE:

16        Q.   If you can turn to page 8, the

17    first paragraph says, "NER Data currently

18    has approximately 45 direct customers."

19             Is that correct?

20        A.   Yes, that's the way it reads.

21        Q.   Okay.  And is that correct, did NER

22    Data, NER Data have approximately 45 direct

23    customers at the time this piece was

24    prepared?

25        A.   I believe so.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

121

1      Q.   Okay.  You can turn to the next

2   page, page 9 before?

3      A.   Before we go back.

4      Q.   Yes?

5      A.   It's direct customers or it's

6   channel partners.

7      Q.   Okay.

8      A.   That provide our DS services to the

9   end user, and you pulled different pieces

10  out, yeah, we had, I, I believe we were

11  probably billing about 45 customers.

12     Q.   45 customers would then be

13  providing products to end users, is that

14  true?  Is that correct?

15     A.   Supporting more contracts, and --

16  yeah.

17     Q.   Okay.  And if you can turn to the

18  next page.

19     A.   Okay.

20     Q.   The first paragraph says, "NER

21  currently employs 24 employees."

22          Is that what it says?

23     A.   Yes.  (Laughs.)

24     Q.   Okay.  And was that true at the

25  time that this piece was created?

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

122

1        A.   Back in roughly March of 2015?

2        Q.   Yes.  Was it true at that point in

3    time?

4        A.   Yeah, the 24 people that were

5    listed there.

6        Q.   Okay.  And one of them is the

7    president and C.O.O., and is that you, Steve

8    Oatway?

9        A.   That would be me.

10        Q.   Okay.  The employee roster below

11    lists the salaries for each employee, is

12    that correct?

13        A.   Yeah.

14        Q.   Okay.  And, and the salary here

15    that's listed for you, I calculate that as

16    being roughly $242,000.  Is that correct?

17        A.   I would calculate it as a little

18    bit more than that.

19        Q.   Okay.  What, what would you

20    calculate it as?

21        A.   Do you have a calculator?

22        Q.   I do not.

23        A.   What's a hundred and twenty-one

24    point one five times 2,080?  If you're

25    asking me if that was, if 242,000 was my

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

123

```
 1    salary --

 2         Q.   Mm-hmm.

 3         A.   -- no, my salary was 252,000.

 4         Q.   Okay.

 5         A.   My salary was 280,000, but I had

 6    taken a pay cut, of ten percent.

 7         Q.   Okay.

 8         A.   The same ten percent that Mike

 9    referred to in his deposition.

10         Q.   And that was the salary being paid

11    from NER Data Corporation?

12         A.   Mm-hmm.

13         Q.   Okay.  Was there a separate salary

14    for NER Data Products, Inc.?

15         A.   No.

16         Q.   Okay.  All right.  At any point in

17    time, uh, was NER ever unable to make its

18    payroll that you can recall?

19         A.   Yes.

20         Q.   Okay.  During what time frames?

21         A.   Heh, oh, 2014, two thousand --

22    maybe 2013, '14, '15.  Could be longer.

23         Q.   Okay.  Well, at the time this piece

24    was put together, Exhibit 15, were there any

25    outstanding payroll obligations for NER that
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

124

1    you can recall?

2        A.    Likely, yeah.

3        Q.    Okay.

4                    MR. A. OATWAY:  Before you go

5    any further, can we have a discussion off

6    the record for a second?

7                    MR. PRIEBE:  Sure, of course.

8                    THE VIDEOGRAPHER:  Okay, hold

9    on.

10                    MR. PRIEBE:  That's fine.

11   Yep.

12                    THE VIDEOGRAPHER:  Hold on.

13   Off the video record at 6:11.

14                    (Whereupon, discussion was

15   held off the record.)

16                    THE VIDEOGRAPHER:  Back on

17   the video record at 6:15.

18   BY MR. PRIEBE:

19       Q.    Okay.  You can go back to page 4,

20   please, and this is page 4 of Exhibit 15.

21                    I'd like to again refer you to the

22   line that states, "In 2014 NER Data MPS

23   generated approximately six million revenue

24   with over 700,000 in gross profit."

25                    Can you tell me what it is that's

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

125

```
 1    been offset against some of this gross

 2    profit, that NER has set off against that

 3    gross profit?

 4               MR. A. OATWAY:  Object to the

 5    form.

 6               THE WITNESS:  The managed

 7    print business generated six million in

 8    revenue and 700,000 in gross profit.

 9    BY MR. PRIEBE:

10        Q.  Correct.  And it's difficult

11    because, you know, we don't, I don't have

12    the actual financial statements.

13               But to the best of your

14    recollection, what, what was offset against

15    the gross profits?  Correct?  I mean I think

16    one thing you named was interest expense.

