IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Daniel D. Domenico**

Civil Action No. 1:15-cv-00179-DDD-STV

IT PORTFOLIO, INC.,

    Plaintiff and Counter Defendant,

v.

NER DATA CORPORATION;
NER DATA PRODUCTS, INC.; and
STEPHEN F. OATWAY,

    Defendants and Counter Claimants.

---

**ORDER GRANTING SECOND MOTION
FOR PARTIAL SUMMARY JUDGMENT**

---

Defendant Stephen F. Oatway, the president and a director of Defendants NER Data Corporation and NER Data Products, Inc. (collectively, "NER"), moves for partial summary judgment with respect to Plaintiff IT Portfolio, Inc.'s derivative claim alleging breach of fiduciary duty. Doc. 232. For the following reasons, the motion is granted.

### BACKGROUND[1]

IT Portfolio is a Colorado corporation doing business in Colorado. NER Data Products is a New Jersey corporation that was based in New Jersey. NER Data Corporation is a Delaware corporation that was based

---

[1] Absent citation to another part of the record, the following facts are drawn from the parties' statements of material fact, Doc. 232 at 3-10; Doc. 235 at 2-5, and are undisputed for purposes of this motion unless otherwise noted.

- 1 -

in New Jersey. Mr. Oatway is an individual who resides in New Jersey and was the president and a director of NER at all relevant times.

In October 2005, IT Portfolio and NER "contracted to combine ITP's Profit software with NER's Printhelpline software into a new product known as Print4." Doc. 213 ¶ 14; Doc. 217 ¶ 14. In February 2010, NER Data Products and IT Portfolio signed a "Software Development and Assignment Agreement" with an effective date of January 1, 2009. Doc. 213-1. That agreement related to software and services in connection with NER's managed print services business. In the agreement, IT Portfolio assigned its Profit software, which had by that point become "irrevocably integrated into the Print4 Software," to NER while reserving the right to market, sell, and distribute the Print4 software in the event that NER "abandoned" it. *See id.* at 2, 7. IT Portfolio alleges that NER failed to pay its obligations under the agreement and brought this lawsuit.

NER Data Corporation was formed in April 2010, and thereafter it operated NER's managed print services business and owned the managed print services assets. From the time of its formation, NER Data Corporation lost money at the rate of approximately $100,000 per month as it was trying to build business. In 2010 or 2011, Hewlett Packard approached NER about purchasing its managed print services business. Although NER and HP entered into a letter of intent, HP ultimately walked away from the deal in the first quarter of 2011.

NER reduced its operating expenses by selling its data center business and improved its contract profitability, and it first turned a profit in January 2015. At that time, it engaged an investment banking firm, Everingham & Kerr, to find potential buyers of its managed print business. The defendants assert that the goal in engaging Everingham & Kerr was "to maximize the value of what was left of the NER DC

business, [and] to shut it down once and for all and to wind down operations." Doc. 232 at 5 (citing Doc. 175-2 at 39-40 (Apr. 4, 2017 Oatway deposition)). IT Portfolio disputes this, noting that "the stated goal in the offering materials produced by Everingham & Kerr was to sell the managed print service business." Doc. 235 at 2 (citing Doc. 235-1 (NER Data Corporation Managed Print Services Division Confidential Business Review prepared by Everingham & Kerr)).

Everingham & Kerr prepared a confidential business review of NER to send out to prospective purchasers who had expressed an interest in buying the managed print business. Doc. 235-1. There were several management calls following the preparation of the confidential business review and at least one site visit by a potential buyer. One potential buyer was a reseller out of New York/New Jersey who used to be called Westwood Computer, and another was in the thermal bar code business and was looking to see whether this would be a good fit for their business. Both prospective inquiries passed and did not make any offer to purchase the business.

In 2015, OfficeMax was NER's largest customer, accounting for approximately 60% of NER's revenues, but that business was declining. Revenues from OfficeMax went from $3,630,000 in 2013 to $1,627,194 in 2015. OfficeMax notified NER that it was cancelling its managed print contract, so the revenues from OfficeMax would be going to zero. NER had engaged Everingham & Kerr prior to receiving the notice that OfficeMax was cancelling its contract, and the notice from OfficeMax came around the same time Everingham & Kerr's was preparing the confidential business review for prospective buyers. By August 2015, when the last contracts for OfficeMax stopped, NER believed that its business was no longer viable.