17    Is that correct?

18        A.   I, I don't know whether this is

19    generally accepted accounting principles,

20    but at least the way we always reported our

21    financials, our business units, data center,

22    managed print, image one, cartridge

23    business, whatever, we had gross profit,

24    revenue and gross profit from the

25    businesses.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

126

 1          Sometimes those businesses were
 2    fully loaded with costs, sometimes they were
 3    not.  It would depend upon the business.
 4    But always there was selling, general and
 5    administrative expenses, which were called
 6    operating expenses, and then there would be
 7    interest expense and nonoperating expenses,
 8    or operating income or taxes or all expenses
 9    below the gross profit line.  That was
10    forever.
11        Q.   Okay.
12        A.   A buyer is typically going to try
13    to look at the lowest number and put a
14    valuation on the lowest number.  A seller is
15    typically going to try to direct the buyer
16    to the highest number.
17          So we were directing the buy -- the
18    potential buyers or interested parties to
19    what we thought showed the most favorable
20    for selling the business.
21        Q.   Okay.
22        A.   Which was the gross profit.
23        Q.   Okay.  And the gross profit, and
24    let me, in terms of transferring and selling
25    the business away, a lot of the line items

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

127

```
 1    that were set off against gross profit,

 2    would they be unique, uh, to NER, or would

 3    those are transferred and incurred by anyone

 4    who was purchasing the managed print

 5    services?

 6         A.   It depends.

 7         Q.   Okay.

 8         A.   It depends upon who the buyer would

 9    be.

10         Q.   Okay.

11         A.   Do they have an accounting system?

12    Do they have an ERP system?  Do they have an

13    umbrella policy for liability insurance?

14    Um, it depends.  It would be depending upon

15    whether it was a financial buyer, whether it

16    was a strategic buyer, who the buyer -- I

17    can't really say, say that.

18         Q.   Okay.

19         A.   We were specifically marketing the

20    business at the revenue and the gross profit

21    level.

22         Q.   Okay.  There's certain costs that

23    you're always going to incur with the

24    managed print service business, correct?

25         A.   I don't know.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

128

```
 1        Q.   Okay.  All right.  If you can turn
 2    to page 10?
 3        A.   Okay.
 4        Q.   Under the heading that says
 5    "Facilities," and it says, "NER Data,
 6    headquartered in Glassboro, New Jersey," uh,
 7    "and the company is located in a building
 8    that is currently commonly owned and leased
 9    back."
10             Is that correct?
11        A.   You read that correctly.
12        Q.   Okay.  And is that, is that a
13    correct statement?
14        A.   At that time?
15        Q.   Okay.  And has that building been
16    sold?
17        A.   I asked you a question and then you
18    asked me another one.  I said, "At that
19    time?"
20        Q.   Oh, I'm sorry.  I'm sorry, I
21    thought you had said, at that time, the
22    building was commonly owned and leased back.
23             Yes, at the time of --
24        A.   The real estate -- go ahead, I'm
25    sorry.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