Facsimile Communications Industries, Inc., which does business as "Atlantic Tomorrow's Office," was also a NER customer. Atlantic had received a copy of the Everingham & Kerr confidential business review in May 2015. Prior to May 2015, Atlantic had no interest in acquiring NER's managed print assets. In August 2015, Mr. Oatway received a call from Atlantic asking him to discuss the relationship and the business. At that time, Atlantic was NER's largest remaining customer. Atlantic was concerned with the profitability of its business that it was running with NER. Atlantic told Mr. Oatway that it did not believe the business was sustainable and that it needed to potentially move its business to another platform. Atlantic made it clear that the current prices it was paying to NER would not continue and that if some other arrangement hadn't been made or couldn't be made, Atlantic would transition from NER's software to something else. Mr. Oatway knew that if NER lost Atlantic's business after the loss of OfficeMax, that would be the end of the company.

In mid to late August 2015, discussions about Atlantic purchasing NER's assets began. There was discussion about Atlantic making an asset purchase of the managed print software so that the Atlantic customers on that platform could be handled by Atlantic if something happened to the NER business. The defendants contend that Mr. Oatway recognized this as a potential opportunity to create value for NER's unsecured creditors, and that in negotiating with Atlantic for the sale of the managed print assets, Mr. Oatway's goal was to get as much value out of the transaction as he could for the unsecured creditors. Doc. 232 at 8 (citing Doc. 175-2 at 22-33, 43). IT Portfolio contends, though, that Mr. Oatway ultimately dissipated NER's assets without satisfying debts owed to creditors, including IT Portfolio. Doc. 235 at 3.

Sometime in September 2015, Atlantic and NER agreed on a purchase price for the sale of the managed print assets. Atlantic formed Atlantic Technology Integrators, LLC ("ATI"), to which the managed print services business would be sold. The agreement to sell the managed print assets from NER to Atlantic/ATI closed on October 31, 2015. From early 2015 when NER engaged Everingham & Kerr to list the managed print business for sale until October 2015 when ATI purchased the assets, NER had suffered more than a 50% reduction in its customer base, and at the time of the sale, NER had between 200-300 unsecured creditors. The purchase price was $150,000 plus 70% of net profit generated in the first year through sales to NER's former customers.

The defendants assert that NER received a fair value from ATI for the managed print assets, and that there were no other entities in the marketplace interested in purchasing NER's assets—not its customer list, the Print4 software, or any combination of them. Doc. 232 at 9 (citing Doc. 175-2 at 43-44, 45). IT Portfolio disputes this and asserts that the defendants "did not properly access the marketplace, did not allow enough time to find a Buyer, did not offer the Print4 platform to logical buyers, and did not market the Print4 platform for sale independent of its failing business." Doc. 235 at 3-4 (citing Doc. 235-2 (affidavit of Lari Masten, CPA); Doc. 235-3 (affidavit of IT Portfolio principal familiar with value of Print4 platform, customers, and logical potential buyers); Doc. 235-4 (affidavit of IT Portfolio principal familiar with Print4 platform capabilities and its value to users); Doc. 235-6 at 144 (Jan. 19, 2016 Oatway deposition, calling NER's sale of assets a "fire sale")). IT Portfolio contends that NER "essentially gave away the Print4 platform" to ATI, and that NER should have returned the platform to IT Portfolio to market and sell pursuant to the abandonment provisions of the Software Development and Assignment Agreement. *Id.*

IT Portfolio brings the following claims: (1) breach of contract against NER; (2) breach of implied contract against NER; (3) unjust enrichment against NER; (4) fraudulent transfer against NER and Mr. Oatway; (5) civil conspiracy against NER and Mr. Oatway; and (6) a derivative claim on behalf of NER Data Corporation for breach of fiduciary duty against Mr. Oatway. *See* Doc. 213 ¶¶ 32-153, 214-65. I previously denied the defendants' motion for summary judgment on IT Portfolio's claims for fraudulent transfer and civil conspiracy and determined that Delaware law applies to the claim for breach of fiduciary duty. Doc. 227. Mr. Oatway now moves for summary judgment on the fiduciary-duty claim. Doc. 232.