129

```
 1        Q.   No, that's -- yeah, I'll ask the
 2   question.
 3             So with respect to the statement,
 4   "The company is currently located in a
 5   building that is currently commonly owned
 6   and leased back," was at that a true
 7   statement as of the time of this marketing
 8   piece?
 9        A.   Yes.
10        Q.   Okay.  And since then the building
11   has been sold, is that correct?
12        A.   Since then that, that building has
13   been sold.
14        Q.   Okay.  And NER is now leasing back
15   a portion of the building?
16        A.   No, not anymore.
17        Q.   Okay.  So did NER sell the building
18   before it sold the managed print service
19   business?
20        A.   Yes.
21        Q.   Okay.  So what's the reason for
22   this drop in rent from $11,000 per month to
23   $4,000 per month, starting in June of 2015?
24   What was the reason for that reduction in
25   rent?
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

130

1        A.   Because the -- NER Data Corporation

2    leased the building to NER -- I'm sorry, NER

3    Data Products leased the building to NER

4    Data Corporation starting back in 2010, for

5    $11,000 a month.

6        Q.   Okay.  Say that for me one more

7    time.

8             So, NER Data Products, Inc. leased

9    the building to NER Data Products

10   Corporation?

11       A.   NER Data Corporation.

12       Q.   Okay.  And NER Data Corporation was

13   a lessee, they were paying rent on the

14   building; correct?

15       A.   Correct.

16       Q.   And their --

17       A.   Whether it was paying or not is

18   another question, but.

19       Q.   But the rent obligation was $11,000

20   a month; correct?

21       A.   Correct.

22       Q.   Okay.  And who is the monthly rent

23   obligation set by?

24       A.   It was set between -- it was a

25   market rate that was set at the time shortly

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

131

1    after the United Stationers investment was

2    made.

3        Q.   But who, who made the decision to

4    set the rent rate?  Was that you who made

5    that decision?

6        A.   I don't, I don't know that it was

7    me specifically.  Um, it was agreed to.  Uh,

8    it was a rent rate that was established as a

9    market rate at the time of the United

10   Stationers investment and transaction.

11       Q.   Okay.  And starting in June of

12   2015, NER was going to be paying monthly

13   rent of $4,000 per month; is that correct?

14       A.   Correct.

15       Q.   Was $4,000 a month market rate?

16       A.   For 6,000 square feet versus 24,000

17   square feet?  Yeah.

18       Q.   Okay.  So, you were not -- you were

19   only leasing back, NER was only leasing back

20   a portion of the building; is that correct?

21       A.   Yes.

22       Q.   Okay.  Whereas before that, NER was

23   leasing the entire building?

24       A.   Correct.

25       Q.   Okay.  What was the reason for, for

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

132

1    the reduction, for the reduction in space?

2        A.   We sold the building.  We also had

3    a -- the data center business was also

4    leasing space in the same building, DCIM

5    Solutions.

6        Q.   But...

7        A.   And they were moving out.

8        Q.   But, but the, the monthly rent

9    obligation of $11,000, was NER Data Products

10   Corporation paying a portion of that for

11   DCIM?

12               MR. A. OATWAY:  Objection.

13               THE WITNESS:  NER Data

14   Corporation had a lease with NER Data

15   Products.

16   BY MR. PRIEBE:

17       Q.   Part of this building was occupied

18   by DCIM, correct?

19       A.   After June of '14, yes.

20       Q.   Okay.  Where was DCIM located prior

21   to June of 2015?

22       A.   From what period to what period?

23       Q.   From 2010 to June of 2015, where

24   was DCIM located?

25       A.   When we owned the data center

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

133

1    business, they were in our building.  It was

2    in our -- in that building.

3        Q.   And the data center business was

4    sold in 2014, correct?

5        A.   June of 2014.

6        Q.   Okay.  And at that point in time,

7    DCIM was no longer, or that, that space was

8    no longer being rented; correct?

9        A.   No, they leased that space from NER

10   Data Corp.

11       Q.   Okay.

12       A.   As part of a shared services

13   agreement.

14       Q.   So DCIM then began paying rent to

15   NER Data Corporation for that space?

16       A.   Yes.

17       Q.   Almost like a, a sublease type of

18   arrangement, at the time?

19       A.   Exactly.

20       Q.   Do you recall the amount of the

21   lease payment?

22       A.   $4,850.

23              (Videographer sneezed.)

24              MR. A. OATWAY:  Bless you.

25              THE VIDEOGRAPHER:  Thank you.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

134

```
 1    BY MR. PRIEBE:
 2        Q.   And if you can turn to page 12,
 3    okay, the first line says, "Management
 4    believes that a potential acquirer could
 5    grow the business in the following manner:
 6    By expanding the company's customer base,
 7    potentially acquire and significantly
 8    increase the revenue and income of the
 9    business," uh, "can be done by adding sales
10    representatives and/or additional skilled
11    employees to the business."
12            Um, was there a reason that NER was
13    not trying to do something along these
14    lines?
15        A.   We had financial limitations.
16        Q.   And from what you told me, 2015 the
17    beginning of 2015, NER had finally begun to
18    turn a profit; correct?
19        A.   Small one, yes.
20        Q.   Okay.  Did it still have those
21    financial limitations at a time when it had
22    started turning a profit?
23        A.   Well, at the same time we had the
24    bank issue with our line of credit.
25    Remember that discussion?
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

135

```
 1        Q.   Mm-hmm.
 2        A.   So we were -- we had a line of
 3    credit reduction.  Um, so, let's put it this
 4    way.
 5             Instead of losing fifty or sixty
 6    thousand dollars a month, maybe we were
 7    making 5,000 a month.  That's a relative.
 8    I'm not saying that's absolute.  But we had
 9    taken losses, and we had stopped losses, and
10    we had gotten to a point where we were
11    making a very small profit.
12        Q.   And my, my -- my question was just
13    that you didn't believe that small profit
14    allowed you enough revenue to hire a new
15    sales representative to try to expand the
16    business?
17        A.   Profit is obviously after the
18    revenue, but, no, we couldn't afford to.  We
19    got to a point where we were able to stop
20    our bleed from a cash flow standpoint,
21    earn -- loss of earnings by cutting expenses
22    and reducing head count, and taking it to a
23    absolute bare bones minimum.
24                 (Whereupon, discussion was
25    held off the record.)
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

136

```
 1                  (Exhibit NER 16 was marked
 2    for identification.)
 3                  THE VIDEOGRAPHER:  We have 35
 4    minutes left, on this tape.
 5                  MR. PRIEBE:  On this tape?
 6    Okay.
 7    BY MR. PRIEBE:
 8        Q.   Okay.  Mr. Oatway, I've handed you
 9    deposition Exhibit 16, which is an asset
10    purchase agreement, uh, dated October 31st
11    of 2015.
12            Do you recognize this document?
13        A.   I do.
14        Q.   Okay.  And what is this?
15        A.   This is the asset purchase
16    agreement for the final sale of the managed
17    print business.
18        Q.   Okay.  And, and explain for me in,
19    in general terms, what was this, what was
20    the, uh, purpose of this asset purchase
21    agreement?
22        A.   To -- it sure was overkill for the
23    size of the transaction, I can tell you
24    that.  It was drafted by a lawyer for the
25    buyer, um, to document the agreement that we
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