## LEGAL STANDARD

A district court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the burden of demonstrating that no genuine dispute of material fact exists. *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008). A fact is material if it could affect the outcome of the suit under the governing law, and a factual dispute is genuine if a rational jury could find for the nonmoving party on the evidence presented. *Id.* If a reasonable juror could not return a verdict for the nonmoving party, summary judgment is proper, and there is no need for a trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In deciding whether the moving party has carried its burden, courts do not weigh the evidence, and instead must view it and draw all reasonable inferences from it in the light most favorable to the nonmoving party. *Adamson*, 514 F.3d at 1145; *Scott v. Harris*, 550 U.S. 372, 378 (2007). But a nonmovant's unsupported conclusory allegations or mere

traces of evidence are not sufficient to demonstrate a genuine factual dispute. *Maxey v. Rest. Concepts II, LLC*, 654 F. Supp. 2d 1284, 1291 (D. Colo. 2009); *Scott*, 550 U.S. at 380 ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."). And "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Because subject-matter jurisdiction in this action is based on diversity of citizenship under 18 U.S.C. § 1332, I must apply Colorado's choice-of-law rules. *Mem'l Hosp. of Laramie County v. Healthcare Realty Tr. Inc.*, 509 F.3d 1225, 1229 (10th Cir. 2007). Applying those rules, I have previously determined that Delaware law governs the fiduciary-duty claim at issue in this motion. Doc. 227 at 10-15. I must therefore apply Delaware's substantive law to the underlying claim and federal law to procedural issues. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Dish Network, LLC*, 17 F.4th 22, 29 (10th Cir. 2021).

## DISCUSSION

As noted above, at issue in this motion is IT Portfolio's claim for breach of fiduciary duty against Mr. Oatway, which is asserted as a derivative claim on behalf of NER Data Corporation. *See* Doc. 213 ¶ 238 ("To the extent Delaware law applies to this claim, the Plaintiff submits this claim as a derivative claim on behalf of NER DC."); Doc. 227 at 14-15 ("Delaware law applies to the claim for breach of fiduciary duty, and this claim must be brought as a derivative claim."). Mr. Oatway contends that this claim must be dismissed because IT Portfolio has failed to comply with Federal Rule of Civil Procedure 23.1, which sets forth

pleading requirements for derivative claims filed in federal court. Doc. 232 at 12-15.

## I. Applicable Law

### A. Derivative Claims Generally

A derivative claim enables a shareholder to bring suit on behalf of a corporation for harm done to the corporation, with any recovery going to the corporation. *Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1262-63 (Del. 2021); *accord In re FairPoint Ins. Coverage Appeals*, 311 A.3d 760, 768 (Del. 2023) ("[A]n equity holder who satisfies certain procedural requirements can bring a suit derivatively on behalf of the entity for harm done to the business entity, with any recovery going to the entity."); 7C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1821 (3d ed.) ("Any relief that is awarded in a [derivative] suit under [Rule 23.1] takes the form of a judgment against defendant that is obtained by the stockholders but runs in favor of the corporation."). In other words, "[t]he derivative form of action permits an individual shareholder to bring suit to enforce a *corporate* cause of action against officers, directors, and third parties." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (internal quotation marks omitted). The purpose of a derivative action is "to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers." *Id.* (internal quotation marks omitted).

Delaware law also provides that "[a]lthough derivative actions are typically brought by equity holders [*i.e.*, shareholders], creditors can step into the shoes of the equity holders and bring derivative claims when a business entity is insolvent." *FairPoint*, 311 A.3d at 768. This is because, while shareholders of a solvent corporation "are the ultimate beneficiaries of the corporation's growth and increased value," when a

corporation is insolvent, "its creditors take the place of the shareholders as the residual beneficiaries of any increase in value." *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-02 (Del. 2007). "[C]reditors of an insolvent corporation have the same incentive to pursue valid derivative claims on its behalf that shareholders have when the corporation is solvent." *Id.* at 102. That is the type of derivative claim that IT Portfolio alleges against Mr. Oatway in this case. *See* Doc. 213 ¶¶ 110, 114-18, 220, 237-65; *see also* Doc. 232 at 11 (for purposes of this motion, Mr. Oatway does not dispute that NER Data Corporation was insolvent at all relevant times).