137

```
 1    reached with Atlantic to sell the platform

 2    and the, and the rights to the customers.

 3        Q.   Okay.  This is basically an

 4    agreement to sell the managed print services

 5    business, is that correct?

 6        A.   It's an agreement to sell the

 7    platform, managed print platform, and the

 8    rights to retain contracts.

 9        Q.   Okay.  All right.  And if we can

10    go into the recitals, it says, "Whereas,

11    NERDP is the owner of certain infrastructure

12    that is used in connection with the

13    business," um, and NERDP is defined as NER

14    Data Products, Inc.

15            Is that a correct statement?  Was

16    NER Data Products, Inc. the owner of the

17    server infrastructure that was used in

18    connection with the business?

19        A.   NER Data Products, Inc. was the

20    lessee of the server infrastructure.

21        Q.   Okay.

22        A.   Because NER Data Corporation

23    couldn't get credit.

24        Q.   Okay.  So NER Data Products, Inc.

25    was the entity that signed the lease
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

138

```
 1    agreement for the infrastructure?

 2         A.   Um, I'm the one who signed it with

 3    Chris, my brother.  I signed as the

 4    corporate officer, and both Chris and I

 5    signed with personal guarantees, because NER

 6    Data Corporation didn't have sufficient

 7    credit to lease the server infrastructure.

 8         Q.   Okay.  And the second paragraph

 9    says, "NERDC," and NERDC is defined as NER

10    Data Corporation, "is the owner and licensor

11    of certain software program code and related

12    intellectual property that is used in

13    connection with the business."

14              Is that correct?  Did I read that

15    correctly?

16         A.   Yeah, you stopped, you stopped the

17    recital, but, yes, what you read to is

18    correct.

19         Q.   Okay.  And, and was NER Data

20    Corporation, was that the owner, um, of all

21    the software program code and related

22    intellectual property that was used in

23    connection with the managed print services

24    business?

25         A.   I believe so, yes.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

139

```
 1       Q.   Okay.  And if you can turn to page

 2    5?  Okay.  See section 2.1, Per Sale of

 3    Assets --

 4       A.   Yes.

 5       Q.   -- see that section?  And under

 6    subsection (a), one of the assets being sold

 7    is the Print4 platform; is that correct?

 8       A.   (A) is defined as Print4 platform.

 9       Q.   Okay.  And the Print4 platform

10    includes:  "All source, object and

11    executable codes associated with the

12    platform and any and all intellectual

13    property rights of sellers in and to the

14    platform."

15            Is that correct?

16       A.   You read that correctly, yes.

17       Q.   Okay.  And I believe we talked

18    before that, in either late 2009 or early

19    2010, NER Data Products, Inc. had assigned

20    all of the, this Print4 platform to NER Data

21    Corporation; correct?

22       A.   We did talk about that, yes.

23       Q.   Okay.  Is, is that what occurred,

24    though?  This Print4 platform was currently

25    owned, or at the time of this -- I'll start
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

140

1    over.

2                   At the time of this agreement

3    with Atlantic, was the Print4 platform owned

4    by NER Data Corporation?

5        A.   Yes.

6        Q.   Okay.  And it had acquired that

7    through a transfer from NER Data Products,

8    Inc. that occurred sometime in either late

9    2013 or early 2014; correct?

10                  I'm sorry, either late 2009 or

11   early 2010; is that correct?

12       A.   Say that question again?

13       Q.   Sure.  NER Data Product

14   Corporation, or -- I'm sorry.

15                  NER Data Corporation acquired the

16   Print4 software through a transfer from NER

17   Data Products, Inc. that occurred sometime

18   in late 2009 or early 2010; is that correct?

19       A.   When we talked about the 2009 to

20   2010 transaction, I said to you that we

21   transferred substantially all of the assets

22   from Data Products to Data Corp. at that

23   time.

24       Q.   Okay.  Did, did you ever provide IT

25   Portfolio with notice of this transfer from

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

141

1    NER Data Products, Inc. to NER Data

2    Corporation?

3        A.   Yes.

4        Q.   How did you accomplish that?

5        A.   Um, I believe IT, I think I said

6    previously that I believe IT Portfolio

7    actually signed the assignment agreement.

8        Q.   They signed the, an assignment

9    agreement?

10       A.   Signed an assignment, signed an

11   assignment agreement from the 2009

12   agreement, I believe, well, I mean I know

13   Mark knew exactly what we were doing.

14       Q.   Okay.  And why -- was NER Products,

15   Inc. an affiliated company of NER Data

16   Products Corporation, or of NER Data

17   Corporation?

18       A.   They had --

19            MR. A. OATWAY:  Objection.

20   Go ahead.

21            THE WITNESS:  I mean, just

22   look at the name, I mean.

23            MR. PRIEBE:  Right.

24            THE WITNESS:  They, they --

25   they had common ownership, but not

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

142

```
 1    identical.