### B. The Demand Requirement for Derivative Claims

Under Delaware law, "[i]n order for a stockholder to divest [a corporation's] directors of their authority to control [a] litigation asset and bring a derivative action on behalf of the corporation, the stockholder must (1) make a demand on the company's board of directors or (2) show that demand would be futile." *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1047 (Del. 2021) (internal quotation marks omitted). The reason for this requirement is that "directors, rather than shareholders, manage the business and affairs of the corporation," and "[b]y its very nature[,] the derivative action encroaches on the managerial freedom of directors by seeking to deprive the board of control over a corporation's litigation asset." *Id.* (internal quotation marks omitted). The demand requirement "is a substantive requirement that ensures that a stockholder exhausts his intracorporate remedies, provides a safeguard against strike suits, and assures that the stockholder affords the corporation the opportunity to address an alleged wrong without litigation and to control any litigation which does occur." *Id.* (cleaned up).

- 9 -

In this case, IT Portfolio does not allege that it made a demand on the board of NER Data Corporation; it contends that making a demand would be futile. Doc. 213 ¶ 239. Delaware courts hold that making a demand would be futile where a majority of the company's directors have "a connection to the challenged transaction that would render [the board] incapable of impartially considering a litigation demand." *Id.* at 1054. Analysis of demand futility

> provides an important doctrinal check that ensures the board is not improperly deprived of its decision-making authority, while at the same time leaving a path for stockholders to file a derivative action where there is reason to doubt that the board could bring its impartial business judgment to bear on a litigation demand.

*Id.* at 1049. But demand "is not excused lightly." *Id.*

When analyzing demand futility, Delaware courts apply a three-part test, on a director-by-director basis, to assess whether demand should be excused as futile:

(1) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(2) whether the director would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand; and

(3) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that is the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.

*Id.* at 1058. If the answer to any of those questions is "yes" for at least half of the members of the board, then demand is excused. *Id.* at 1058-59 & n.169.

### C. Federal Rule of Civil Procedure 23.1

Mr. Oatway argues that IT Portfolio has failed to comply with two of Federal Rule of Civil Procedure 23.1(b)'s requirements for derivative claims: (1) the requirement that the complaint be verified; and (2) the requirement that the complaint "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Doc. 232 at 12-15.

Rule 23.1(b)(3) thus sets forth a heightened standard for pleading compliance with the demand requirement for derivative claims. But the rule "speaks only to the adequacy of the shareholder representative's pleadings." *Kamen*, 500 U.S. at 96. It "does not *create* a demand requirement of any particular dimension," and the scope and content of any demand requirement is a matter of substantive, not procedural, law. *Id.* at 96-97.

The instant motion is styled as a motion for summary judgment, not a motion to dismiss or for judgment on the pleadings. *See* Doc. 232 at 1, 10-11. And while Mr. Oatway focuses his arguments on the allegations in IT Portfolio's Third Amended Complaint, *see id.* at 13-15, IT Portfolio has responded with evidence to demonstrate that demand would be futile, *see* Doc. 235 at 12-13 (citing Docs. 235-1, 235-6, 235-8). I will therefore decide the motion under Rule 56 rather than confining my analysis to the sufficiency of IT Portfolio's complaint under Rule 23.1. *Cf. Cribari v. Allstate Fire & Cas. Ins. Co.*, 861 F. App'x 693, (10th Cir. 2021) ("Courts, both in this Circuit and in others, regularly decline to entertain Rule 9 [particularity] arguments at the summary judgment stage." (collecting cases)); *see also VGS, Inc. v. Castiel*, No. C.A. 17995, 2003 WL 723285, at *11 to *12 (Del. Ch. Feb. 28, 2003) (granting summary

- 11 -

judgment because plaintiffs failed to establish genuine issue of material fact as to demand futility, without analyzing particularity of pleadings under Del. Ch. R. 23.1).

## II. Discussion

### A. Applicability of Demand Requirement to Derivative Claims Brought by Creditors

As a threshold issue, IT Portfolio raises the question of whether the demand requirement applies when a derivative claim is brought by a creditor rather than a shareholder. This appears to be an open question under Delaware law. *See Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 181-82 (Del. Ch. 2014) (noting that it is "possible that creditors could be required to comply with the doctrines of demand futility and demand excusal" but declining to address the issue); *Prod. Res. Grp., L.L.C. v. NCT Grp., Inc.*, 863 A.2d 772, 795-96 (Del. Ch. 2004) ("[T]here is no Delaware law precisely on point . . . ."); *Metcoff v. Lebovics*, 977 A.2d 285, 295 (Conn. Super. Ct. 2007) ("There are relatively few cases discussing derivative actions instituted by creditors, and there are no Delaware cases delineating the pre-suit requirements for such actions.").