 2    BY MR. PRIEBE:

 3        Q.   Okay.  But, but you would believe

 4    them to be, and I believe the same thing

 5    with the name, but would you believe them to

 6    be affiliated companies, NER Data Products,

 7    Inc. and NER Data Corporation?

 8        A.   I don't know what the definition of

 9    "affiliate" is, but we, we -- we

10    specifically set up NER Data Corporation to

11    transfer the, substantially transfer all of

12    the assets of NER Data Products to NER Data

13    Corporation associated with the operating

14    business, businesses at that time, but not

15    including the real estate and not including

16    the Lexmark toner business.

17        Q.   Okay.  All right.  Now, you're now

18    selling through this agreement, deposition

19    Exhibit 16, you're now selling the Print4

20    platform to Atlantic; is that correct?

21        A.   I believe I've answered that

22    question, yes.

23        Q.   Did you provide IT Portfolio with

24    notice of this sale?

25        A.   No.
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

143

1        Q.   And why did you not provide them

2    with notice?

3        A.   Because I didn't believe we needed

4    to.

5        Q.   Why did you not believe you needed

6    to?

7        A.   Because I believe, I believe that

8    our agreement had been terminated.

9        Q.   You believe that your agreement had

10   been terminated?

11       A.   The agreement with IT Portfolio had

12   been terminated.

13       Q.   So you were aware that the 2009

14   software agreement did require notice for a

15   sale of the Print4 software, correct?

16       A.   Originally, yes.

17       Q.   Okay.  Well, the, the contract

18   required it, you just didn't believe the

19   contract was in force; is that correct?

20       A.    I was, I was clearly aware

21   historically that the agreement with IT

22   Portfolio required us to notify them if we

23   had a offer or had the intent to enter into

24   a transaction to sell the business.

25       Q.   Okay.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

144

    1        A.   I did not believe four months ago,
    2   or however many months ago it was, that we
    3   were -- I was obligated to notify IT
    4   Portfolio that we were selling, um, in a
    5   fire sale the assets of the managed print
    6   business.
    7        Q.   Okay.  And, and why did you not
    8   believe you had an obligation to tell them?
    9        A.   Because I believe that the
   10   agreement had been terminated.
   11        Q.   Did, did you, did you provide
   12   Atlantic with a copy of the January 2009
   13   software agreement?
   14        A.   I did.
   15        Q.   Okay.  Did you provide Atlantic
   16   with a copy of the Complaint in this action?
   17        A.   I did.
   18        Q.   Did you provide Atlantic with a
   19   copy of the answer and counterclaims in this
   20   action?
   21        A.   I provided Atlantic with a version
   22   of the answer and counterclaim, which I
   23   believe was sub -- substantially the form of
   24   what was filed with the Court, but I don't
   25   know that I ever got the final, final, final

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

145

1    copy of what was filed.

2        Q.   Okay.  Okay.  So you, you -- you

3    provided them with what you believed to be a

4    very close --

5        A.   Substantially, yes.

6        Q.   Okay.  Were there any other

7    materials that you provided to Atlantic with

8    respect to the January 2009 software

9    agreement?

10       A.   I'm, I'm not sure I understand your

11   question.

12       Q.   Sure.  You gave them a copy of the,

13   the January 2009 software agreement?

14       A.   I said that already.

15       Q.   Was there anything about the

16   contractual arrangement, did you disclose

17   anything additionally to Atlantic in that

18   regard?

19       A.   You have what I disclosed to

20   Atlantic.

21       Q.   And the question is, I didn't see

22   the agreement itself specifically listed in

23   here, and I may have just missed it.  So I

24   just wanted to ask you if that was something

25   that you could provide --

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

146

1        A.   You want me to point you to where
2   it is in the agreement?
3        Q.   Sure, absolutely.
4        A.   Schedule 4.1(h) litigation was the
5   complaint and the, and the counterclaim.
6   All right, so let me -- ask the question
7   again.
8        Q.   Sure.  Did you provide Atlantic
9   with a copy of the January 2009 software
10  agreement?
11       A.   I already answered that question
12  and I said yes.
13       Q.   Okay.  Were there any other
14  materials regarding the January 1st, 2009
15  software agreement that you provided to
16  Atlantic?  Was there anything else?
17       A.   I provided with regards to IT
18  Portfolio, I provided the January 2009
19  agreement, the claim, IT Portfolio claim,
20  and NER's response and counterclaim.  That
21  was it.
22       Q.   Okay.  Did Atlantic ask for any
23  additional information?
24       A.   No.
25       Q.   Do you recall any specific