In the absence of Delaware law directly on point, I must make an "*Erie* guess" as to how the Delaware Supreme Court would rule. *FDIC v. Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000). My *Erie* guess is that the Delaware Supreme Court would hold that a creditor bringing a derivative claim must comply with the demand requirement. A creditor bringing a derivative claim against an insolvent corporation "step[s] into the shoes" of a shareholder. *FairPoint*, 311 A.3d at 768. Other courts faced with this question have concluded, and I agree, that "[t]he policies behind the demand requirement for shareholders apply with equal force to creditors—directors are charged with managing a corporation's

affairs and the decision to litigate belongs in their hands, absent special circumstances." *Hildene Opportunities Master Fund, Ltd. v. Holata Micco, LLC*, No. 18 CV 1758, 2019 WL 1125798, at *7 (N.D. Ill. Mar. 12, 2019) (applying Illinois law, which "follows Delaware law on the issue"); *accord Metcoff*, 977 A.2d at 296 ("[T]he pre-suit demand requirement facilitates the balance between the protection of corporate interests through derivative actions and the deference given to corporate directors' managerial discretion . . . ." (applying Delaware law)). "For that reason, the demand requirement applies to derivative actions brought by creditors." *Hildene*, 2019 WL 1125798, at *7; *accord Metcoff*, 977 A.2d at 296 (demand requirement applies to creditor plaintiffs because it is an "integral aspect[] of derivative claims").

### B. Whether IT Portfolio Has Demonstrated a Genuine Dispute of Material Fact as to Demand Futility

Had Mr. Oatway filed a motion to dismiss under Rule 23.1 rather than an answer followed by a motion for summary judgment under Rule 56, I would have concluded that the Third Amended Complaint does not allege particularized facts demonstrating that demand should be excused as futile under Delaware law. And even now given the opportunity to submit evidence in support of its allegations of demand futility, IT Portfolio has failed to demonstrate a genuine dispute of material fact as to whether demand should be excused.

IT Portfolio has pleaded the following:

- Mr. Oatway was the president and director of both NER entities at all relevant times. Doc. 213 ¶¶ 4, 241.
- NER Data Corporation paid Mr. Oatway a salary while it was insolvent. *Id.* ¶¶ 112-14, 243-45.
- While it was insolvent, NER Data Corporation "made transfers of its cash assets to officers, directors, shareholders and affiliates, in

- 13 -

preference to its unpaid creditors," "paid creditors whose debt was guaranteed by the officers, directors and shareholders of NER, in preference to its other creditors," and generally "favored the interests of its officers, directors and shareholders to the interests of its creditors." *Id.* ¶¶ 116-18, 253-55, 261-62.

- The purchase price of the Print4 sale was below the fair market value of the Print4 software. *Id.* ¶ 121.
- Mr. Oatway breached his fiduciary duty while NER Data Corporation was insolvent by (1) paying himself an unreasonably large salary, (2) transferring the managed print services business, including Print4, to Atlantic for less than fair consideration, and (3) otherwise dissipating corporate assets. *Id.* ¶ 248, 251-52, 264.
- Demand for action by NER Data Corporation is futile because "72.5% of NER [Data Corporation], and all of NER [Data Products], are owned by NER Holdings, a corporation controlled by Defendant Stephen Oatway, his father, Frances C[.] Oatway, and his extended family." *Id.* ¶ 239.

And on summary judgment, IT Portfolio has submitted evidence demonstrating that:

- Mr. Oatway's father owns 85% of NER Holdings, which owns 72.5% of NER Data Corporation. Doc. 235-1 at 6, 16.
- Mr. Oatway is the president of NER Data Corporation and NER Data Products and makes decisions for those companies. Doc. 235-6 at 6-7, 103.

IT Portfolio argues that "[t]he decision to bring litigation on behalf of NER would be made by Oatway or his father. Under that governance structure, any expectation that NER would bring this action after demand is nonsensical, and demand futility is a given." Doc. 235 at 12-13.