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

147

```
 1   discussions regarding the litigation, or
 2   this litigation?
 3       A.   With Atlantic?
 4       Q.   With Atlantic?
 5       A.   No.
 6       Q.   If you Can go to page 8, of Exhibit
 7   16.  If you can look at paragraph 2.5,
 8   that's titled "Purchase Price for Assets".
 9            That paragraph kind of separates
10   out the components of the purchase price, is
11   that correct?
12       A.   Yes.
13       Q.   Okay.  And how, how does it break
14   it out?  Can you explain to me, what's the
15   breakout to the purchase price?
16       A.   It's pretty sad.  We go from 20
17   million to a hundred and fifty thousand,
18   huh?  In a four- or five-year period of
19   time, pretty sad, huh?
20            MR. A. OATWAY:  All right,
21   just keep -- answer the question.
22            THE WITNESS:  75,000 at
23   closing, 75,000 in six months.
24   BY MR. PRIEBE:
25       Q.   And was there also an agreement for
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

148

 1   profit sharing of certain assumed customer

 2   contracts?

 3       A.   There is, but that's not in this

 4   section.

 5       Q.   I think that's in section 2.7.  Is

 6   that correct?

 7       A.   Yes.

 8       Q.   Okay.  And what is the, the

 9   profit-sharing component?

10       A.   Still to be determined.  I'm pretty

11   sure that we've shared with you that we, we

12   hope or believe that it has the potential to

13   be about a hundred thousand over 12 months.

14       Q.   Okay.  Um, did you communicate to

15   Atlantic that this litigation is currently

16   ongoing?

17       A.   I, I don't know that I understand

18   the question.  I communicated to -- they

19   certainly didn't, they...

20           MR. A. OATWAY:  Just say if

21   you know or if you don't know.

22   BY MR. PRIEBE:

23       Q.   If you don't know...

24       A.   Ask me the question again.

25       Q.   Sure.  Did you communicate to

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

149

```
 1    Atlantic that this litigation was ongoing?
 2       A.    They --
 3                   MR. A. OATWAY:  Is that
 4    beyond furnishing the Complaint and the
 5    answering the counterclaim, or no?
 6                   MR. PRIEBE:  Correct.
 7                   THE WITNESS:  I didn't
 8    represent to Atlantic that the litigation
 9    had been resolved.
10                   MR. PRIEBE:  Okay.
11                   THE WITNESS:  So by default,
12    they knew, I, I believe they knew it was
13    continuing.
14                   MR. A. OATWAY:  You answered
15    it.  Let's keep going.
16                   (Whereupon, Exhibit NER 17
17    was marked for identification.)
18                   (Discussion held off the
19    record.)
20    BY MR. PRIEBE:
21       Q.   Mr. Oatway, I'm handing you Exhibit
22    17, which is the Affidavit of Stephen
23    Oatway.
24             Do you recognize this document?
25       A.   Yes.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

150

1       Q.    Okay.  And this document, if you

2   turn to the last page, this document or

3   affidavit was signed on January 6th of 2016.

4           Is that correct?

5       A.    That's what the date says, yes.

6       Q.    Okay.   I'm going to refer you to

7   the first paragraph, the last sentence.

8           It says, "ITP is the only," or,

9   actually, we'll go to the sentence above

10  that.

11          The affidavit says, "The company,"

12  that's NER, "has been working with its

13  creditors to pay each of them a percentage

14  of the debt owed to them.  ITP is the only

15  creditor that has refused to work with NER,

16  and instead has resorted to litigation."

17          Did I read that correctly?

18      A.    Yes, you did.

19      Q.    Okay.  Is that a true statement?

20      A.    As of now, no other creditor has

21  litigated for collection of payment other

22  than ITP.

23      Q.    Okay.  What other creditors are

24  there?