The test for demand futility, however, "is not whether it appears unlikely on the evidence that the board will respond affirmatively to the demand." *Blasband ex rel. Danaher Corp. v. Rales*, 772 F. Supp. 850, 856 (D. Del. 1991), *vacated on other grounds by* 971 F.2d 1034 (3d Cir. 1992). "Rather, the question is whether directors have the legal capacity to consider the demand disinterestedly." This inquiry requires a determination as to "whether there is a reasonable doubt that [a majority of the] directors [are] capable of objectively making a business decision to assert or not assert a corporate claim against" Mr. Oatway. *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1049-50 (Del. 2004). As noted above, this inquiry requires a director-by-director evaluation of whether each director (1) is interested because he or she either benefitted from the alleged misconduct or faces a substantial likelihood of liability on the claim, or (2) lacks independence from an interested director. *Zuckerberg*, 262 A.3d at 1058.

IT Portfolio has not demonstrated a genuine dispute of material fact as to whether at least half of the members of the board of NER Data Corporation or NER Holdings are interested or lack independence, even assuming that (1) Mr. Oatway is interested because he both benefited from his own misconduct and faces a substantial likelihood of liability on the derivative claim; and (2) Mr. Oatway's father lacks independence due to his familial relationship with Mr. Oatway. The fact that Mr. Oatway's father is the controlling shareholder of both entities is not enough to show a lack of independence by the other board members.

To demonstrate a lack of independence as to a particular director, IT Portfolio must provide evidence "that would support the inference that because of the nature of a relationship or additional circumstances *other than [an] interested director's stock ownership or voting power*, the non-interested director would be more willing to risk his or her

reputation than risk the relationship with the interested director." *Beam*, 845 A.2d at 1052. "[T]he mere fact that a director serves on the board of a corporation with a controlling stockholder does not automatically make that director not independent." *In re Cornerstone Therapeutics Inc, Stockholder Litig.*, 115 A.3d 1173, 1183 (Del. 2015) (citing *Aronson v. Lewis*, 473 A.2d 805, 815 (Del. 1984), *modified on other grounds by Zuckerberg*, 262 A.3d at 1057-59). Even "overwhelming voting control" like that of Mr. Oatway's father, standing alone, "fails to create a reasonable doubt of independence" absent other facts as to "relationships between the directors and the controlling stockholder demonstrating that the directors are beholden to the stockholder." *Beam*, 845 A.2d at 1054 (94% stock ownership insufficient).

A rational factfinder could not find under the governing law on the evidence presented that at least half of the directors of NER Holdings or NER Data Corporation are beholden to Mr. Oatway's father. IT Portfolio has not identified who the directors of these companies are, other than alleging they are Mr. Oatway's "extended family." *See, e.g.*, *Potter v. Hughes*, 546 F.3d 1051, 1057, 1058-59 (9th Cir. 2008) (allegations that directors were dominated by one family that held several seats on the board were not complete and detailed enough to demonstrate lack of independence (applying California law, which "is identical to Delaware law on the demand requirement")); *Dorfman ex rel. MGP Ingredients, Inc. v. Griffin*, No. 20-2239-DDC-JPO, 2021 WL 1209734, at *18 (D. Kan. Mar. 31, 2021) (conclusory allegation that directors were cousins insufficient to rebut presumption of independence (applying Delaware law)). IT Portfolio has not even identified how many directors each company has. The demand-futility analysis "is fact-intensive," *Khanna v. McMinn*, No. Civ.A. 20545-NC, 2006 WL 1388744, at *14 (Del. Ch. 2006) (citing *Beam*, 845 A.2d at 1051), and the summary-judgment

record is missing the facts that might demonstrate a genuine dispute as to demand futility.

## CONCLUSION

It is **ORDERED** that Defendant Stephen Oatway's Second Motion for Partial Summary Judgment on Count IX of the Third Amended Complaint, **Doc. 232**, is **GRANTED**, and Plaintiff IT Portfolio, Inc.'s derivative claim alleging breach of fiduciary duty against Mr. Oatway is **DISMISSED**.

DATED: February 6, 2025          BY THE COURT:

~~Daniel D.~~ Domenico
United States District Judge