25                  MR. A. OATWAY:  Objection.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

151

```
 1    What does this have to do at all with this

 2    case?

 3                 MR. PRIEBE:  Well, I, I

 4    generally agree, but this is what he said in

 5    his affidavit, I mean, he's filed with the

 6    Court.  I think I'm required to ask

 7    questions about whether or not this is a

 8    true statement.

 9                 MR. A. OATWAY:  I think

10    you're not.  So you can have this answer,

11    and then if you want to go beyond that,

12    we're going to have to make a judge make a,

13    make a call on that, okay?

14                 You can have this one, and

15    then if you go beyond that I'm going to seek

16    a protective order.

17                 MR. PRIEBE:  Well, I just

18    want to ask what other creditors.

19                 MR. A. OATWAY:  Don't, don't,

20    don't -- are you not hearing me?  I said you

21    could ask that question.

22                 MR. PRIEBE:  Okay.

23                 MR. A. OATWAY:  But if you go

24    beyond that, I'm going to seek a protective

25    order.  Because it is 6:51 p.m., and it is
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

1    well beyond the scope of anything that has

2    to do with this case.  And I've been

3    patiently letting you go there for the last

4    hour or so, but it has to stop.  So this is

5    your warning.

6              MR. PRIEBE:  Okay.  Well, I'm

7    going to ask my questions.  I'm not making

8    any stipulations.

9              Again, we're here at 6:51

10   because we all agreed to continue to this

11   date.  I absolutely volunteered that we're

12   fine coming back in the morning, if you

13   choose.  This is what you selected.

14             This is an affidavit that

15   he's filed with the Court.  I believe I'm

16   entitled to ask questions about it, and I'm

17   not going to somehow limit my questions.

18             And if you want to, if you

19   want to -- if there's a question that comes

20   up and you want to refuse -- you want to

21   tell the witness, um, he should refuse to

22   answer the question, then we'll address that

23   as it arises.  But I think I'm entitled to

24   ask questions about the affidavit.

25   BY MR. PRIEBE:

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

153

1            So, Mr. Oatway, what other
2    creditors are there, um, with respect to
3    NER?  What other creditors are you referring
4    to here?
5        A.   As of January 6th, there were no
6    secured creditors remaining.  And there
7    would have been what I would consider two
8    classes of creditors:  Unsecured trade
9    creditors and preferential creditors,
10   sharehold -- somebody who had a shareholder
11   interest.
12           In this particular statement, I am
13   specifically referring to the unsecured
14   trade creditors, because we are not paying
15   back any shareholders or, or preferred debt
16   because we're acting like we are in a
17   bankruptcy.
18       Q.   Okay.  The statement that ITP is
19   the only creditor that has refused to work
20   with NER, can you tell me, who are the other
21   creditors who have worked with NER?
22       A.   Since, over the last six months,
23   and over the last, more probably over the
24   last three months, we used available assets
25   or proceeds or cash to pay off roughly six

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

154

```
 1    or seven hundred thousand dollars of trade
 2    debt with roughly sixty or seventy thousand
 3    dollars worth of cash.  Those unsecured
 4    trade creditors are taking approximately
 5    12-and-a-half cents on the dollar.
 6        Q.   Okay.  How, how many of them are
 7    there?
 8        A.   Roughly 20, to date.
 9        Q.   Okay.  What are the amount of
10    claims?
11               MR. A. OATWAY:  I think he
12    just answered that.  He said six or --
13               MR. PRIEBE:  Did he?
14               MR. A. OATWAY:  -- seven
15    hundred thousand dollars.
16    BY MR. PRIEBE:
17        Q.   Was that correct?  Was that what
18    you said, six or seven hundred thousand
19    dollars?
20        A.   I said that we, I said that we are,
21    we retired roughly six or seven hundred
22    thousand, with roughly sixty or seventy
23    thousand dollars worth of cash, and the
24    guideline that I am using is roughly
25    12-and-a-half cents on the dollar.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

155

1        Q.   Okay.  With respect to the, the

2    negotiation with Atlantic, did NER ever

3    disclose any specific issues it believed

4    existed with respect to the Print4 software?

5        A.   Can you be more specific about that

6    question?

7        Q.   Sure.  With regard --

8        A.   Are we back to the document?  Or,

9    the --

10       Q.   We don't have to go back to the

11   document.  But if you'd like to review it,

12   that's fine.

13           My question was simply:  Atlantic

14   was purchasing the entire managed print

15   services business.  Did they ask any

16   questions about how well it functioned, how

17   well the software underlined the managed

18   print --

19       A.   They were the largest customer of

20   the business.

21       Q.   Okay.  So, they had --

22       A.   At that time.  So they were very

23   familiar with the software.

24       Q.   Okay.

25       A.   And the business and the people.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

156

1        Q.   Okay.  Had you ever received any

2    complaint from Atlantic about the service?

3        A.   Oh, sure, yeah.

4        Q.   Okay.  What complaints did Atlantic

5    make?

6        A.   When?

7        Q.   Uh, well, at any point in time?

8    How long have they been a customer for?

9        A.   Five, six, seven, eight years.

10        Q.   Okay.  So what specific issues with

11    the managed print services can you recall

12    Atlantic conveying to NER?

13        A.   (Laugh.)  They would have expressed

14    concern about, um, the software and its

15    functionality, uh, its responsiveness.

16            They would have expressed concern

17    about how our "decisioning" that we were

18    making with regards to shipping supplies or

19    errors that were made in transactions or

20    quality of service, or anything, any one of

21    a number of, um, normal and ordinary

22    customer complaints.

23        Q.   Okay.  Did you have any buyers

24    other than Atlantic or any interested buyers

25    other than Atlantic for the managed print

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

157

```
 1   services business?
 2       A.   Tried hard, strategic and
 3   financial.  No one expressed any interest.
 4       Q.   And how many -- my understanding,
 5   at least, from the testimony of Mike Walsh
 6   was that Atlantic did take on some of, uh,
 7   NER's employees; is that correct?
 8       A.   Yes.
 9       Q.   Okay.  How many employees did, did
10   Atlantic take on?
11       A.   I don't know, at the end of the
12   day.  I know that there were four,
13   originally.  And over a period of two, four,
14   six -- two, four months, they've taken on
15   more.  But I don't know whether they are
16   full-time employees, whether they're 1099.
17   I don't know the exact employment
18   relationship with, with them.
19               MR. PRIEBE:  Okay.  I think
20   I'm just about done.  Can we go off the
21   record real quick?
22               THE VIDEOGRAPHER:  Sure.
23               MR. PRIEBE:  Um...
24               THE VIDEOGRAPHER:  Hold on a
25   second.  Off the video record, 6:59.
```

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

```
 1                    (Whereupon, discussion was

 2      held off the record.)

 3                    THE VIDEOGRAPHER:  Back on

 4      the video record, 7:04.

 5      BY MR. PRIEBE:

 6          Q.   Okay.  Mr. Oatway, referring back

 7      to the sale from -- or, from NER to

 8      Atlantic, did United Stationers consent to

 9      that sale as well?

10          A.   No.

11          Q.   Okay.  And why, why did they not

12      consent to it?

13          A.   I told them what we were doing,

14      but, um, they've not been very interested in

15      the business since it's lost its value.  And

16      my -- this, I can't say one hundred percent

17      for this, but they're very involved in the

18      Staples-OfficeDepot merger, which is in

19      front of the Federal Trade Commission right

20      now.  So getting any attention from anybody

21      at United Stationers is very difficult.

22          Q.   And I believe that they were not a

23      majority stakeholder in NER Data

24      Corporation.  Correct?

25          A.   They were a minority shareholder.
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

159

1      Q.   Okay.  Were they, were they aware

2   of the sale?

3      A.   Yes.

4             MR. PRIEBE:  Okay.  I have no

5   further questions.

6                  - - -

7                EXAMINATION

8                  - - -

9   BY MR. A. OATWAY:

10     Q.   Okay.  I just have one narrow area

11   to cover, Steve.

12          This is going back to a few hours

13   ago in the deposition.  You recall that

14   Attorney Priebe asked you a question about

15   whether or not you were aware of section

16   3.3(b) of the 2009 agreement at the time

17   that you prepared NER's counterclaims?  Do

18   you remember that question?

19     A.   Yes.

20     Q.   And your answer was that you were

21   not aware.  Do you recall that answer?

22     A.   Yes.

23     Q.   When you answered that question

24   that you were not aware, what was your

25   understanding as to what Attorney Priebe was

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

160

1    referring to when he said section 3.3(b)?

2        A.   I believed Attorney Priebe was

3    referring to the $800,000 annual payments

4    that would trigger additional resources.

5        Q.   Okay.  And, and I'm just going to

6    show you a copy of Exhibit 6, and section

7    3.3(b) is in front of you.

8            Do you see that it has two

9    paragraphs?

10       A.   I do.

11       Q.   Okay.  And is it the second

12   paragraph that refers to the $800,000

13   threshold?

14       A.   Yes.

15       Q.   When he asked you that question,

16   was it your understanding that he was asking

17   about the second paragraph?

18       A.   I was under the impression he was

19   asking me about the second paragraph.

20           MR. A. OATWAY:  Okay.  Now I

21   have no other questions.

22           MR. PRIEBE:  Okay.

23           THE VIDEOGRAPHER:  Hold on,

24   please.  This deposition is now concluded at

25   7:07, tape number 4.

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F. Oatway

161

```
 1                    (Whereupon, discussion was

 2      held off the record.)

 3                    (Discussion held off video

 4      record, at 7:21 p.m.:

 5                    MR. A. OATWAY:  We previously

 6      at the beginning of the depositions

 7      stipulated that all objections as to form

 8      would be preserved until the time of trial.

 9                    We also stipulated that the

10      witness would have 30 days from receipt of

11      the stenographic transcript to review and

12      sign any errata sheet, and that the

13      requirement of a notary would be waived.

14                    MR. PRIEBE:  And that is

15      correct as it applies to the stenographic

16      transcript, obviously not with respect to

17      the video, we're just talking the

18      transcript.

19                    (Whereupon, the deposition

20      concluded at approximately 7:22 p.m.)

21                         - - -

22

23

24

25
```

144343a8-0244-462a-9623-80d764338c8a

IT Portfolio, Inc. v. NER Data Corporation
Stephen F.  Oatway

162

```
 1                   C E R T I F I C A T E

 2

 3

 4

 5        I, CATHERINE T. McLAUGHLIN, Certified

 6   Court Reporter and Notary Public, certify

 7   that the foregoing is a true and accurate

 8   transcript of the testimony as taken

 9   stenographically by and before me at the

10   time, place and on the date herein before

11   set forth.

12        I DO FURTHER CERTIFY that I am neither

13   a relative nor employee nor attorney nor

14   counsel of any of the parties to this

15   action, and that I am neither a relative nor

16   employee of such attorney or counsel, and

17   that I am not financially interested in the

18   action.

19

20                      Catherine T. McLaughlin,

21

22                      Certified Court Reporter

23                      License No. 30XI00186100

24

25
```